# APPENDIX 1
# PART 2

**SUPERIOR COURT OF CALIFORNIA,
COUNTY OF ORANGE
CIVIL COMPLEX CENTER**

**MINUTE ORDER**

DATE: 01/23/2025
 TIME: 10:45:00 AM    DEPT: CX101

JUDICIAL OFFICER PRESIDING: William Claster
CLERK: G. Hernandez
REPORTER/ERM: None
BAILIFF/COURT ATTENDANT: . None

CASE NO: **30-2024-01412019-CU-BC-CXC**   CASE INIT.DATE: 07/05/2024
CASE TITLE: **Core Health & Fitness, LLC vs. Powerbahn, LLC**
CASE CATEGORY: Civil - Unlimited    CASE TYPE: Breach of Contract/Warranty

EVENT ID/DOCUMENT ID: 74474539
**EVENT TYPE:** Chambers Work

**APPEARANCES**

There are no appearances by any party.

Pursuant to the 01/23/2025 telephonic request of attorney Courtney S. Alexander, Defendant Powerbahn's Motion to Seal (ROA #95) set for 02/07/2025 at 09:00 a.m. in Department CX101 is vacated.

Court orders clerk to give notice.

DATE: 01/23/2025
DEPT: CX101

MINUTE ORDER

Page 1

Calendar No.

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE**
Civil Complex Center
751 W. Santa Ana Blvd
Santa Ana, CA 92701

**SHORT TITLE:** Core Health & Fitness, LLC vs. Powerbahn, LLC

| **CLERK'S CERTIFICATE OF MAILING/ELECTRONIC SERVICE** | CASE NUMBER: **30-2024-01412019-CU-BC-CXC** |
|---|---|

I certify that I am not a party to this cause. I certify that that the following document(s), Minute Order dated 01/23/25, was transmitted electronically by an Orange County Superior Court email server on January 23, 2025, at 10:47:25 AM PST. The business mailing address is Orange County Superior Court, 700 Civic Center Dr. W, Santa Ana, California 92701. Pursuant to Code of Civil Procedure section 1013b, I electronically served the document(s) on the persons identified at the email addresses listed below:

BARNES & THORNBURG LLP
AMOJDEHI@BTLAW.COM

BARNES & THORNBURG LLP
AREGO@BTLAW.COM

SML AVVOCATI P. C.
SML@SMLAVVOCATI.COM

Clerk of the Court, by: _____, Deputy

**CLERK'S CERTIFICATE OF MAILING/ELECTRONIC SERVICE**

**SUPERIOR COURT OF CALIFORNIA,
COUNTY OF ORANGE
CIVIL COMPLEX CENTER**

**MINUTE ORDER**

DATE: 01/23/2025          TIME: 10:45:00 AM          DEPT:  CX101

JUDICIAL OFFICER PRESIDING: William Claster
CLERK: G. Hernandez
REPORTER/ERM: None
BAILIFF/COURT ATTENDANT: . None

CASE NO: **30-2024-01412019-CU-BC-CXC**   CASE INIT.DATE: 07/05/2024
CASE TITLE: **Core Health & Fitness, LLC vs. Powerbahn, LLC**
CASE CATEGORY: Civil - Unlimited     CASE TYPE: Breach of Contract/Warranty

EVENT ID/DOCUMENT ID: 74474539
**EVENT TYPE:** Chambers Work

**APPEARANCES**

There are no appearances by any party.

Pursuant to the 01/23/2025 telephonic request of attorney Courtney S. Alexander, Defendant Powerbahn's Motion to Seal (ROA #95) set for 02/07/2025 at 09:00 a.m. in Department CX101 is vacated.

Court orders clerk to give notice.

DATE: 01/23/2025                                                                    Page 1
DEPT:  CX101                          MINUTE ORDER
                                                                          Calendar No.

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE | *FOR COURT USE ONLY* |
|---|---|
| STREET ADDRESS: 751  W. Santa Ana Blvd<br>MAILING ADDRESS: P.O. Box 1994<br>CITY AND ZIP CODE: Santa Ana, CA 92702<br>BRANCH NAME: Civil Complex Center | |

| SHORT TITLE: Core Health & Fitness, LLC vs. Powerbahn, LLC | |
|---|---|

| **NOTICE OF REJECTION OF ELECTRONIC FILING** | CASE NUMBER:<br>30-2024-01412019-CU-BC-CXC |
|---|---|

The electronic filing described by the summary data below was reviewed and rejected by the Superior Court of California, County of Orange

## E-Filing Summary Data

Electronically Submitted By: Core Health & Fitness, LLC
On Behalf of:
Transaction Number:        21593541
Court received Date:        01/24/2025
Court received Time:        03:44:44 PM
Amount not to Exceed:

## Documents Electronically Filed

Association of Attorney

This electronic filing was rejected based on the following reason(s):

**Reject Reason 1:**   Other
Clerk's comments to submitter:
The association of attorney also needs to be signed by the current attorney of record.

## E-Filing Service Provider Information
Name:           OneLegal
Email:           support@onelegal.com
Contact Person:  Customer Support
Phone:           8009388815

E-filing Rejection Notice
Date Printed:   01/27/2025
User ID:        sjuarez

Electronically Filed by Superior Court of California, County of Orange, 01/27/2025 11:42:00 AM.
30-2024-01412019-CU-BC-CXC - ROA # 136 - DAVID H. YAMASAKI, Clerk of the Court By E. emlinguser, Deputy Clerk.

ALI M. MOJDEHI (SBN 123846)
ali.mojdehi@mojdehigalvin.com
ANDREW J. GALVIN (SBN 261925)
andrew.galvin@mojdehigalvin.com
**MOJDEHI GALVIN LLP**
2550 Fifth Ave, Suite 910
San Diego, California 92103
Telephone: (619) 549-4000

ALLISON REGO (SBN 272840)
arego@btlaw.com
**BARNES & THORNBURG LLP**
655 West Broadway, Suite 1300
San Diego, California 92101
Telephone:    (619) 321-5000
Facsimile:    (310) 284-3894

Attorneys for Plaintiff
CORE HEALTH & FITNESS, LLC

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE

| | |
|---|---|
| CORE HEALTH & FITNESS, LLC, a California limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> POWERBAHN, LLC, and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No.  30-2024-01412019-CU-BC-CXC <br><br> **PLAINTIFF CORE HEALTH & FITNESS LLC'S PROTECTIVE RESPONSE IN OPPOSITION TO DEMURRER** <br><br> Date:      February 7, 2025 <br> Time:      9:00 a.m. <br> Dept:      CX101 <br> Judge:    Hon. William D. Claster <br><br> Complaint Filed: July 5, 2024 <br> Trial Date: Note Set |

MOJDEHI GALVIN
LLP
ATTORNEYS AT LAW

41421321.3

1

PROTECTIVE RESPONSE TO DEMURRER

Plaintiff Core Health & Fitness, LLC ("Plaintiff" or "Core") hereby files this Protective Response in Opposition to the Demurrer (ROA 29) filed by Defendant Powerbahn, LLC ("Defendant" or "Powerbahn").

The Demurrer is moot because Plaintiff has filed a First Amended Complaint. As such, the Demurrer should be overruled.

## I.   BRIEF SUMMARY OF RELEVANT CASE HISTORY

Plaintiff filed its Complaint on July 5, 2024, asserting claims against Powerbahn for declaratory relief, accounting and constructive trust. *See* ROA 1. Powerbahn filed its Demurrer to the Complaint on October 14, 2024. *See* ROA 29. After a stipulated continuance (ROA 37) and a temporary stay of the case (ROA 79), hearing was set on the Demurrer for February 7, 2025 (ROA 122). Plaintiff's opposition deadline, thus, is January 27, 2025. *See* Cal. Civ. Proc. Code §1005(b).

## II.   THE DEMURRER MUST BE OVERRULED AS MOOT

Plaintiff filed its First Amended Complaint on January 27, 2025, asserting a claim for breach of contract against Powerbahn. Civil Procedure Code section 472(a) provides, in relevant part, that: "A party may amend its pleading once without leave of the court at any time before the answer, demurrer, or motion to strike is filed, or after a demurrer or motion to strike is filed but before the demurrer or motion to strike is heard if the amended pleading is filed and served no later than the date for filing an opposition to the demurrer or motion to strike." Here, the Demurrer has not been heard and Plaintiff has filed and served its First Amended Complaint by the date for filing its opposition.

An amended "pleading supersedes the original one, which ceases to perform any function as a pleading." *JKC3H8 v. Colton* (2013) 221 Cal. App. 4th 468, 477 (internal quotation omitted). "The amended complaint furnishes the sole basis for the cause of action, and the original complaint ceases to have any effect either as a pleading or as a basis for judgment. Because there is but one complaint in a civil action, the filing of an amended complaint moots a motion directed to a prior complaint." *Id.* Thus, "the filing of an amended complaint renders moot a demurrer to the original complaint." *Id.*; *see also* Weil, et al, CAL. PRAC. GUIDE CIV. PRO. BEFORE TRIAL, AMENDED AND SUPPLEMENTAL PLEADINGS (The Rutter Group 2024) ¶ 6:604.2 ("When plaintiff files an amended

complaint after a demurrer is filed, but before it is decided, the demurrer must be overruled as moot.").

### III.    CONCLUSION

Because Plaintiff has filed a First Amended Complaint, the Demurrer is moot, and Plaintiff accordingly requests that the Court enter an order overruling the Demurrer.

Respectfully submitted,

Dated:  January 27, 2025          **MOJDEHI GALVIN LLP**

By: _____

ALI M. MOJDEHI

Dated:  January 27, 2025          **BARNES & THORNBURG LLP**

By: _____

ALLISON REGO

*Attorneys for CORE HEALTH & FITNESS, LLC*

## PROOF OF SERVICE

**CASE NAME:**     *Core Health & Fitness, LLC v. POWERbahn, LLC, et al.*
**CASE NUMBER:**   30-2024-01412019-CU-BC-CXC

I, the undersigned, am over 18 years of age, employed in the County of San Diego, California, in which the within-mentioned service occurred; and that I am not a party to the subject cause of action. My business address is 2550 Fifth Ave, Suite 910, San Diego, California 92103.

On January 27, 2025, I served the following documents:

**PROTECTIVE RESPONSE IN OPPOSITION TO DEMURRER**

**SEE ATTACHED SERVICE LIST**

☒    **BY ELECTRONIC SERVICE.** I caused a true and correct copy of the document(s) described above to be electronically served on counsel of record at the electronic service addresses listed on the attached service list via email.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 27, 2025

Andrew Galvin
andrew.galvin@mojdehigalvin.com

1

PROOF OF SERVICE

## SERVICE LIST

*Core Health & Fitness, LLC v. POWERbahn, LLC, et al.*
Orange County Superior Court Case No. 30-2024-01412019-CU-BC-CXC

Allison M. Rego
Barnes & Thornburg LLP
arego@btlaw.com
655 West Broadway, Suite 1300
San Diego, California  92101
Telephone:     (619) 321-5000
Facsimile:     (310) 284-3894
*Attorneys for Plaintiff Core Health & Fitness, LLC*

Stephen M. Lobbin, Esq.
SML Avvocati P.C.
888 Prospect Street, Suite 200
San Diego, CA 92037
Email: sml@smlavvocati.com | cmf@smlavvocati.com
*Attorneys for Defendant POWERbahn, LLC*

Cortney Alexander, Esq.
Kent & Risley LLC
5755 N Point Pkwy Ste 57
Alpharetta, GA 30022
Email: cortneyalexander@kentrisley.com
*Attorneys for Defendant POWERbahn, LLC*

2

PROOF OF SERVICE

Electronically Filed by Superior Court of California, County of Orange, 01/27/2025 11:34:00 AM.
30-2024-01412019-CU-BC-CXC - ROA # 138 - DAVID H. YAMASAKI, Clerk of the Court By S. Juarez, Deputy Clerk.

ALI M. MOJDEHI (SBN 123846)
ali.mojdehi@mojdehigalvin.com
ANDREW J. GALVIN (SBN 261925)
andrew.galvin@mojdehigalvin.com
**MOJDEHI GALVIN LLP**
2550 Fifth Ave, Suite 910
San Diego, California 92103
Telephone: (619) 549-4000

ALLISON REGO (SBN 272840)
arego@btlaw.com
**BARNES & THORNBURG LLP**
655 West Broadway, Suite 1300
San Diego, California 92101
Telephone:    (619) 321-5000
Facsimile:    (310) 284-3894

*Attorneys for Core Health & Fitness, LLC*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE

| | |
|---|---|
| CORE HEALTH & FITNESS, LLC, | Case No. 30-2024-01412019-CU-BC-CXC |
| Plaintiff, | **FIRST AMENDED COMPLAINT** |
| v. | Dept: CX101 <br> Judge: Hon. William D. Claster |
| POWERBAHN, LLC, and DOES 1 through 10, inclusive, | Action Filed: July 5, 2024 <br> Trial Date: None Set |
| Defendants. | |

FIRST AMENDED COMPLAINT

Plaintiff, Core Health & Fitness, LLC ("**Core**" or "**Plaintiff**"), by and through its counsel, as and for its First Amended Complaint against Powerbahn LLC, ("**Powerbahn**") and DOES 1 through 10, inclusive (collectively, "**Defendants**"), respectfully alleges on behalf of the Plaintiff as follows:

## INTRODUCTION

1.     Plaintiff is a company that designs, sells, installs and supports high quality commercial fitness equipment and digital solutions for various well-known fitness equipment brands. This action concerns disputes arising from a certain Exclusive License Agreement dated June 29, 2018, and entered into between Plaintiff as licensee, and Powerbahn as licensor, a true and correct copy of which is attached hereto as the **Exhibit "1"** (hereinafter, the "**License Agreement**").

2.     Powerbahn describes itself in litigation pleadings as a company that "researches and develops products and technology concerning, and owns and licenses patents covering, exercise devices and methods that incorporate POWERbahn's proprietary technology, among other things."[1]

3.     The primary purpose of the License Agreement was to provide a framework for the development and sale of a "smart bike." Under the License Agreement, Plaintiff licensed certain patents and related intellectual property relating to electronic control systems for the smart bike from Powerbahn. Plaintiff also provided certain components for the smart bike, primarily the bicycle frame, which were modified by Plaintiff for use with the Powerbahn technology and intellectual property that was licensed to Plaintiff under the License Agreement.

4.     Plaintiff is informed and believes that at or about the time that Powerbahn and Plaintiff entered into the License Agreement, Powerbahn was in need of funding to enable it to continue to maintain ongoing litigation it had brought to enforce the Patents that were to be licensed to Plaintiff under the License Agreement. To that end, as a separate and divisible

---

[1] Powerbahn's website, https://www.powerbahn.com, states "ride into the next generation of fitness equipment and software with POWERbahn™" but contains no other publicly available information.

covenant, the parties also included a provision in the License Agreement whereby Plaintiff would provide Powerbahn with a litigation advance, which was to be used by Powerbahn to fund its litigation in enforcement of the Patents.

5.      Specifically, Powerbahn agreed under Paragraph 5(b)(VII) of the License Agreement to share with Plaintiff 33 percent of all net proceeds from any settlement or awards from third parties resulting from Powerbahn's enforcement of the Patents (as defined in the License Agreement), including "damages, settlement proceeds, or royalties." The License Agreement also requires that Powerbahn cooperate with Plaintiff in connection with "any intellectual property litigation" regarding, *inter alia*, the Patents. As consideration for Plaintiff's receipt of 33 percent of such net litigation proceeds, Plaintiff provided much-needed funding for Powerbahn to maintain ongoing patent litigation, in an amount of at least $320,000.00.

6.      Plaintiff is informed and believes that, in 2018 when the License Agreement was signed, Powerbahn did not have the financial wherewithal to effectively maintain the Patent Infringement Case (defined below), without Plaintiff's provision of funding for such purposes under the License Agreement.

7.      Despite Plaintiff having provided Powerbahn the promised funding in the form of the litigation advance, Powerbahn has refused to cooperate respecting such litigation and has also failed to provide any transparency to Plaintiff regarding actual or potential settlement or awards from third parties resulting from Powerbahn's enforcement of the Patents, defeating Plaintiff's ability to ascertain or recover its rightful 33 percent share of such net proceeds. Moreover, public court records evidence that Powerbahn has, in fact, actually entered into one or more settlements with third-party defendants resulting from Powerbahn's enforcement of the Patents.

8.      Plaintiff is informed and believes that the consideration received by Powerbahn in connection with at least one of these settlements is considerable, amounting to upwards of tens of millions of dollars. Furthermore, Plaintiff is informed and believes that there are more potential settlements and/or other recovery that may be realized prospectively in connection with litigation in the enforcement of the Patents, predicated upon Powerbahn's statements made in court filings that such settlements may be forthcoming.

9.      Plaintiff brings this action seeking damages for its 33 percent share in the net proceeds actually received by Powerbahn to date, and specific performance as to any future net proceeds realized, resulting from all settlement or awards from third parties resulting from Powerbahn's enforcement of the Patents, together with other related relief.

### PARTIES

10.     Powerbahn is a Florida limited liability company, EIN No. 20-1119660, with its principal place of business, mailing address and corporate residence located at 5615 Foret Circle, Reno, Nevada. Powerbahn's Manager is Scott B. Radow.

11.     Plaintiff is a limited liability company incorporated in the State of Nevada. Plaintiff is registered to do business in the State of California under registration No. 201505710643 and operates a place of business in the State of California located at 20 Empire Drive, Lake Forest, CA, 92630. Plaintiff has its principal place of business at 17800 SE Mill Plain Blvd., Suite 190, Vancouver, Washington.

12.     Plaintiff is ignorant of the name(s) of one or more defendant(s), and such are named herein under the fictitious names of "DOES 1 through 10." When such person or persons true name(s) are discovered, the Complaint will be amended accordingly, pursuant to Code. Civ. Proc. §474.

### JURISDICTION AND VENUE

13.     This Court may exercise jurisdiction on any basis not inconsistent with the Constitution of the State of California or of the United States. Code of Civ. Proc. §410.10.

14.     This action arises out of the License Agreement. This Court has personal jurisdiction over Powerbahn in respect to the claims asserted in this action under Code of Civ. Proc. §410.40, pursuant to the following provision contained in the License Agreement: as it pertains to the Agreement and "all matters relating hereto, including any matter or dispute arising out of the Agreement . . . the parties hereto consent to the exclusive jurisdiction of any appropriate court in the State of California to resolve such disputes." License Agreement Para.12(o).

15.     Venue is proper in this Court under Code of Civ. Proc. §395(a) because defendant Powerbahn does not reside in the State of California, and Plaintiff designates Orange County as

MOJDEHI GALVIN LLP
ATTORNEYS AT LAW

3

the "appropriate court" in the State, as Plaintiff is entitled to designate under the License Agreement. Further, Orange County is an appropriate court in the State because Plaintiff has a place of business in Lake Forest, in Orange County, California.

16.     The amount of the dispute is over $35,000.00, as such, the matter is an unlimited civil case.

## GENERAL ALLEGATIONS

### A.  POWERBAHN INITIATES THE PATENT INFRINGEMENT CASE

17.     On June 18, 2015, Powerbahn filed suit in the U.S. District Court in Nevada against Wahoo Fitness, L.L.C. ("**Wahoo**"), Giant Bicycle, Inc. ("**Giant**") and Foundation Fitness LLC ("**Foundation** Fitness") (such action, the "**Patent Infringement Case**"), alleging that the Wahoo KICKR stationary trainer infringed on its patents. Powerbahn sought at least $1 million in lost royalties and penalties from the three companies.

18.     On August 31, 2015, Giant was dismissed from the action, without prejudice, prior to its having answered the complaint.

19.     The amended complaint filed by Powerbahn in the Patent Infringement Case alleged claims for (i) direct infringement of the '865 Patent (defined below), (ii) induced infringement of the '865 Patent, (iii) direct infringement of the '476 Patent (defined below); and (iv) induced infringement of the '476 Patent.

20.     Powerbahn alleged in its amended complaint filed on April 3, 2019, in the Patent Infringement Case that inventor, Scott Radow, developed and patented technology to simulate real-world resistance in a stationary trainer by electronically controlling resistance applied to a flywheel. Powerbahn further alleged that Radow licensed the 865 Patent to Powerbahn, which he manages. Powerbahn further alleged that Powerbahn, in turn, licensed the technology to Nautilus, Inc. from 2005 to 2008.

21.     In the Patent Infringement Case, Powerbahn alleged that a Nautilus executive, Pat Warner ("**Warner**"), took the technology with him when he left Nautilus in 2010.

22.     Powerbahn further alleged in the Patent Infringement Case that Warner later joined Foundation Fitness, LLC., a company that develops and markets gym exercise equipment

MOJDEHI GALVIN LLP
ATTORNEYS AT LAW

4

FIRST AMENDED COMPLAINT

including exercise bikes.

23. In the Patent Infringement Case, Powerbahn alleged that "Warner, a former Nautilus executive, took this knowledge of the rights claimed in the '865 [P]atent—and knowledge of the '865 [P]atent itself—with him to Foundation. Foundation then proceeded to copy the '865 [P]atent and sold or licensed the copy to Wahoo."

24. Powerbahn alleged in the Patent Infringement Case that it is owed "at least a 5 percent royalty on sales of the Kickr to be trebled based on Foundation's willful conduct."

25. The Patent Infringement Case was later moved from Nevada to Georgia's Northern District Court on August 8, 2017, proceeding as Case No. 1:17-cv-02965-AT.

**B. PLAINTIFF AND POWERBAHN ENTER INTO A LICENSE AGREEMENT PROVIDING PLAINTIFF A SHARE IN PROCEEDS FROM THE PATENT INFRINGEMENT CASE**

26. On or about June 29, 2018, Plaintiff, as licensee, and Powerbahn, as licensor, entered into the License Agreement.

27. The License Agreement is governed by California law, excluding any conflicts of law rules that may require application of the laws of any other state or country. License Agreement Paragraph 12(o).

28. Paragraph 12(h)(3) of the License Agreement provides that the following provision "shall govern the interpretation and construction of this Agreement . . . . If any provision of this Agreement as applied to any party or any circumstance shall be adjudged by a court to be unlawful, void, or for any reason unenforceable, *such provision shall be deemed separable from the remainder of this Agreement and the same shall in no way affect the validity or enforceability of any other provision of this Agreement*, the application of such provision to other parties or circumstances, or the validity or enforceability of this Agreement as whole." (emphasis added).

29. The License Agreement is a divisible contract, evidenced by the parties' intent expressed in the severability language of Paragraph 12(h)(3) of the License Agreement.

30. Paragraph 5(b)(VII) of the License Agreement contains the following covenant:

Within two (2) years from the date first listed above in this Agreement and only upon written request from POWERbahn, CORE shall pay up to $300,000 within

MOJDEHI GALVIN LLP
ATTORNEYS AT LAW

5

FIRST AMENDED COMPLAINT

fifteen (15) days from such notification ("**Recoupable Litigation Advance**"). POWERbahn agrees to pay CORE thirty-three percent (33%) of its net proceeds from any settlement or awards from third parties resulting from enforcement of the Patents, including damages, settlement proceeds, or royalties ("Net Litigation Proceeds"). In the event CORE does not receive back the entire Recoupable Litigation Advance from Net Litigation Proceeds, any remaining unpaid portion of the Litigation Advance shall be deemed a pre-payment of future Royalties and Minimum Annual Royalties.

31.     The consideration paid for Plaintiff's receipt of 33 percent of the Net Litigation Proceeds (as defined in Paragraph 5(b)(VII) of the License Agreement) was expressly apportioned apart from the other consideration called for under the License Agreement.

32.     The covenant regarding Plaintiff's receipt of 33 percent of the Net Litigation Proceeds contained in Paragraph 5(b)(VII) of the License Agreement is a divisible or severable covenant.

33.     Powerbahn made a written request to Plaintiff to pay the Recoupable Litigation Advance (as defined in the License Agreement) within two (2) years of the effective date of the License Agreement.

34.     Plaintiff paid the Recoupable Litigation Advance of $300,000.00, to Powerbahn within fifteen (15) days of such written request. In addition, Plaintiff paid Powerbahn an additional amount of no less than $20,000.00 as a Recoupable Litigation Advance, for a total of no less than $320,000.00.

35.     Plaintiff has fully performed all of its obligations under Paragraph 5(b)(VII) of the License Agreement.

36.     Powerbahn is obligated under Paragraph 5(b)(VII) of the License Agreement to pay Plaintiff thirty-three percent (33%) of its net proceeds from any settlement or awards from third parties, including, without limitation, "damages, settlement proceeds or royalties, that result from enforcement" of the Patents, defined in the License Agreement consisting of any of the following United States patents: 7,862,476 (the "**476 Patent**"), 7,066,865 (the "**865 Patent**"), 7.841,964

(the "**'964 Patent**"), 7,608,015 (the "**'015 Patent**"), and 7,833,135 (the "**'135 Patent"),** "together with all patentable material and all U.S. and foreign related patents of importation, patents of confirmation, improvement patents, provisional patents, patents and certificates of addition and utility models, as well as division, reissue, reexamined, continuation, continuation-in-part, applications, renewals and extensions of any of the foregoing" (referred to herein collectively as the "**Patents**").

37.    Plaintiff is informed and believes that Powerbahn utilized the funds that Plaintiff paid to it as a Recoupable Litigation Advance under Paragraph 5(b)(VII) of the License Agreement to fund a portion of its litigation fees and costs in maintaining the Patent Infringement Case.

38.    Plaintiff has otherwise performed all of its payment obligations to Powerbahn, including but not limited to, by rendering full payment to Powerbahn of the Initial recoupable signing bonus, Royalties, and Minimum Annual Royalty Payments due under Paragraph 5 of the License Agreement.

39.    Plaintiff has performed all of its obligations under Paragraph 7 of the License Agreement by promptly delivering to Powerbahn all tangible and intangible embodiments, electronic or hard copy, including all copies, of Powerbahn's Confidential Information upon the termination of the License Agreement.

40.    Plaintiff has otherwise performed all of its other material obligations under the License Agreement.

41.    Powerbahn has no right of offset against Plaintiff arising from the License Agreement.

42.    Powerbahn has not made any payments to Plaintiff on account of Plaintiff's thirty-three percent (33%) share of Net Litigation Proceeds, which term is defined in the License Agreement as the "net proceeds from any settlement or awards from third parties resulting from enforcement of the Patents, including damages, settlement proceeds, or royalties." Paragraph 5(b)(VII) of the License Agreement.

43.    Plaintiff is informed and believes that Powerbahn has received Net Litigation

Proceeds resulting from the enforcement of the Patents, including, but not limited to, by virtue of the enforcement of the Patents in the Patent Infringement Case.

44.    In this litigation, Plaintiff has made written requests to Powerbahn for full disclosure regarding Powerbahn's receipt of Net Litigation Proceeds.

45.    Powerbahn has both failed and refused to provide Plaintiff with any disclosure regarding Powerbahn's receipt of Net Litigation Proceeds.

46.    The covenant of good faith and fair dealing applies to Powerbahn's obligations to Plaintiff under the License Agreement, without limitation, making full disclosure regarding Powerbahn's receipt of Net Litigation Proceeds.

47.    Paragraph 8.d of the License Agreement obligates Powerbahn to reasonably cooperate with Plaintiff in any intellectual property litigation involving the Patents, including, without limitation, making full disclosure to Plaintiff regarding Powerbahn's receipt of Net Litigation Proceeds and potential settlements or awards.

48.    Powerbahn and Plaintiff previously participated in mediation before a neutral in Reno, Nevada, pursuant to the provisions of Paragraph 12.k of the License Agreement, which mediation was not successful.

49.    The License Agreement has terminated.

50.    The License Agreement provides that "[e]xcept as otherwise specifically provided for in this Agreement, the terms and conditions of this Agreement shall survive the expiration or termination of this Agreement to the full extent necessary for their enforcement and for the protection of the party in whose favor they operate."

51.    The provisions of Paragraph 5(b)(VII) of the License Agreement survived the termination of the License Agreement.

52.    The License Agreement provides that the prevailing party in any action brought to enforce the License Agreement shall be entitled to recover all reasonable costs in connection therewith, including reasonable attorneys' fees. License Agreement Paragraph 12.1.

53.    This action is an action brought to enforce the License Agreement.

MOJDEHI GALVIN LLP
ATTORNEYS AT LAW

8

FIRST AMENDED COMPLAINT

## C. POWERBAHN SETTLES WITH CERTAIN DEFENDANTS IN THE PATENT LITIGATION CASE

54.    In light of the parties' announced desire to settle the action, the United States district court presiding in the Patent Infringement Case administratively closed the action on June 28, 2022, provided that in the event a settlement was not consummated, any party may move to reopen the action.

55.    On or about April 2023, Wahoo Fitness reached a written settlement agreement with Powerbahn regarding the allegations in the complaint filed in the Patent Infringement Case that its Kickr trainer infringed on Powerbahn's patent, with each side paying its own legal costs (the "**Wahoo Fitness Settlement**"). On April 5, 2023, Powerbahn and Wahoo Fitness filed a joint status report stating that they were "pleased to report that they have executed final agreements to resolve all issues between them and expect to file a stipulation of dismissal of claims and counterclaims" between them within 15 days. A copy of the Joint Status Report is attached hereto as **Exhibit "2"**. Wahoo Fitness and Powerbahn thereafter stipulated to the dismissal of claims between them on April 8, 2023. A copy of the stipulation for dismissal between Powerbahn and Wahoo Fitness is attached hereto as **Exhibit "3"**.

56.    The terms of the Wahoo Fitness Settlement, including the settlement consideration paid or payable to Powerbahn (including damages, settlement proceeds, or royalties) is not known to Plaintiff.

57.    At the time that the Wahoo Fitness Settlement was reached, Powerbahn also told the district court it was close to a settlement with Foundation Fitness and Warner. Powerbahn said both sides had conceptually agreed to a settlement, but that Foundation Fitness now wanted to negotiate about a new model it introduced, a certain SB20 product, after the case's discovery period had concluded.

58.    On May 8, 2024, Powerbahn filed a motion in the district court seeking to reopen the action and to file an amended complaint in order to also pursue its infringement claims under the '476 Patent against Foundation Fitness and Warner relating to Foundation Fitness' SB20 product.

MOJDEHI GALVIN LLP
ATTORNEYS AT LAW

FIRST AMENDED COMPLAINT

59. The '476 Patent is within the scope of the Patents and is subject to the provisions of Paragraph 5(b)(VII) of the License Agreement.

60. In Powerbahn's reply in support of its motion to file an amended complaint, Powerbahn also states that "Warner remains connected to the case even with his apparent new employer. Public information indicates that Warner now works for Giant Bicycle, which was initially a party in this case due to its manufacture of the Wahoo KICKR products."

61. On July 30, 3034, Powerbahn, Foundation Fitness and Warner filed a joint response requesting dismissal, stating, among other things, that "[a]s the Court noted in its July 18 Order, the dismissal of Powerbahn's claims against Foundation and Warner relating to Wahoo's KICKR production does not preclude Powerbahn from filing suit against Foundation and/or Warner for infringement in connection with the SB20 product." On August 6, 2024, the court entered an order terminating the case.

62. Plaintiff is informed and believes that additional Net Litigation Proceeds may be realized by Powerbahn as a result of the '476 Patent, of which Plaintiff is entitled to receive 33 percent.

**FIRST CLAIM FOR RELIEF**
**Breach of Contract**
**(Against All Defendants)**

63. Plaintiff realleges and incorporates by reference in this claim for relief Paragraphs 1 through 62 of this Complaint as though fully set forth herein.

64. Plaintiff and Defendant entered into the License Agreement. The License Agreement is a valid contract between Plaintiff and Powerbahn.

65. The License Agreement is a divisible or severable contract. Paragraph 5(b)(VII) of the License Agreement is a divisible and severable covenant.

66. All conditions that must occur before Powerbahn was required to perform under Paragraph 5(b)(VII) of the License Agreement were met.

67. Plaintiff did all, or substantially all, of the significant things that Paragraph 5(b)(VII) of the License Agreement required it to do.

68.    Powerbahn is obligated under the License Agreement to share with Plaintiff thirty-three percent (33%) of Powerbahn's "net proceeds from any settlement or awards from third parties resulting from enforcement of the Patents, including, without limitation, all damages, settlement proceeds, or royalties" that have been received or may be received as a result of the Wahoo Fitness Settlement.

69.    Powerbahn is obligated to share with Plaintiff thirty-three percent (33%) of Powerbahn's "net proceeds from any settlement or awards from third parties resulting from enforcement of the Patents, including, without limitation, all damages, settlement proceeds, or royalties" it has or may receive, past, present or future, as a result of any other action relating to the enforcement of the Patents.

70.    Paragraph 5(b)(VII) of the License Agreement survived the termination of the License Agreement.

71.    Paragraph 8.d of the License Agreement or, in the alternative, the covenant of good faith and fair dealing, obligates Powerbahn to make full disclosure to Plaintiff and to render a full accounting of any and all "net proceeds from any settlement or awards from third parties resulting from enforcement of the Patents, including damages, settlement proceeds, or royalties."

72.    Plaintiff has otherwise performed all of its payment obligations to Powerbahn, including but not limited to, by rendering full payment to Powerbahn of the "Initial recoupable signing bonus" [*sic*], Royalties, and Minimum Annual Royalty Payments due under Paragraph 5 of the License Agreement.

73.    Plaintiff has performed all of its obligations under Paragraph 7 of the License Agreement by promptly delivering to Powerbahn all tangible and intangible embodiments, electronic or hard copy, including all copies, of Powerbahn's Confidential Information (as defined in the License Agreement) upon the termination of the License Agreement.

74.    Plaintiff has otherwise done all, or substantially all, of the significant things the License Agreement required it to do or was excused from having to do so.

75.    Powerbahn has received Net Litigation Proceeds and may receive future Net Litigation Proceeds as a result of the Patent Infringement Case and/or any other action brought to

MOJDEHI GALVIN LLP
ATTORNEYS AT LAW

11

FIRST AMENDED COMPLAINT

enforce the Patents.

76. Powerbahn has breached and is continuing to breach its obligations under the License Agreement including by failing to pay Plaintiff its thirty-three percent (33%) share of Net Litigation Proceeds, which term is defined in the License Agreement as the "net proceeds from any settlement or awards from third parties resulting from enforcement of the Patents, including damages, settlement proceeds, or royalties."

77. Powerbahn has breached and is continuing to breach its obligations under the License Agreement including by failing to make full disclosure to Plaintiff and to render a full accounting of any and all "net proceeds from any settlement or awards from third parties resulting from enforcement of the Patents, including damages, settlement proceeds, or royalties."

78. As a direct and proximate result of Powerbahn's breaches, Plaintiff has been damaged in an amount according to proof at trial.

79. In addition to damages for Plaintiff's 33% share of the Net Litigation Proceeds Powerbahn has obtained and failed to pay to Plaintiff, Plaintiff is entitled to specific performance by Powerbahn of its obligation under Paragraph 5(b)(VII) of the License Agreement to pay Plaintiff 33% of any Net Litigation Proceeds it obtains in the future. Plaintiff is not seeking both specific performance and damages for the same breach of the License Agreement. Plaintiff is seeking specific performance as to future amounts due to Plaintiff under Paragraph 5(b)(VII) of the License Agreement. "[S]pecific performance is preferred over the inadequate remedy of repetitive future damages actions." *Union Oil Co. of California v. Greka Energy Corp.* (2008) 165 Cal.App. 4th 129, 136.

80. Powerbahn's breach of the License Agreement is a substantial factor in causing Plaintiff's harm, including by failing to pay Plaintiff the share of Net Litigation Proceeds due to Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1. For damages in an amount according to proof;

2. For an order that Powerbahn specifically perform its obligation under Paragraph

MOJDEHI GALVIN LLP
ATTORNEYS AT LAW

12

FIRST AMENDED COMPLAINT

5(b)(VII) of the License Agreement to pay Plaintiff 33% of any Net Litigation Proceeds it obtains;

3.    For prejudgment and post judgment interest, attorneys' fees, costs of suit, collection costs thereafter, and all other amounts allowed by law;

4.    For such other and further relief as the Court deems just and proper.

Dated:  January 27, 2025              **MOJDEHI GALVIN LLP**

By: _____

ALI M. MOJDEHI

Dated:  January 27, 2025              **BARNES & THORNBURG LLP**

By: _____

ALLISON REGO

*Attorneys for CORE HEALTH & FITNESS, LLC*

## PROOF OF SERVICE

**CASE NAME:**     *Core Health & Fitness, LLC v. POWERbahn, LLC, et al.*
**CASE NUMBER:**   30-2024-01412019-CU-BC-CXC

I, the undersigned, am over 18 years of age, employed in the County of San Diego, California, in which the within-mentioned service occurred; and that I am not a party to the subject cause of action. My business address is 2550 Fifth Ave, Suite 910, San Diego, California 92103.

On January 27, 2025, I served the following documents:

### FIRST AMENDED COMPLAINT

### SEE ATTACHED SERVICE LIST

☒     **BY ELECTRONIC SERVICE.** I caused a true and correct copy of the document(s) described above to be electronically served on counsel of record at the electronic service addresses listed on the attached service list via email.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 27, 2025

Andrew Galvin
andrew.galvin@mojdehigalvin.com

1

PROOF OF SERVICE

## <u>SERVICE LIST</u>

*Core Health & Fitness, LLC v. POWERbahn, LLC, et al.*
Orange County Superior Court Case No. 30-2024-01412019-CU-BC-CXC

Allison M. Rego
Barnes & Thornburg LLP
arego@btlaw.com
655 West Broadway, Suite 1300
San Diego, California  92101
Telephone:      (619) 321-5000
Facsimile:      (310) 284-3894
*Attorneys for Plaintiff Core Health & Fitness, LLC*

Stephen M. Lobbin, Esq.
SML Avvocati P.C.
888 Prospect Street, Suite 200
San Diego, CA 92037
Email: sml@smlavvocati.com | cmf@smlavvocati.com
*Attorneys for Defendant POWERbahn, LLC*

Cortney Alexander, Esq.
Kent & Risley LLC
5755 N Point Pkwy Ste 57
Alpharetta, GA 30022
Email: cortneyalexander@kentrisley.com
*Attorneys for Defendant POWERbahn, LLC*

2
PROOF OF SERVICE

Electronically Filed by Superior Court of California, County of Orange, 01/27/2025 11:31:00 AM.
30-2024-01412019-CU-BC-CXC - ROA # 140 - DAVID H. YAMASAKI, Clerk of the Court By S. Juarez, Deputy Clerk.

ALI M. MOJDEHI (SBN 123846)
ali.mojdehi@mojdehigalvin.com
ANDREW J. GALVIN (SBN 261925)
andrew.galvin@mojdehigalvin.com
**MOJDEHI GALVIN LLP**
2550 Fifth Ave, Suite 910
San Diego, California 92103
Telephone: (619) 549-4000


ALLISON REGO (SBN 272840)
arego@btlaw.com
**BARNES & THORNBURG LLP**
655 West Broadway, Suite 1300
San Diego, California 92101
Telephone:      (619) 321-5000
Facsimile:      (310) 284-3894

*Attorneys for Core Health & Fitness, LLC*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ORANGE

| | |
|---|---|
| CORE HEALTH & FITNESS, LLC, | Case No. 30-2024-01412019-CU-BC-CXC |
| Plaintiff, | **NOTICE OF ASSOCIATION OF COUNSEL** |
| v. | |
| POWERBAHN, LLC, and DOES 1 through 10, inclusive, | Complaint Filed: July 5, 2024 |
| Defendants. | Trial Date: Not Set |

MOJDEHI GALVIN LLP
ATTORNEYS AT LAW

1

NOTICE OF ASSOCIATION OF COUNSEL

**TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

Please take notice that Ali M. Mojdehi and Andrew J. Galvin of Mojdehi Galvin LLP, who are permitted to practice in this Court, hereby appear as counsel of record on behalf of Plaintiff Core Health & Fitness, LLC. Effective immediately, please add Ali M. Mojdehi and Andrew J. Galvin as attorneys to be noticed on all matters at the following address:

Ali M. Mojdehi
ali.mojdehi@mojdehigalvin.com
Mojdehi Galvin LLP
2550 Fifth Avenue, Suite 910
San Diego, CA 92103
Telephone: (619) 549-4000

Andrew J. Galvin
andrew.galvin@mojdehigalvin.com
Mojdehi Galvin LLP
2550 Fifth Avenue, Suite 910
San Diego, CA 92103
Telephone: (858) 401-3670

Dated: January 27, 2025

**MOJDEHI GALVIN LLP**

By: _____

ALI M. MOJDEHI

Dated: January 27, 2025

**BARNES & THORNBURG LLP**

By: _____

ALLISON REGO

*Attorneys for CORE HEALTH & FITNESS, LLC*

2

NOTICE OF ASSOCIATION OF COUNSEL

## PROOF OF SERVICE

**CASE NAME:**        *Core Health & Fitness, LLC v. POWERbahn, LLC, et al.*
**CASE NUMBER:**     30-2024-01412019-CU-BC-CXC

I, the undersigned, am over 18 years of age, employed in the County of San Diego, California, in which the within-mentioned service occurred; and that I am not a party to the subject cause of action. My business address is 2550 Fifth Ave, Suite 910, San Diego, California 92103.

On January 27, 2025, I served the following documents:

### NOTICE OF ASSOCIATION OF COUNSEL

### SEE ATTACHED SERVICE LIST

☒    **BY ELECTRONIC SERVICE.** I caused a true and correct copy of the document(s) described above to be electronically served on counsel of record at the electronic service addresses listed on the attached service list via email.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 27, 2025

Andrew Galvin
andrew.galvin@mojdehigalvin.com

1

PROOF OF SERVICE

**SERVICE LIST**

*Core Health & Fitness, LLC v. POWERbahn, LLC, et al.*
Orange County Superior Court Case No. 30-2024-01412019-CU-BC-CXC

Allison M. Rego
Barnes & Thornburg LLP
arego@btlaw.com
655 West Broadway, Suite 1300
San Diego, California  92101
Telephone:     (619) 321-5000
Facsimile:      (310) 284-3894
*Attorneys for Plaintiff Core Health & Fitness, LLC*

Stephen M. Lobbin, Esq.
SML Avvocati P.C.
888 Prospect Street, Suite 200
San Diego, CA 92037
Email: sml@smlavvocati.com | cmf@smlavvocati.com
*Attorneys for Defendant POWERbahn, LLC*

Cortney Alexander, Esq.
Kent & Risley LLC
5755 N Point Pkwy Ste 57
Alpharetta, GA 30022
Email: cortneyalexander@kentrisley.com
*Attorneys for Defendant POWERbahn, LLC*

PROOF OF SERVICE

**MOJDEHI GALVIN LLP**
Ali M. Mojdehi (SBN 123846)
ali.mojdehi@mojdehigalvin.com
Andrew J. Galvin (SBN 261925)
andrew.galvin@mojdehigalvin.com
2550 Fifth Avenue, Suite 910
San Diego, CA 92013
Telephone: (619) 549-4000

**BARNES & THORNBURG LLP**
Allison M. Rego (SBN 272840)
arego@btlaw.com
655 West Broadway, Suite 1300
San Diego, California 92101
Telephone: (619) 321-5000

Attorneys for Plaintiff
CORE HEALTH & FITNESS, LLC

Stephen M. Lobbin
SML Avvocati P.C.
888 Prospect Street, Suite 200
San Diego, CAL 92037
Tel: 949.636.1391
Email: sml@smlavvocati.com

Cortney S. Alexander (admitted pro hac vice)
Email: cortneyalexander@kentrisley.com
Tel: 404.855.3867
Kent & Risley LLC
5755 N Point Pkwy, Ste 57
Alpharetta, GA 30022

Attorneys for Defendant POWERbahn, LLC

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE

| | |
|---|---|
| CORE HEALTH & FITNESS, LLC, a California limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>POWERBAHN, LLC, and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 30-2024-01412019-CU-BC-CXC<br><br>**JOINT CASE MANAGEMENT CONFERENCE REPORT**<br><br>Date: February 7, 2025<br>Time: 9:00 a.m.<br>Dept: CX101<br>Judge: Hon. William D. Claster<br><br>Complaint Filed: July 5, 2024<br>Trial Date: None Set |

41421321.3

JOINT CASE MANAGEMENT CONFERENCE REPORT

Pursuant to the Court's Minute Order dated August 19, 2024 (*see* ROA 14), the parties hereby submit the following Joint Case Management Conference Report.

## I.      List All Parties and Counsel

*List of Parties*:

- Core Health & Fitness, LLC ("Plaintiff" or "Core")
- POWERbahn, LLC ("Defendant" or "Powerbahn")

*List of Counsel*:

- For Plaintiff, Ali M. Mojdehi and Andrew J. Galvin of Mojdehi Galvin LLP and Allison M. Rego of Barnes & Thornburg LLP
- For Defendant, Stephen M. Lobbin of SML Avvocati P.C. and Cortney S. Alexander of Kent & Risley LLC

## II.      Statement as to Whether Additional Parties are Likely to be Added a Proposed Date by Which all Parties Must be Served

**Plaintiff's Position:**

Plaintiff is not presently aware of any additional parties, but reserves the right to seek to add additional parties, including anyone Plaintiff may discover improperly received Net Litigation Proceeds (as discussed further below) that should have been paid to Plaintiff. Plaintiff proposes that no new parties may be added without leave of court and all unserved, non-appearing and fictitiously named parties are dismissed at the Trial Readiness Conference.

**Defendant's Position:**

Defendant believes that any attempt to add a party should be evaluated under the applicable laws and rules.

## III.      Outline of the Claims and Cross-Claims and the Parties Against Whom each Claim is Asserted

**Plaintiff's Position:**

Core's initial Complaint (ROA 1) asserted claims for declaratory relief, accounting and constructive trust against Powerbahn relating to the Exclusive License Agreement dated June 29, 2018, and entered into between Core as licensee, and Powerbahn as licensor (the "License Agreement"). On January 27, 2025, Core filed a First Amended Complaint ("FAC") asserting a

1

claim for breach of the License Agreement against Powerbahn.  More particularly, the FAC alleges that under the License Agreement Powerbahn is required to pay Core 33% of all net proceeds from any settlement or awards from third parties resulting from Powerbahn's enforcement of the Patents (as defined in the License Agreement), including damages, settlement proceeds, or royalties. *See* FAC, ¶5. As separate and severable consideration for Core's receipt of 33 percent of such net litigation proceeds, Core provided funding for Powerbahn to maintain ongoing patent litigation, in an amount of at least $320,000.00. *Id.*, ¶¶5, 31-34. The FAC further alleges that Powerbahn has received net proceeds, and may receive net proceeds in the future, as to which Powerbahn refuses to pay Core its share and that Powerbahn breached its obligation to make full disclosure to Core of the net proceeds it has received. *See id.*, ¶¶42-47. Core seeks damages for its 33% share of the Net Litigation Proceeds Powerbahn has obtained but failed to pay to Core and seeks specific performance by Powerbahn of its obligation under Paragraph 5(b)(VII) of the License Agreement to pay Plaintiff 33% of any Net Litigation Proceeds it obtains in the future.

Core disputes Powerbahn's assertions and will respond accordingly at the appropriate time.

**Defendant's Position:**

Plaintiff filed its amended complaint earlier this week on January 27, 2025, and Defendant is reviewing the complaint and will respond at the appropriate time, whether by answer, demurrer, and/or presenting cross-claims against Plaintiff.

Plaintiff Core Health & Fitness, LLC entered into an agreement with Defendant POWERbahn, LLC on June 29, 2018. Dkt. 1, Ex. 1, 1. Under that agreement, POWERbahn granted Core an exclusive license to certain intellectual property, including patents, for exploitation in connection with certain commercial exercise equipment (e.g., equipment for use in gyms, hotels and the like). *Id.* at 1- 3, 8. While Core focuses on its obligation to pay POWERbahn a Recoupable Litigation Advance, the agreement placed several other material obligations on Core that are either not referenced or only tangentially referenced by Core. Those obligations included, for example, that Core (1) make commercially reasonable efforts to promote, market, and sell licensed products (*id.* at § 4(e)); (2) exclusively purchase from POWERbahn certain Technology Components, including minimum annual purchase requirements of 2,000 per year (*id.* at § 3(a), (e)); (3) pay

2

royalties to POWERbahn, including certain minimum annual royalty payments (*id.* at § 5(a), (b)); (4) sell POWERbahn indoor cycle frames and related hardware components at its most competitive OEM cost to allow POWERbahn to sell a non-commercial product (*id.* at § 3(g)); and (5) execute a Commercial Dealer-Distributor Agreement allowing POWERbahn to operate as a dealer, distributor, and/or franchisor for Core's products (*id.* at § 3(g)).

While Core had provided the Recoupable Litigation Advance of $300,000 (not $320,000, as Core alleges), that amount alone was insufficient to fund a patent litigation in federal court. Thus, POWERbahn was counting on the revenue it expected and had bargained for under the ELA to continue its lawsuit on the patents exclusively licensed to Core. Core, however, did not live up to its obligations, including failing to make reasonable efforts to sell Licensed Products, pay minimum royalties in full, sell POWERbahn indoor cycle frames, or to purchase Technology Components from POWERbahn. These failures caused a great deal of harm to POWERbahn, which was deep in litigation with Core's competitor Foundation Fitness LLC (as well as Wahoo Fitness, LLC), asserting infringement of patents exclusively licensed to Core for the commercial market.

POWERbahn asked Core to cure its breaches in early 2020, but Core refused. POWERbahn therefore terminated the agreement in 2020 (after the cure period specified in the ELA) due to Core's failure to live up to its material obligations under the agreement and thereby causing a great deal of damage and hardship to POWERbahn. The parties subsequently conducted a mediation in 2020 in an effort to resolve Core's breaches, but that effort was unsuccessful. Core's original complaint also wrongly implied that it made written requests to POWERbahn for full disclosure regarding its receipt of Net Litigation Proceeds after the Wahoo settlement. That is false.

POWERbahn disagrees with Core's assertion that the litigation-funding provisions were divisible from the remainder of the ELA, including Core's obligations discussed above. This is evidenced, for one example, by the fact that, under certain circumstances, Core would be able to deem the Recoupable Litigation Advance a pre-payment of future Royalties and Minimum Annual Royalties. Thus, especially in view of Core's material breaches of multiple obligations under the ELA, POWERbahn denies that Core is entitled to any share in the Net Litigation Proceeds. Moreover, POWERbahn intends to present cross-claims for damages it suffered as a result of

3

Core's conduct, including without limitation claims for breach of contract.

IV.    **Service Lists and Procedures for Efficient Service**

The parties have agreed to accept service electronically via email to their counsel of record. The current service list is as follows:

Ali M. Mojdehi
Andrew J. Galvin
MOJDEHI GALVIN LLP
2550 Fifth Avenue, Suite 910
San Diego, CA 92013
Telephone: (619) 549-4000
Email: ali.mojdehi@mojdehigalvin.com
          andrew.galvin@mojdehigalvin.com

Allison M. Rego
Barnes & Thornburg LLP
655 West Broadway, Suite 1300
San Diego, California  92101
Telephone:    (619) 321-5000
Facsimile:    (310) 284-3894
Email: arego@btlaw.com

Attorneys for Plaintiff Core Health & Fitness, LLC

Stephen M. Lobbin, Esq.
SML Avvocati P.C.
888 Prospect Street, Suite 200
San Diego, CA 92037
Email: sml@smlavvocati.com | cmf@smlavvocati.com

Cortney Alexander, Esq.
Kent & Risley LLC
5755 N Point Pkwy Ste 57
Alpharetta, GA 30022
Email: cortneyalexander@kentrisley.com

Attorneys for Defendant POWERbahn, LLC

V.    **Whether any Issues of Jurisdiction or Venue Exist that Might Affect this Court's Ability to Proceed with this Case**

**Plaintiff's Position:**

Plaintiff is not aware of any issues of jurisdiction or venue that might affect this Court's ability to proceed with this case.

Defendant is in the process of obtaining discovery with respect to Plaintiff's citizenship for purposes of diversity jurisdiction to determine whether Defendant may seek to remove this case to federal court.

4

**Defendant's Position:**

As Plaintiff notes, POWERbahn has served discovery on Defendant and its ownership seeking identification of Defendant's citizenship. Due to Plaintiff's representation to the Court that it has been unable to obtain the information from its ownership necessary to identify its citizenship, Defendant has served (at significant expense) third-party subpoenas for documents and depositions in Delaware on Plaintiff's ownership. Defendant's counsel has since had a conversation with counsel representing some or all of Defendant's ownership and understands that the counsel is working to provide the necessary information to identify Plaintiff's citizenship in the hope of avoiding depositions.

### VI.    Applicability and Enforceability of Arbitration Clauses

There is no arbitration clause in the contract to which the FAC relates.

### VII.    List of All Related Litigation Pending in Other Courts, a Brief Description of any such Litigation, and a Statement as to Whether any Additional Related Litigation is Anticipated

There is no related litigation pending in other courts and none is presently anticipated.[1]

The parties note that Defendant has instituted actions in Delaware to domesticate certain subpoenas directed to third parties.

### VIII.    Description of Core Factual and Legal Issues

**Plaintiff's Position:**

In Plaintiff's view, a core factual issue with respect to its FAC is the amount and other details relating to proceeds from enforcement of the Patents (as defined in the License Agreement) that Powerbahn has received and anticipates receiving, which information is uniquely in Powerbahn's possession. Plaintiff has propounded document requests on this issue on September 9, 2024. As a result of an informal discovery conference, and case deadlines being reset after lifting

---

[1] Pursuant to CRC, Rule 3.300 a "pending civil case is related to another pending civil case, or to a civil case that was dismissed with or without prejudice, or to a civil case that was disposed of by judgment, if the cases: (1) Involve the same parties and are based on the same or similar claims; (2) Arise from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact; (3) Involve claims against, title to, possession of, or damages to the same property; or (4) Are likely for other reasons to require substantial duplication of judicial resources if heard by different judges."

5

of the temporary stay, Powerbahn is to produce documents by February 7, 2025. Plaintiff proposed a form stipulated protective order to counsel for Defendant on November 7, 2024 and responded to Defendant's proposed edits on November 29, 2024, but Defendant has not agreed to the terms of a protective order. The parties conferred regarding outstanding issues with respect to the protective order on January 31, 2025 and expect to follow up by February 3. Plaintiff's view is that Powerbahn is nonetheless required to produce documents on February 7. Additionally, as asserted in the FAC, Paragraph 5(b)(VII) of the License Agreement, which requires Powerbahn to pay Core 33% of all Net Litigation Proceeds (as defined in the License Agreement), is a divisible and severable covenant. "Where a contract imposes on a party multiple duties that are *divisible . . .* a breach of each divisible duty gives rise to a separate breach-of-contract claim . . . ." *Piedmont Cap. Mgmt., L.L.C. v. McElfish* (2023) 94 Cal. App. 5th 961, 964. It is undisputed that Core paid Powerbahn the $300,000 "Recoupable Litigation Advance" required under Paragraph 5(b)(VII) of the License Agreement. As such, Core has fully performed.

As noted above, Core disputes Powerbahn's assertions and will respond accordingly at the appropriate time.

**Defendant's Position:**

As Defendant discussed above, Defendant disagrees that Plaintiff's obligations to Defendant under the ELA were divisible from the litigation-funding provisions. Defendant believes that core factual and legal issues include, for example, Plaintiff's breaches of the ELA and resulting damage to Defendant, which led to the termination of the ELA.

Defendant provided edits to Plaintiff's proposed protective order in November 2024, thereby providing a counterproposal with terms of a protective order to which it agreed. Plaintiff accepted some of Defendant's edits and rejected others. The parties conferred regarding the outstanding issues on January 31, 2025, and have agreed to exchange proposed compromises on certain issues.

6

**IX.    Description of Legal Issues that, if Decided by the Court, May Simplify or Further Resolution of the Case**

**Plaintiff's Position:**

Plaintiff believes that the Court can determine as a matter of law, based on the License Agreement, that Paragraph 5(b)(VII) is a divisible and severable covenant.

**Defendant's Position:**

While the interpretation of the ELA is important to this dispute, Defendant believes it is too early in the case (before meaningful discovery has occurred) for the Court to consider determining as a matter of law whether the ELA is a divisible and severable covenant. (As discussed above, Defendant disputes Plaintiff's assertion.) For example, to the extent the interpretation of the ELA turns upon questions of credibility of extrinsic evidence (e.g., evidence regarding the parties' intent), the interpretation of the ELA could potentially involve triable issues of fact.

Additional issues that the Court may determine as a matter of law include the nature of Plaintiff's obligations to Defendant, including its obligation to (1) make commercially reasonable efforts to promote, market, and sell licensed products; (2) exclusively purchase from POWERbahn certain technology components, including minimum annual purchase requirements; (3) pay royalties to POWERbahn, including certain minimum annual royalty payments; (4) sell POWERbahn indoor cycle frames and related hardware components at its most competitive OEM cost to allow POWERbahn to sell a non-commercial product; and (5) execute a Commercial Dealer-Distributor Agreement allowing POWERbahn to operate as a dealer, distributor, and/or franchisor for Core's products.

**X.    Whether Discovery Should be Conducted in Phases or Limited; and if so, the Order of Phasing or Types of Limitations on Discovery**

**Plaintiff's Position:**

Plaintiff does not believe that discovery should be conducted in phases or limited. Plaintiff disputes Defendant's characterization of Plaintiff's discovery response to date as Plaintiff made a reasonable and good faith effort to respond to the interrogatory propounded to it with respect to citizenship in accordance with relevant statutory authority.

7

**Defendant's Position:**

Defendant believes that Plaintiff should identify its citizenship so that Defendant may evaluate potential removal to federal court before substantive discovery occurs. The recent conversations between Defendant's counsel and counsel for Plaintiff's ownership suggests that Plaintiff could have provided this information much earlier in the litigation.

XI.    **Whether Particular Documents and Witness Information can be Exchanged by Agreement of the Parties**

The Parties have already initiated formal document discovery.

The Parties agree to exchange the name and, if known, the address and telephone number of each individual likely to have discoverable information, along with the subjects of that information, that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment, based upon information that is reasonably available to it at that time, by no later than March 14, 2025.

XII.    **The Parties Tentative Views on an ADR Mechanism and how such Mechanism Might be Integrated into the Course of the Litigation**

**Plaintiff's Position:**

The parties participated in a formal mediation before Plaintiff commenced this suit. In Plaintiff's tentative view, Plaintiff would consider participation in an additional mediation after completion of preliminary discovery in the case. Plaintiff contests Defendant's characterizations below, particularly with respect to alleged breaches of the License Agreement. In the event the parties were to agree to mediate in the future, Plaintiff would expect that both parties would participate in good faith with an appropriately authorized representative.

**Defendant's Position:**

Defendant believes that mediation may be useful, so long as such the actual decision-makers for each party (Scott Radow for Defendant and Michael Bruno for Plaintiff) would participate in the mediation to maximize the possibility of a business resolution between the business people. The business people who represented Core during the negotiation of the ELA was the President at the time, Dustin Grosz, who departed Core about six months after the Effective Date of the ELA, in December of 2018. Michael Bruno, who Defendant understood to be the only employee to have an

8

ownership interest in Plaintiff and was acting as CEO (or at least in a CEO-like capacity), and was directly involved in discussions with Defendant regarding detailed discussion of Plaintiff's breaches of its obligations.

### XIII.   The Usefulness of a Written Case Management Order

The parties do not believe a written case management order is necessary at this time, other than an order setting the trial date and related deadlines and cutoffs.

### XIV.   Target Date and a Time Estimate for Trial

Plaintiff anticipates this case will be ready for trial by no later than March 2026. Plaintiff estimates 3-5 days for trial.

**Defendant's Position:**

Defendant believes that Plaintiff's proposed trial date of March 2026 is significantly too soon given the complexity of the case, as reflected by the Court's designation of this case as complex and therefore exempt from the case disposition time goals imposed by California Rule of Court, rule 3.714. This led the Court to estimate that the maximum time required to dispose of this case will exceed twenty-four months due to the following case evaluation factors of California Rules of Court, rules 3.715 and 3.400.

As noted herein, Defendant filed a demurrer to Plaintiff's original complaint on October 14, 2024. Plaintiff filed an amended complaint earlier this week, on January 27, 2025. Defendant is evaluating that complaint and will answer by the appropriate deadline. Defendant expects that its complaint will include cross-claims. The parties have not yet exchanged substantive discovery. Thus, this case remains in its infancy. Moreover, Defendant expects that significant third-party discovery will be required in this case, including because several of Plaintiff's employees who were most closely involved in Plaintiff's relationship with Defendant are no longer employed by Plaintiff. Such third-party discovery often requires additional time to domesticate subpoenas, resolve any objections or motion practice relating to subpoenas in foreign jurisdictions, and accommodate scheduling concerns of third parties. Third-party discovery also includes Defendant's ongoing third-party discovery of five entities in Delaware given Plaintiff's counsel's representation at a recent informal discovery conference that it is unable to identify its own citizenship and has

9

not been able to obtain that information from its owners. Moreover, this case may benefit from mediation at some point during discovery, which will likely require time, resources, and effort by the parties to make a good-faith effort to resolve the case.

Additionally, the issues presented in the case will likely involve subject-matter experts (e.g., in the area of patent licensing and technical experts regarding areas such as the underlying technology, Plaintiff's obligation under the ELA to purchase Technology Components from Defendant), the fitness industry, and damages experts. Expert discovery will require additional time for opening reports, rebuttal reports, reply reports, and expert depositions. Moreover, one or both parties may file dispositive motions.

Given these factors, Defendant expects that this case will be ready for trial no earlier than early 2027, with at least 7-10 days allocated for trial given the complexity of the issues, number of witnesses, and the likelihood of multiple expert witnesses.

Respectfully submitted,

Dated:  January 31, 2025                    **MOJDEHI GALVIN LLP**

By:   *s/ Ali. M. Mojdehi*
Ali M. Mojdehi

Attorneys for Plaintiff Core Health & Fitness, LLC

Dated:  January 31, 2025                    **BARNES & THORNBURG LLP**

By:   *s/ Allison M. Rego*
Allison M. Rego

Attorneys for Plaintiff Core Health & Fitness, LLC

10

JOINT CASE MANAGEMENT CONFERENCE REPORT

Dated:  January 31, 2025

By:    s/ Cortney S. Alexander

Cortney S. Alexander (admitted pro hac vice)
Email: cortneyalexander@kentrisley.com
Tel: 404.855.3867
Kent & Risley LLC
5755 N Point Pkwy, Ste 57
Alpharetta, GA 30022

Stephen M. Lobbin
SML Avvocati P.C.
888 Prospect Street, Suite 200
San Diego, CAL 92037
Tel: 949.636.1391
Email: sml@smlavvocati.com

Attorneys for Defendant POWERbahn, LLC

11

# PROOF OF SERVICE

**CASE NAME:**    *Core Health & Fitness, LLC v. POWERbahn, LLC, et al.*
**CASE NUMBER:**  30-2024-01412019-CU-BC-CXC

I, the undersigned, am over 18 years of age, employed in the County of San Diego, California, in which the within-mentioned service occurred; and that I am not a party to the subject cause of action. My business address is 2550 Fifth Ave, Suite 910, San Diego, California 92103.

On January 31, 2025, I served the following documents:

**JOINT CASE MANAGEMENT CONFERENCE REPORT**

**SEE ATTACHED SERVICE LIST**

☒   **BY ELECTRONIC SERVICE.** I caused a true and correct copy of the document(s) described above to be electronically served on counsel of record at the electronic service addresses listed on the attached service list via email.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 31, 2025

_____
Andrew Galvin
andrew.galvin@mojdehigalvin.com

1

PROOF OF SERVICE

## **SERVICE LIST**

*Core Health & Fitness, LLC v. POWERbahn, LLC, et al.*
Orange County Superior Court Case No. 30-2024-01412019-CU-BC-CXC

Allison M. Rego
Barnes & Thornburg LLP
arego@btlaw.com
655 West Broadway, Suite 1300
San Diego, California  92101
Telephone:     (619) 321-5000
Facsimile:     (310) 284-3894
*Attorneys for Plaintiff Core Health & Fitness, LLC*

Stephen M. Lobbin, Esq.
SML Avvocati P.C.
888 Prospect Street, Suite 200
San Diego, CA 92037
Email: sml@smlavvocati.com | cmf@smlavvocati.com
*Attorneys for Defendant POWERbahn, LLC*

Cortney Alexander, Esq.
Kent & Risley LLC
5755 N Point Pkwy Ste 57
Alpharetta, GA 30022
Email: cortneyalexander@kentrisley.com
*Attorneys for Defendant POWERbahn, LLC*

2

**SUPERIOR COURT OF CALIFORNIA,
COUNTY OF ORANGE
CIVIL COMPLEX CENTER**

**MINUTE ORDER**

DATE: 02/07/2025                    TIME: 09:00:00 AM          DEPT:  CX101

JUDICIAL OFFICER PRESIDING: William Claster
CLERK: G. Hernandez
REPORTER/ERM: None
BAILIFF/COURT ATTENDANT: B. Allen, None

CASE NO: **30-2024-01412019-CU-BC-CXC**    CASE INIT.DATE: 07/05/2024
CASE TITLE: **Core Health & Fitness, LLC vs. Powerbahn, LLC**
CASE CATEGORY: Civil - Unlimited       CASE TYPE: Breach of Contract/Warranty

EVENT ID/DOCUMENT ID: 74463848

**EVENT TYPE:** Case Management Conference

EVENT ID/DOCUMENT ID: 74463824

**EVENT TYPE:** Demurrer to Complaint
MOVING PARTY: Powerbahn, LLC
CAUSAL DOCUMENT/DATE FILED: Demurrer to Complaint, 10/14/2024

**APPEARANCES**
Andrew Galvin, from Mojdehi Galvin LLP, present for Plaintiff(s) remotely.
Allison Rego, from Barnes & Thornburg LLP, present for Plaintiff(s) remotely.
Cortney Alexander, from SML Avvocati P. C., present for Defendant(s) remotely.

Hearing held with all participants appearing remotely.

The Demurrer scheduled for today is off calendar. A First Amended Complaint has been filed. **The Court orders the Plaintiff to file a Revised First Amended Complaint to include exhibits that were omitted in the original filing of the First Amended Complaint.**

Case Management Conference held. Court and counsel discuss the status of the case.

A Status Conference is scheduled for 07/16/2025 at 10:00 AM in Department CX101.

A joint status conference statement is to be filed on or before 07/09/2025.

Parties waive notice.

Electronically Filed by Superior Court of California, County of Orange, 02/07/2025 02:06:00 PM.
30-2024-01412019-CU-BC-CXC - ROA # 146 - DAVID H. YAMASAKI, Clerk of the Court By G. Ramirez, Deputy Clerk.

ALI M. MOJDEHI (SBN 123846)
ali.mojdehi@mojdehigalvin.com
ANDREW J. GALVIN (SBN 261925)
andrew.galvin@mojdehigalvin.com
**MOJDEHI GALVIN LLP**
2550 Fifth Ave, Suite 910
San Diego, California 92103
Telephone: (619) 549-4000

ALLISON REGO (SBN 272840)
arego@btlaw.com
**BARNES & THORNBURG LLP**
655 West Broadway, Suite 1300
San Diego, California 92101
Telephone:     (619) 321-5000
Facsimile:     (310) 284-3894

*Attorneys for Core Health & Fitness, LLC*

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE

| | |
|---|---|
| CORE HEALTH & FITNESS, LLC, | Case No. 30-2024-01412019-CU-BC-CXC |
| Plaintiff, | **FIRST AMENDED COMPLAINT** |
| v. | Dept: CX101<br>Judge: Hon. William D. Claster |
| POWERBAHN, LLC, and DOES 1 through 10, inclusive, | Action Filed: July 5, 2024<br>Trial Date: None Set |
| Defendants. | |

MOJDEHI GALVIN LLP
ATTORNEYS AT LAW

Plaintiff, Core Health & Fitness, LLC ("**Core**" or "**Plaintiff**"), by and through its counsel, as and for its First Amended Complaint against Powerbahn LLC, ("**Powerbahn**") and DOES 1 through 10, inclusive (collectively, "**Defendants**"), respectfully alleges on behalf of the Plaintiff as follows:

## INTRODUCTION

1.    Plaintiff is a company that designs, sells, installs and supports high quality commercial fitness equipment and digital solutions for various well-known fitness equipment brands. This action concerns disputes arising from a certain Exclusive License Agreement dated June 29, 2018, and entered into between Plaintiff as licensee, and Powerbahn as licensor, a true and correct copy of which is attached hereto as the **Exhibit "1"** (hereinafter, the "**License Agreement**").

2.    Powerbahn describes itself in litigation pleadings as a company that "researches and develops products and technology concerning, and owns and licenses patents covering, exercise devices and methods that incorporate POWERbahn's proprietary technology, among other things."[1]

3.    The primary purpose of the License Agreement was to provide a framework for the development and sale of a "smart bike." Under the License Agreement, Plaintiff licensed certain patents and related intellectual property relating to electronic control systems for the smart bike from Powerbahn. Plaintiff also provided certain components for the smart bike, primarily the bicycle frame, which were modified by Plaintiff for use with the Powerbahn technology and intellectual property that was licensed to Plaintiff under the License Agreement.

4.    Plaintiff is informed and believes that at or about the time that Powerbahn and Plaintiff entered into the License Agreement, Powerbahn was in need of funding to enable it to continue to maintain ongoing litigation it had brought to enforce the Patents that were to be licensed to Plaintiff under the License Agreement. To that end, as a separate and divisible

---

[1] Powerbahn's website, https://www.powerbahn.com, states "ride into the next generation of fitness equipment and software with POWERbahn™" but contains no other publicly available information.

covenant, the parties also included a provision in the License Agreement whereby Plaintiff would provide Powerbahn with a litigation advance, which was to be used by Powerbahn to fund its litigation in enforcement of the Patents.

5.      Specifically, Powerbahn agreed under Paragraph 5(b)(VII) of the License Agreement to share with Plaintiff 33 percent of all net proceeds from any settlement or awards from third parties resulting from Powerbahn's enforcement of the Patents (as defined in the License Agreement), including "damages, settlement proceeds, or royalties." The License Agreement also requires that Powerbahn cooperate with Plaintiff in connection with "any intellectual property litigation" regarding, *inter alia*, the Patents. As consideration for Plaintiff's receipt of 33 percent of such net litigation proceeds, Plaintiff provided much-needed funding for Powerbahn to maintain ongoing patent litigation, in an amount of at least $320,000.00.

6.      Plaintiff is informed and believes that, in 2018 when the License Agreement was signed, Powerbahn did not have the financial wherewithal to effectively maintain the Patent Infringement Case (defined below), without Plaintiff's provision of funding for such purposes under the License Agreement.

7.      Despite Plaintiff having provided Powerbahn the promised funding in the form of the litigation advance, Powerbahn has refused to cooperate respecting such litigation and has also failed to provide any transparency to Plaintiff regarding actual or potential settlement or awards from third parties resulting from Powerbahn's enforcement of the Patents, defeating Plaintiff's ability to ascertain or recover its rightful 33 percent share of such net proceeds. Moreover, public court records evidence that Powerbahn has, in fact, actually entered into one or more settlements with third-party defendants resulting from Powerbahn's enforcement of the Patents.

8.      Plaintiff is informed and believes that the consideration received by Powerbahn in connection with at least one of these settlements is considerable, amounting to upwards of tens of millions of dollars. Furthermore, Plaintiff is informed and believes that there are more potential settlements and/or other recovery that may be realized prospectively in connection with litigation in the enforcement of the Patents, predicated upon Powerbahn's statements made in court filings that such settlements may be forthcoming.

MOJDEHI GALVIN LLP
ATTORNEYS AT LAW

2

FIRST AMENDED COMPLAINT

9. Plaintiff brings this action seeking damages for its 33 percent share in the net proceeds actually received by Powerbahn to date, and specific performance as to any future net proceeds realized, resulting from all settlement or awards from third parties resulting from Powerbahn's enforcement of the Patents, together with other related relief.

## PARTIES

10. Powerbahn is a Florida limited liability company, EIN No. 20-1119660, with its principal place of business, mailing address and corporate residence located at 5615 Foret Circle, Reno, Nevada. Powerbahn's Manager is Scott B. Radow.

11. Plaintiff is a limited liability company incorporated in the State of Nevada. Plaintiff is registered to do business in the State of California under registration No. 201505710643 and operates a place of business in the State of California located at 20 Empire Drive, Lake Forest, CA, 92630. Plaintiff has its principal place of business at 17800 SE Mill Plain Blvd., Suite 190, Vancouver, Washington.

12. Plaintiff is ignorant of the name(s) of one or more defendant(s), and such are named herein under the fictitious names of "DOES 1 through 10." When such person or persons true name(s) are discovered, the Complaint will be amended accordingly, pursuant to Code. Civ. Proc. §474.

## JURISDICTION AND VENUE

13. This Court may exercise jurisdiction on any basis not inconsistent with the Constitution of the State of California or of the United States. Code of Civ. Proc. §410.10.

14. This action arises out of the License Agreement. This Court has personal jurisdiction over Powerbahn in respect to the claims asserted in this action under Code of Civ. Proc. §410.40, pursuant to the following provision contained in the License Agreement: as it pertains to the Agreement and "all matters relating hereto, including any matter or dispute arising out of the Agreement . . . the parties hereto consent to the exclusive jurisdiction of any appropriate court in the State of California to resolve such disputes." License Agreement Para.12(o).

15. Venue is proper in this Court under Code of Civ. Proc. §395(a) because defendant Powerbahn does not reside in the State of California, and Plaintiff designates Orange County as

MOJDEHI GALVIN LLP
ATTORNEYS AT LAW

3

FIRST AMENDED COMPLAINT

the "appropriate court" in the State, as Plaintiff is entitled to designate under the License Agreement. Further, Orange County is an appropriate court in the State because Plaintiff has a place of business in Lake Forest, in Orange County, California.

16.     The amount of the dispute is over $35,000.00, as such, the matter is an unlimited civil case.

## GENERAL ALLEGATIONS

### A.  POWERBAHN INITIATES THE PATENT INFRINGEMENT CASE

17.     On June 18, 2015, Powerbahn filed suit in the U.S. District Court in Nevada against Wahoo Fitness, L.L.C. ("**Wahoo**"), Giant Bicycle, Inc. ("**Giant**") and Foundation Fitness LLC ("**Foundation** Fitness") (such action, the "**Patent Infringement Case**"), alleging that the Wahoo KICKR stationary trainer infringed on its patents. Powerbahn sought at least $1 million in lost royalties and penalties from the three companies.

18.     On August 31, 2015, Giant was dismissed from the action, without prejudice, prior to its having answered the complaint.

19.     The amended complaint filed by Powerbahn in the Patent Infringement Case alleged claims for (i) direct infringement of the '865 Patent (defined below), (ii) induced infringement of the '865 Patent, (iii) direct infringement of the '476 Patent (defined below); and (iv) induced infringement of the '476 Patent.

20.     Powerbahn alleged in its amended complaint filed on April 3, 2019, in the Patent Infringement Case that inventor, Scott Radow, developed and patented technology to simulate real-world resistance in a stationary trainer by electronically controlling resistance applied to a flywheel. Powerbahn further alleged that Radow licensed the 865 Patent to Powerbahn, which he manages. Powerbahn further alleged that Powerbahn, in turn, licensed the technology to Nautilus, Inc. from 2005 to 2008.

21.     In the Patent Infringement Case, Powerbahn alleged that a Nautilus executive, Pat Warner ("**Warner**"), took the technology with him when he left Nautilus in 2010.

22.     Powerbahn further alleged in the Patent Infringement Case that Warner later joined Foundation Fitness, LLC., a company that develops and markets gym exercise equipment

MOJDEHI GALVIN LLP
ATTORNEYS AT LAW

4

FIRST AMENDED COMPLAINT

including exercise bikes.

23.    In the Patent Infringement Case, Powerbahn alleged that "Warner, a former Nautilus executive, took this knowledge of the rights claimed in the '865 [P]atent—and knowledge of the '865 [P]atent itself—with him to Foundation. Foundation then proceeded to copy the '865 [P]atent and sold or licensed the copy to Wahoo."

24.    Powerbahn alleged in the Patent Infringement Case that it is owed "at least a 5 percent royalty on sales of the Kickr to be trebled based on Foundation's willful conduct."

25.    The Patent Infringement Case was later moved from Nevada to Georgia's Northern District Court on August 8, 2017, proceeding as Case No. 1:17-cv-02965-AT.

**B.  PLAINTIFF AND POWERBAHN ENTER INTO A LICENSE AGREEMENT PROVIDING PLAINTIFF A SHARE IN PROCEEDS FROM THE PATENT INFRINGEMENT CASE**

26.    On or about June 29, 2018, Plaintiff, as licensee, and Powerbahn, as licensor, entered into the License Agreement.

27.    The License Agreement is governed by California law, excluding any conflicts of law rules that may require application of the laws of any other state or country. License Agreement Paragraph 12(o).

28.    Paragraph 12(h)(3) of the License Agreement provides that the following provision "shall govern the interpretation and construction of this Agreement . . . . If any provision of this Agreement as applied to any party or any circumstance shall be adjudged by a court to be unlawful, void, or for any reason unenforceable, *such provision shall be deemed separable from the remainder of this Agreement and the same shall in no way affect the validity or enforceability of any other provision of this Agreement*, the application of such provision to other parties or circumstances, or the validity or enforceability of this Agreement as whole." (emphasis added).

29.    The License Agreement is a divisible contract, evidenced by the parties' intent expressed in the severability language of Paragraph 12(h)(3) of the License Agreement.

30.    Paragraph 5(b)(VII) of the License Agreement contains the following covenant:

Within two (2) years from the date first listed above in this Agreement and only

upon written request from POWERbahn, CORE shall pay up to $300,000 within

fifteen (15) days from such notification ("**Recoupable Litigation Advance**"). POWERbahn agrees to pay CORE thirty-three percent (33%) of its net proceeds from any settlement or awards from third parties resulting from enforcement of the Patents, including damages, settlement proceeds, or royalties ("Net Litigation Proceeds"). In the event CORE does not receive back the entire Recoupable Litigation Advance from Net Litigation Proceeds, any remaining unpaid portion of the Litigation Advance shall be deemed a pre-payment of future Royalties and Minimum Annual Royalties.

31.     The consideration paid for Plaintiff's receipt of 33 percent of the Net Litigation Proceeds (as defined in Paragraph 5(b)(VII) of the License Agreement) was expressly apportioned apart from the other consideration called for under the License Agreement.

32.     The covenant regarding Plaintiff's receipt of 33 percent of the Net Litigation Proceeds contained in Paragraph 5(b)(VII) of the License Agreement is a divisible or severable covenant.

33.     Powerbahn made a written request to Plaintiff to pay the Recoupable Litigation Advance (as defined in the License Agreement) within two (2) years of the effective date of the License Agreement.

34.     Plaintiff paid the Recoupable Litigation Advance of $300,000.00, to Powerbahn within fifteen (15) days of such written request. In addition, Plaintiff paid Powerbahn an additional amount of no less than $20,000.00 as a Recoupable Litigation Advance, for a total of no less than $320,000.00.

35.     Plaintiff has fully performed all of its obligations under Paragraph 5(b)(VII) of the License Agreement.

36.     Powerbahn is obligated under Paragraph 5(b)(VII) of the License Agreement to pay Plaintiff thirty-three percent (33%) of its net proceeds from any settlement or awards from third parties, including, without limitation, "damages, settlement proceeds or royalties, that result from enforcement" of the Patents, defined in the License Agreement consisting of any of the following United States patents: 7,862,476 (the "**476 Patent**"), 7,066,865 (the "**865 Patent**"), 7,841,964

(the "**'964 Patent**"), 7,608,015 (the "**'015 Patent**"), and 7,833,135 (the "**'135 Patent**"), "together with all patentable material and all U.S. and foreign related patents of importation, patents of confirmation, improvement patents, provisional patents, patents and certificates of addition and utility models, as well as division, reissue, reexamined, continuation, continuation-in-part, applications, renewals and extensions of any of the foregoing" (referred to herein collectively as the "**Patents**").

37.    Plaintiff is informed and believes that Powerbahn utilized the funds that Plaintiff paid to it as a Recoupable Litigation Advance under Paragraph 5(b)(VII) of the License Agreement to fund a portion of its litigation fees and costs in maintaining the Patent Infringement Case.

38.    Plaintiff has otherwise performed all of its payment obligations to Powerbahn, including but not limited to, by rendering full payment to Powerbahn of the Initial recoupable signing bonus, Royalties, and Minimum Annual Royalty Payments due under Paragraph 5 of the License Agreement.

39.    Plaintiff has performed all of its obligations under Paragraph 7 of the License Agreement by promptly delivering to Powerbahn all tangible and intangible embodiments, electronic or hard copy, including all copies, of Powerbahn's Confidential Information upon the termination of the License Agreement.

40.    Plaintiff has otherwise performed all of its other material obligations under the License Agreement.

41.    Powerbahn has no right of offset against Plaintiff arising from the License Agreement.

42.    Powerbahn has not made any payments to Plaintiff on account of Plaintiff's thirty-three percent (33%) share of Net Litigation Proceeds, which term is defined in the License Agreement as the "net proceeds from any settlement or awards from third parties resulting from enforcement of the Patents, including damages, settlement proceeds, or royalties." Paragraph 5(b)(VII) of the License Agreement.

43.    Plaintiff is informed and believes that Powerbahn has received Net Litigation

Proceeds resulting from the enforcement of the Patents, including, but not limited to, by virtue of the enforcement of the Patents in the Patent Infringement Case.

44.    In this litigation, Plaintiff has made written requests to Powerbahn for full disclosure regarding Powerbahn's receipt of Net Litigation Proceeds.

45.    Powerbahn has both failed and refused to provide Plaintiff with any disclosure regarding Powerbahn's receipt of Net Litigation Proceeds.

46.    The covenant of good faith and fair dealing applies to Powerbahn's obligations to Plaintiff under the License Agreement, without limitation, making full disclosure regarding Powerbahn's receipt of Net Litigation Proceeds.

47.    Paragraph 8.d of the License Agreement obligates Powerbahn to reasonably cooperate with Plaintiff in any intellectual property litigation involving the Patents, including, without limitation, making full disclosure to Plaintiff regarding Powerbahn's receipt of Net Litigation Proceeds and potential settlements or awards.

48.    Powerbahn and Plaintiff previously participated in mediation before a neutral in Reno, Nevada, pursuant to the provisions of Paragraph 12.k of the License Agreement, which mediation was not successful.

49.    The License Agreement has terminated.

50.    The License Agreement provides that "[e]xcept as otherwise specifically provided for in this Agreement, the terms and conditions of this Agreement shall survive the expiration or termination of this Agreement to the full extent necessary for their enforcement and for the protection of the party in whose favor they operate."

51.    The provisions of Paragraph 5(b)(VII) of the License Agreement survived the termination of the License Agreement.

52.    The License Agreement provides that the prevailing party in any action brought to enforce the License Agreement shall be entitled to recover all reasonable costs in connection therewith, including reasonable attorneys' fees. License Agreement Paragraph 12.1.

53.    This action is an action brought to enforce the License Agreement.

MOJDEHI GALVIN LLP
ATTORNEYS AT LAW

8

FIRST AMENDED COMPLAINT

## C. POWERBAHN SETTLES WITH CERTAIN DEFENDANTS IN THE PATENT LITIGATION CASE

54.     In light of the parties' announced desire to settle the action, the United States district court presiding in the Patent Infringement Case administratively closed the action on June 28, 2022, provided that in the event a settlement was not consummated, any party may move to reopen the action.

55.     On or about April 2023, Wahoo Fitness reached a written settlement agreement with Powerbahn regarding the allegations in the complaint filed in the Patent Infringement Case that its Kickr trainer infringed on Powerbahn's patent, with each side paying its own legal costs (the "**Wahoo Fitness Settlement**"). On April 5, 2023, Powerbahn and Wahoo Fitness filed a joint status report stating that they were "pleased to report that they have executed final agreements to resolve all issues between them and expect to file a stipulation of dismissal of claims and counterclaims" between them within 15 days. A copy of the Joint Status Report is attached hereto as **Exhibit "2"**. Wahoo Fitness and Powerbahn thereafter stipulated to the dismissal of claims between them on April 8, 2023. A copy of the stipulation for dismissal between Powerbahn and Wahoo Fitness is attached hereto as **Exhibit "3"**.

56.     The terms of the Wahoo Fitness Settlement, including the settlement consideration paid or payable to Powerbahn (including damages, settlement proceeds, or royalties) is not known to Plaintiff.

57.     At the time that the Wahoo Fitness Settlement was reached, Powerbahn also told the district court it was close to a settlement with Foundation Fitness and Warner. Powerbahn said both sides had conceptually agreed to a settlement, but that Foundation Fitness now wanted to negotiate about a new model it introduced, a certain SB20 product, after the case's discovery period had concluded.

58.     On May 8, 2024, Powerbahn filed a motion in the district court seeking to reopen the action and to file an amended complaint in order to also pursue its infringement claims under the '476 Patent against Foundation Fitness and Warner relating to Foundation Fitness' SB20 product.

MOJDEHI GALVIN LLP
ATTORNEYS AT LAW

9

FIRST AMENDED COMPLAINT

59. The '476 Patent is within the scope of the Patents and is subject to the provisions of Paragraph 5(b)(VII) of the License Agreement.

60. In Powerbahn's reply in support of its motion to file an amended complaint, Powerbahn also states that "Warner remains connected to the case even with his apparent new employer. Public information indicates that Warner now works for Giant Bicycle, which was initially a party in this case due to its manufacture of the Wahoo KICKR products."

61. On July 30, 3034, Powerbahn, Foundation Fitness and Warner filed a joint response requesting dismissal, stating, among other things, that "[a]s the Court noted in its July 18 Order, the dismissal of Powerbahn's claims against Foundation and Warner relating to Wahoo's KICKR production does not preclude Powerbahn from filing suit against Foundation and/or Warner for infringement in connection with the SB20 product." On August 6, 2024, the court entered an order terminating the case.

62. Plaintiff is informed and believes that additional Net Litigation Proceeds may be realized by Powerbahn as a result of the '476 Patent, of which Plaintiff is entitled to receive 33 percent.

<u>**FIRST CLAIM FOR RELIEF**</u>
**Breach of Contract**
**(Against All Defendants)**

63. Plaintiff realleges and incorporates by reference in this claim for relief Paragraphs 1 through 62 of this Complaint as though fully set forth herein.

64. Plaintiff and Defendant entered into the License Agreement. The License Agreement is a valid contract between Plaintiff and Powerbahn.

65. The License Agreement is a divisible or severable contract. Paragraph 5(b)(VII) of the License Agreement is a divisible and severable covenant.

66. All conditions that must occur before Powerbahn was required to perform under Paragraph 5(b)(VII) of the License Agreement were met.

67. Plaintiff did all, or substantially all, of the significant things that Paragraph 5(b)(VII) of the License Agreement required it to do.

68.     Powerbahn is obligated under the License Agreement to share with Plaintiff thirty-three percent (33%) of Powerbahn's "net proceeds from any settlement or awards from third parties resulting from enforcement of the Patents, including, without limitation, all damages, settlement proceeds, or royalties" that have been received or may be received as a result of the Wahoo Fitness Settlement.

69.     Powerbahn is obligated to share with Plaintiff thirty-three percent (33%) of Powerbahn's "net proceeds from any settlement or awards from third parties resulting from enforcement of the Patents, including, without limitation, all damages, settlement proceeds, or royalties" it has or may receive, past, present or future, as a result of any other action relating to the enforcement of the Patents.

70.     Paragraph 5(b)(VII) of the License Agreement survived the termination of the License Agreement.

71.     Paragraph 8.d of the License Agreement or, in the alternative, the covenant of good faith and fair dealing, obligates Powerbahn to make full disclosure to Plaintiff and to render a full accounting of any and all "net proceeds from any settlement or awards from third parties resulting from enforcement of the Patents, including damages, settlement proceeds, or royalties."

72.     Plaintiff has otherwise performed all of its payment obligations to Powerbahn, including but not limited to, by rendering full payment to Powerbahn of the "Initial recoupable signing bonus" [*sic*], Royalties, and Minimum Annual Royalty Payments due under Paragraph 5 of the License Agreement.

73.     Plaintiff has performed all of its obligations under Paragraph 7 of the License Agreement by promptly delivering to Powerbahn all tangible and intangible embodiments, electronic or hard copy, including all copies, of Powerbahn's Confidential Information (as defined in the License Agreement) upon the termination of the License Agreement.

74.     Plaintiff has otherwise done all, or substantially all, of the significant things the License Agreement required it to do or was excused from having to do so.

75.     Powerbahn has received Net Litigation Proceeds and may receive future Net Litigation Proceeds as a result of the Patent Infringement Case and/or any other action brought to

enforce the Patents.

76.     Powerbahn has breached and is continuing to breach its obligations under the License Agreement including by failing to pay Plaintiff its thirty-three percent (33%) share of Net Litigation Proceeds, which term is defined in the License Agreement as the "net proceeds from any settlement or awards from third parties resulting from enforcement of the Patents, including damages, settlement proceeds, or royalties."

77.     Powerbahn has breached and is continuing to breach its obligations under the License Agreement including by failing to make full disclosure to Plaintiff and to render a full accounting of any and all "net proceeds from any settlement or awards from third parties resulting from enforcement of the Patents, including damages, settlement proceeds, or royalties."

78.     As a direct and proximate result of Powerbahn's breaches, Plaintiff has been damaged in an amount according to proof at trial.

79.     In addition to damages for Plaintiff's 33% share of the Net Litigation Proceeds Powerbahn has obtained and failed to pay to Plaintiff, Plaintiff is entitled to specific performance by Powerbahn of its obligation under Paragraph 5(b)(VII) of the License Agreement to pay Plaintiff 33% of any Net Litigation Proceeds it obtains in the future. Plaintiff is not seeking both specific performance and damages for the same breach of the License Agreement. Plaintiff is seeking specific performance as to future amounts due to Plaintiff under Paragraph 5(b)(VII) of the License Agreement. "[S]pecific performance is preferred over the inadequate remedy of repetitive future damages actions." *Union Oil Co. of California v. Greka Energy Corp.* (2008) 165 Cal.App. 4th 129, 136.

80.     Powerbahn's breach of the License Agreement is a substantial factor in causing Plaintiff's harm, including by failing to pay Plaintiff the share of Net Litigation Proceeds due to Plaintiff.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

1.     For damages in an amount according to proof;

2.     For an order that Powerbahn specifically perform its obligation under Paragraph

5(b)(VII) of the License Agreement to pay Plaintiff 33% of any Net Litigation Proceeds it obtains;

3.  For prejudgment and post judgment interest, attorneys' fees, costs of suit, collection costs thereafter, and all other amounts allowed by law;

4.  For such other and further relief as the Court deems just and proper.

Dated:  February 7, 2025                      **MOJDEHI GALVIN LLP**

By: _____

         ALI M. MOJDEHI

Dated:  February 7, 2025                      **BARNES & THORNBURG LLP**

By: _____

         ALLISON REGO

*Attorneys for CORE HEALTH & FITNESS, LLC*

# Exhibit 1

## EXCLUSIVE LICENSE AGREEMENT

**DATE:**       June 29, 2018

**PARTIES:**       **POWERbahn, LLC**
Mr. Scott Radow
5615 Foret Circle
Reno, NV 89511
Telephone: (305) 495-1524
Attn: Scott Radow
("POWERbahn")

and

**CORE Health & Fitness, LLC**
Mr. Dustin Grosz
4400 NE 77th Avenue, Suite 300
Vancouver, Washington 98662
Telephone: (360) 326-3268
Attn: Dustin Grosz
("CORE")

## RECITALS

A.       POWERbahn controls certain Intellectual Property Rights through an exclusive license from Scott Radow, except with respect to Music Synchro™, and desires to exclusively license the Licensed Intellectual Property to CORE for its worldwide exploitation with respect to Exercise Equipment.

B.       CORE manufactures and distributes Exercise Equipment and other products and desires to exclusively license the Licensed Intellectual Property from POWERbahn for worldwide exploitation with respect to Commercial Exercise Equipment and to non-exclusively license the Licensed Intellectual Property from POWERbahn for worldwide exploitation with respect to Non-commercial Exercise Equipment.

1

71573-00001/3042199.1

C.      CORE desires to retain POWERbahn to supply certain component parts for the Licensed Product.

D.      Concurrent herewith, CORE is entering into an agreement with Mr. Scott Radow to provide consulting services.

TERMS OF AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      **Definitions.** In addition to terms defined elsewhere in this Agreement, the following terms shall have the meanings set forth below:

"Affiliate" shall mean with respect to an entity, any entity that is owned by, controlled by or under common control with such entity, where "controlled" or "control" means possession directly or indirectly, of (a) the power to direct or cause the direction of the management or policies of such entity (whether through ownership of securities or other ownership interests), and (b) greater than fifty percent (50%) of the voting equity interest of such entity (or other comparable interest for an entity other than a corporation).

"Average Sale Price" shall mean Net Sales divided by the number of units sold.

"Commercial Channel" shall mean a distribution channel through which a product passes title to or is licensed, sublicensed, or leased to an entity that is going to make such product available to numerous unrelated persons (e.g., not family members or persons sharing a dwelling), institutional, commercial, and professional entities that provide access to the product to multiple users (i.e., the product is available for use by club members, employees, contractors, etc.). Commercial Channel entities include fitness centers, gyms, health clubs, studios, hotels,

2

resorts, schools, military, commercial fitness, medical and senior/long term care facilities, corporate fitness, and corporate employee centers that provide fitness equipment for use by numerous unrelated persons. For the avoidance of doubt, "Commercial Channel" does not include, without limitation, sale or distribution to (a) end users (non-commercial users, typically home use) and resellers of the product, such as retailers and online direct resellers (e.g. Amazon.com); (b) persons or entities that are directly utilizing the product or making it available to related persons (e.g., family members or person sharing a dwelling); and (c) any entity where there is reason to know that such entity is selling or distributing to end users and/or resellers (other than as used equipment following normal use in the entity's facility).

"Commercial Exercise Equipment" shall mean Indoor Cycling Products sold, licensed, sublicensed, leased, distributed, used or otherwise commercialized in the Commercial Channel.

"Cycle Trainer Product" shall mean equipment used in combination with a bicycle for training purposes. By way of example only, the following products are Cycle Trainer Products: Wahoo KICKr, Wahoo KICKr SNAP, Cycleops Hammer, and Cycleops Magnus.

"Exercise Equipment" shall mean all equipment or apparatus that is commonly used by persons to promote the physical health and fitness of such individual. By way of example only, "Exercise Equipment" includes equipment and apparatus designed to improve the cardio or strength fitness of an individual (whether retail or commercial), such as, elliptical trainers, treadmills, and stationary or "spin" bicycles. Except as set forth in the definition of Licensed Product, "Exercise Equipment" does not include any of the following: non-fitness related simulators, video and arcade games, equipment or apparatus utilized for governmental, military or space exploration purposes other than equipment or apparatus used to promote the physical

3

71573-00001/3042199.1

health and fitness of individuals participating in governmental, military or space exploration purposes, motion control, and other equipment and/or apparatus whose primary purpose is not the promotion of physical health and fitness for human beings.

"Indoor Cycling Product" shall mean equipment and/or software, content or other Intellectual Property Rights used in combination with a group indoor bicycle, an indoor bicycle, or "spin bike" for training purposes. For purposes of this Agreement, the following are not Indoor Cycling Products: bicycles used outdoors, stationary upright bicycles, stationary recumbent bicycles, ellipticals, tread climbers, cross-trainers, alternative motion machines, rowers, treadmills, revolving staircase machines, free climbers, and Cycle Trainer Products. The parties acknowledge that in the future they may consider entering into an amendment of this Agreement to include stationary upright bicycles and stationary recumbent bicycles into such definition and provide for the non-exclusive license of such items.

"Intellectual Property Rights" shall mean all United States and worldwide trademarks, service marks, trade names, trade dress, logos, trademarkable material, copyrights and copyrightable material, rights of authorship, inventions, mask work rights, rights relative to Software (as hereinafter defined), firmware, Source Code (as hereinafter defined), Object Code (as hereinafter defined), moral rights, patents, patents pending, patent applications, patentable material, rights of inventorship, all applications, registrations and renewals in connection with any of the above, database rights, trade secrets, rights of publicity, privacy and/or defamation, rights under unfair competition and unfair trade practices laws, and all other intellectual and industrial property rights related thereto.

4

"Know-How" shall mean all knowledge, skill, information, advice, direction, formulas, methods, concepts, devices, compilations of information or the like, whether secret or publicly available, that is utilized or invented for use in or related to the Licensed Intellectual Property and/or POWERbahn's Intellectual Property Rights, whether or not capable of being patented, copyrighted or trademarked.

"Launch" shall mean the first offering for sale of Commercial Exercise Equipment or Non-Commercial Exercise Equipment by CORE through the Commercial Channel or any other channels.

"Launch Date" shall mean the date that Launch occurs.

"Licensed Intellectual Property" shall mean all Intellectual Property Rights of POWERbahn relative to its proprietary control systems for Exercise Equipment and the associated methods, circuitry utilized therein and Software. Licensed Intellectual Property includes, but is not limited to: (i) the patents and patent applications described in Exhibit A hereto, as it may be updated by POWERbahn from time to time (the "Patents"), together with all patentable material and all U.S. and foreign related patents of importation, patents of confirmation, improvement patents, provisional patents, patents and certificates of addition and utility models, as well as division, reissue, reexamined, continuation, continuation-in-part, applications, renewals and extensions of any of the foregoing; (ii) copyrighted and copyrightable Software and other material incorporated into the Patents and/or the Exercise Equipment that utilizes the Patents and/or Technology Components supplied to CORE hereunder (the "Copyright Material"), (iii) the trademarked and trademarkable logo, trade names, trade secrets

5

and trade dress utilized in relation to the Patents and/or Copyright Material and Exercise Equipment that utilizes the Patents and/or Copyright Material, and (iv) Know How.

"Licensed Product" shall mean each Indoor Cycling Product manufactured by or for CORE or any sublicensee, transferee or delegee under this Agreement that utilizes any of the Licensed Intellectual Property or is covered by any rights conferred by any government agency, Federal or State law or common law, to POWERbahn and any equivalent thereof and any associated data that contains any of the Licensed Intellectual Property and that utilizes or operates on or with an Indoor Cycling Product that contains any of the Licensed Intellectual Property, such as but not limited to a DVD product including Modified Software or other computer programs including Licensed Intellectual Property, manufactured by or for CORE, regardless of where such product is manufactured and/or commercially exploited, which "associated data" includes, but is not limited to data, Source Code, Object Code, Software, CD-ROM, DVD, interactive, internet based and other technology whether now known or hereafter devised that provides instruction, competition or simulation of "real life" events or activities (such as bicycle racing or riding a bicycle on an actual course such as the first stage of the Tour de France). This definition explicitly excludes products, data, software, or accessories, that (i) do not include or are not derived from the Licensed Intellectual Property and/or (ii) are not Indoor Cycling Products.

"Net Sales" shall mean the gross sales invoiced price or other revenue generating activities payable or accrued, at the time that title, license or leasehold rights to each Licensed Product transfers from CORE, any sublicensee, transferee or delegee, or companies controlled by either to any third party, less sales tax, shipping costs, discounts, rebates and actual returns;

6

provided, that, in no event shall the Net Sales applicable to a given item be less than CORE's actual costs arising out of or related to the manufacture, promotion and sale of such product plus the amount of Royalties due pursuant to this Agreement. For purposes hereof, "Net Sales" shall also be calculated to include gross revenues received by CORE relative to the lease, license or other commercial exploitation of the Licensed Intellectual Property.

"Non-commercial Exercise Equipment" shall mean Indoor Cycling Products sold, licensed, sublicensed, leased, distributed or used in a channel other than the Commercial Channel.

"Object Code" shall mean the computer executable embodiment of any computer code for any software (including the Software), which is derived from the Source Code by a process generally known as "compilation" or any other process that translates the Source Code or some intermediate code derived from the Source Code into a form that can be executed by a computer.

"Royalties" shall mean all amounts paid or payable to POWERbahn under Section 5 hereof, and shall be calculated upon Net Sales, and shall include, but are not limited to, "Quarterly Minimum Royalties" to be paid on a quarterly basis.

"Software" shall mean any and all Object Code, Source Code, firmware and other executable files relevant to the function and operation of the Licensed Product.

"Source Code" shall mean the human readable embodiment of any computer code for any software (including the Software), which must be translated by a process generally known as "compilation" into Object Code before such software can be executed by a computer, including, without limitation, flow charts, algorithms, production tools, programmer's notes and comments, command files and regression tests and other written instructions and explanatory or technical

7

materials, and any modifications, or derivatives thereof, including any localized versions thereof, that may be developed from time to time

"Technology Components" means electronic components that implement the Software and other components that may be included in the Licensed Products, such as cables, sensors and modules.

2.    *License Grant*

a.      POWERbahn hereby grants to CORE an exclusive, royalty-bearing, worldwide license to the Licensed Intellectual Property and the Know How in the field of Commercial Exercise Equipment; including the rights to make, have made, use, lease and/or sell, import or otherwise dispose of and fully exploit, the Licensed Product. Any sublicense, delegation, assignment or transfer shall require POWERbahn's prior written consent (not unreasonably to be withheld, delayed or conditioned) except no consent is required for a sublicense, assignment or transfer to an Affiliate of Core as part of an internal restructuring.

b.      POWERbahn hereby grants to CORE a non-exclusive, royalty-bearing, worldwide license to the Licensed Intellectual Property (other than with respect to Music Synchro™ which is being licensed as set forth below) and the Know How in the field of Non-commercial Exercise Equipment; including the rights to make, have made, use, lease and/or sell, import or otherwise dispose of and fully exploit, the Licensed Product. The license with respect to Music Synchro™ is non-exclusive and solely to allow the Licensed Products to be enabled to utilize such Intellectual Property, but not for the actual use of that Intellectual Property (which shall require entry into a separate definite agreement). Any sublicense, delegation, assignment or

8

transfer shall require POWERbahn's prior written consent (not unreasonably to be withheld, delayed or conditioned).

        c.      POWERbahn reserves all rights to the Licensed Intellectual Property in all fields other than those explicitly licensed to CORE under sections 2(a) and 2(b) of this Agreement.

        d.      CORE shall have sole authority to make decisions regarding the Licensed Product, and, upon prior written consent of POWERbahn, which consent shall be in its sole discretion, CORE shall have the right to sublicense the Licensed Intellectual Property to third parties under this Agreement, subject to the terms and conditions herein. CORE shall obtain from each permitted sublicensee an executed writing (a copy of which shall be provided concurrently to POWERbahn, and POWERbahn shall be named as an intended third party beneficiary) that indicates the reading and examination of, and agreement to be bound by, the terms of this Agreement and that certain Non-Disclosure Agreement(s) entered into between the Parties on August 24, 2010, (the "First NDA") attached as Exhibit B, and on February 16, 2016, attached as Exhibit C, and incorporated herein by this reference, except that CORE shall not be required to negotiate a sublicense under the terms of this Section in order to make and have made prototypes of Licensed Products and/or Licensed Products for CORE's sale and distribution. Notwithstanding any such sublicense (or making of prototypes), CORE shall remain fully liable for all of its obligations hereunder, and agrees to secure appropriate agreements for the protection of Confidential Information from any permitted sublicensee/vendor that manufactures prototypes of Licensed Products as referenced herein (a copy of which shall be provided concurrently to POWERbahn, and POWERbahn shall be named as an intended third party

9

beneficiary). CORE shall provide prompt written notice to POWERbahn of any suspected or actual breach or threatened breach of any such agreements in the two prior sentences.

      e.      CORE shall have the right, but not the obligation to, append to any Licensed Product and utilize in any advertisements or promotions of such Licensed Product the POWERbahn name, logo and/or trademark to designate the source of the control system for such Licensed Product. During the term of this Agreement, POWERbahn and Mr. Radow shall have the limited right to identify its/his affiliation and/or license relationship with CORE in business plans and/or other ordinary course of business documents/agreements as well as in books written by, resumes of and promotional materials for speaking arrangements for Mr. Radow, including the limited right to utilize royalty-free the CORE name solely in connection therewith; provided that neither POWERbahn nor its principals will disclose the terms of this Agreement except to its accountants, attorneys, members, managers or any other person who has asked to know and agrees to be bound by the confidentiality obligations set forth herein and in the NDA; and provided further that except as set forth above, neither POWERbahn nor Mr. Radow will utilize the CORE name or logo in advertisements, promotional materials or on websites without CORE's prior written approval of such use, which approval or disapproval shall not unreasonably be withheld or delayed, but which shall be at CORE's sole discretion. POWERbahn shall make any request under this Section in writing to the Notice recipient under Section 12a herein, and for the purposes of this Section e-mail is an acceptable form of written request. If no written response is sent by CORE to POWERbahn after thirty (30) days from the date of the receipt of such written request, such written request shall be deemed approved. For

10

71573-00001/3042199.1

purposes of this section, electronic mail approval from an authorized CORE representative shall be considered to be written approval.

### 3. *Purchase of Technology Components & Cycle Frames*

a. **Exclusive right to supply components**: CORE agrees to exclusively purchase from POWERbahn Technology Components for a price roughly comparable to that charged to other POWERbahn customers that purchase similar products.

b. **Warranty:** POWERbahn provides a limited warranty of the Technology Components for eighteen (18) months beginning after the date of shipment   of a Licensed Product that contains such Technology Components that such Technology Components are free from material latent or patent defects. All other express or implied warranties are disclaimed. Remedy for breach of such warranty is limited to refund or replacement at POWERbahn's election.

c. **Quality Standards:** CORE's purchase of Technology Components shall be subject to CORE's supplier quality review standards ("Quality Standards"). CORE's Quality Standards are attached as Exhibit D.

d. **Failure to Meet Quality Standards:** In the event that the Technology Components supplied by POWERbahn fail to comply with the Quality Standards and trigger the termination remedies set forth in this subsection (d), CORE shall have the option after providing POWERbahn with written notice and sixty (60) days to cure, to convert POWERbahn's right to supply Technology Components to be non-exclusive. CORE may exercise this right by written notice to POWERbahn. No such conversion shall be deemed an event of default or breach as set

11

forth in Section 10 or otherwise reduce, terminate or affect CORE's other obligations hereunder, including without limitation, the payment of royalties and to indemnify.

     e.    **Competitive Pricing and Minimum Purchase Requirements:** CORE shall have the right to solicit quotes from third parties to produce Technology Components. In the event that a quote from a Third Party for a product that is substantially identical to POWERbahn's Technology Components is at least ten percent (10%) less than the amount charged by POWERbahn, CORE may provide written notice to POWERbahn including the quote. If POWERbahn does not agree in writing to match the quote within thirty (30) days of notification, CORE may at its option convert POWERbahn's right to supply Technology Components to be non-exclusive; provided, however, that at all times during the Term, POWERbahn will manufacture no less than 2,000 Technology Components per year. Any Third Party vendor would be required to sign POWERbahn's License Agreement for Manufacturers for Product Manufacturing Information. Third Party and CORE would receive Product Manufacturing Information for the Technology Components. POWERbahn would supply programmed CPU Chips for Technology Components directly in Third Party at POWERbahn's cost for the programmed CPU Chips plus ten percent (10%) of any Third Party's price for the Technology Components to CORE, which price will be disclosed by the Third Party to POWERbahn and by CORE to POWERbahn independently. No such conversion to non-exclusive status shall be deemed an event of default or breach as set forth in Section 10 or otherwise reduce, terminate or affect CORE's other obligations hereunder, including without limitation, the payment of royalties or indemnity.

12

f.      **Software License to Third Party Supplier:** In the event that CORE elects to convert POWERbahn's right to supply Technology Components to be non-exclusive under the provisions of the previous paragraphs, POWERbahn agrees to enter into a software license on terms reasonably satisfactory to POWERbahn with a third party supplier to allow that third party supplier to produce Technology Components exclusively for CORE.

g.      **Purchase of Indoor Cycle Frames:** The parties agree in good faith to do all things necessary to negotiate and execute a Commercial Dealer-Distributor Agreement allowing POWERbahn or its designee to operate as a dealer, distributor and/or franchisor for CORE's line of Licensed Products and CORE's other products in their respective Commercial and non-commercial Channels as defined or described herein in all reasonable geographic regions and territories  The Commercial Dealer-Distributor Agreement shall contain terms sufficient to carry out and effectuate the purposes of the agreement as mutually agreed to by the parties and it is the parties' intention that the agreement shall be executed on or before the Launch Date.  POWERbahn shall have the right to purchase Indoor Cycle frames and related hardware components, e.g., pedals, saddles, chains, etc., developed by CORE for commercial and non-commercial products for use in assembling, marketing, selling, and/or distributing a non-commercial product at CORE's most competitive OEM (original equipment manufacture) cost quote to be provided by CORE to POWERbahn upon request and entry into a definitive agreement relative thereto (which the parties covenant to negotiate in good faith).

4.      *Representations and Warranties*

a.      POWERbahn represents, warrants and covenants to CORE that, to the best of its knowledge as of the date of this Agreement without inspection or investigation of any kind:

13

(i) it is free to enter into this Agreement; (ii) it will not enter into any other agreement which would conflict with the terms of this Agreement; (iii) it has, and will have throughout the term of this Agreement, ownership and/or control of the Licensed Intellectual Property and Software (subject to this Agreement and the rights of CORE hereunder), free and clear of all liens and encumbrances, and the right to license the Licensed Intellectual Property to CORE in accordance with the terms and provisions of this Agreement subject to (a) future transfers or licenses granted by POWERbahn of the Licensed Intellectual Property for use in fields other than Exercise Equipment; (b) POWERbahn's rights to manufacture and distribute itself or license to third parties rights to manufacture and distribute Non-commercial Exercise Equipment; and (c) the devices and methods disclosed in the Licensed Intellectual Property do not infringe upon or violate any Intellectual Property Right of any third party.

        b.      POWERbahn shall not disparage the Licensed Product or the CORE name or the principals, employees, contractors or consultants of CORE.

        c.      CORE represents, warrants and covenants to POWERbahn, to the best of its knowledge as of the date of this Agreement without inspection or investigation of any kind as follows: (i) it is a corporation in good standing, (ii) it has corporate power and authority to enter into this Agreement; (iii) it will not enter into any other agreement which would conflict with the terms of this Agreement; and (iv) the execution, delivery and performance of this Agreement will not conflict with or violate any agreement, mortgage, indenture, license, permit, authorization, lease or other instrument by which CORE or any of its properties or assets are or may be bound, or require CORE to obtain or make any consent, authorization, approval or filing

14

71573-00001/3042199.1

under any law, statute, rule or regulation, except those which have been obtained or completed on or prior to the date hereof.

        d.      CORE shall not disparage the Licensed Intellectual Property, the Licensed Product, the Technology Components, the POWERbahn name or the principals, employees, contractors or consultants of POWERbahn; provided however, nothing in this section shall restrict CORE distinguishing over the Licensed Intellectual Property in patent prosecution and trademark prosecution proceedings before the United States Patent and Trademark Office.

        e.      CORE shall make commercially reasonable efforts to promote, market and sell each Licensed Product for the term of this Agreement and any sell-off period thereafter. CORE agrees that, in order to preserve and enhance the good will associated with the Licensed Intellectual Property, the Licensed Products shall be of a quality no less than the quality of the products currently manufactured by CORE and that the materials used to make any parts of any Licensed Products shall conform to industry standards of the time.

        **5.**      ***Royalties***

        a.      Subject to Section 6, on a quarterly basis on or before thirty (30) days after each calendar year quarter ending on March 31, June 30, September 30, and December 31, CORE shall pay without deduction or offset, to POWERbahn the Royalties in the amount of five percent (5%) (the "Royalty Rate") of Net Sales generated in the immediately preceding calendar quarter. Royalties shall be paid by CORE on Licensed Products on a global basis.

        b.      For purposes of reporting and payment of Royalties, the Minimum Annual Royalty Payments shall be calculated and paid 30 days after the end of the calendar quarter or partial calendar quarter that follows the earlier of (i) the Launch Date or (ii) January 1, 2020. By

15

way of example, if the Launch Date is February 1, 2019, then all product shipped from February 1, 2019 to March 31, 2019 will count towards the Royalties owed for those shipped orders, and Royalties will be paid by April 30, 2019. In this example, the first full quarter would be April 1, 2019 through June 30, 2019, which would mean the first full year of Minimum Annual Royalty would end March 31, 2020 and any shortfall in Minimum Royalties owed from any prior quarter would be trued up on March 31, 2020 and paid by April 30, 2020, which would serve as the basis for the Minimum Annual Royalties each year. The Minimum Annual Royalty Payments shall be calculated as the product of the Average Sale Price of Licensed Products sold during the applicable calendar quarter, the Royalty Rate (5%), and a Minimum Number of Units based on the time elapsed since the Launch Date. By way of example only, if the first calendar quarter after the earlier of the Launch Date or January 1, 2020, the Average Sale price is $2,000, the Royalty is five percent (5%), and the number of units applicable to the first quarter after launch is 1,250, the Minimum Annual Royalty Payment shall be $2,000 × 5% × 1,250, which equals $125,000. Notwithstanding the foregoing, beginning January 1, 2019 through the earlier of the Launch Date or January 1, 2020 and provided that the Launch Date does not occur prior to March 31, 2019, Core shall pay POWERbahn $50,000 of Minimum Annual Royalties in four equal quarterly installments of. $12,500 thirty (30) days after the end of each quarter. For the avoidance of doubt, CORE will pay POWERbahn the first $12,500 on April 30, 2019, provided that the Launch Date does not occur prior to March 31, 2019. This $50,000 payment shall reduce future Royalties paid by CORE to POWERbahn after CORE first receives back the Recoupable Litigation Advance in item VII, immediately below. The Minimum Number of Units shall be as follows:

I. Initial recoupable signing bonus
   (paid $50,000 via offset against a Promissory Note entered into prior to the      $300,000.00

16

71573-00001/3042199.1

date hereof, $100,000 upon execution of this Agreement and the balance of $150,000 90 days after execution of this Agreement):

| | | |
|---|---|---|
| II. | First year after commencement of calculation: | 1,250 units |
| III. | Second year after commencement of calculation: | 3,000 units |
| IV. | Third year after commencement of calculation: | 5,000 units |
| V. | Fourth year after commencement of calculation: | 7,500 units |
| VI. | Fifth year after commencement of calculation: | 10,000 units |

VII.    Within two (2) years from the date first listed above in this Agreement and only upon written request from POWERbahn, CORE shall pay up to $300,000 within thirty (30) days from such notification ("Recoupable Litigation Advance"). POWERbahn agrees to pay CORE thirty-three percent (33%) of its net proceeds from any settlement or awards from third parties resulting from enforcement of the Patents, including damages, settlement proceeds, or royalties ("Net Litigation Proceeds"). In the event CORE does not receive back the entire Recoupable Litigation Advance from Net Litigation Proceeds, any remaining unpaid portion of the Litigation Advance shall be deemed a pre-payment of future Royalties and Minimum Annual Royalties.

c.      The Minimum Annual Royalty Payment associated with a particular calendar year shall be reduced by Royalties paid by CORE to POWERbahn for the year for which the Minimum Annual Royalty Payment is calculated.

d.      The initial signing bonus and Litigation Advance shall be applied against Royalties otherwise due and payable to POWERbahn. The Minimum Annual Royalty Payment associated with a particular year shall be reduced by the amount of the initial signing bonus applied against Royalties during the calendar year for which the Minimum Annual Royalty Payment is calculated; provided, however, that (i) in the first year after the Launch Date, CORE shall not apply more than twenty-five percent (25%) of any Royalties and Minimum Annual Royalty Payments that would otherwise be payable to POWERbahn to recoup against the signing

17

71573-00001/3042199.1

bonus and the Litigation Advance, (ii) in subsequent years, CORE shall not apply more than fifty percent (50%) of any Royalties and Minimum Annual Royalty Payments that would otherwise be payable to POWERbahn to recoup against the signing bonus and the Litigation Advance, (iii) the total amount of Royalties and Minimum Annual Royalty Payments applied under this Section shall not exceed the sum of the portion of the signing bonus and the Litigation Advance actually received by POWERbahn.

e. Royalties shall be computed and paid quarterly by CORE, and within thirty (30) days after the end of each calendar quarter, CORE shall send POWERbahn (i) a report of transactions involving the Licensed Product in the applicable quarter; and (ii) payment for Royalties due. Royalty reports shall include, at a minimum, the gross sales relative to and the quantity of Licensed Products sold or leased by Licensee in such quarter, including an identification of each Licensed Product type, any credits or offsets (including related deductions, returns and allowances) claimed by Licensee, the aggregate amount of Net Sales from all sources, the calculation of the Royalty and the total Royalty amount due Licensor, and a brief status of product development efforts, in a form mutually agreeable to the parties.

f. CORE shall keep records according to generally accepted accounting principles and sufficient to enable POWERbahn to confirm proper calculation of the Royalties. POWERbahn (whether directly or though an authorized representative) shall have the right to inspect Licensed Products and CORE's records (including those at sublicensees and parties associated with CORE) relating to (i) the Licensed Product, (ii) the computation of Royalties, and (iii) CORE's performance under Section 4 above. Inspections of records and Licensed Products may be made no more often than once per year, unless previously agreed upon by

18

CORE in writing. Such inspections shall be on not less than 48 hours advance notice, on a date agreed upon by the parties and sensitive to CORE regulatory reporting requirements, and during CORE's normal business hours. Such inspections, the results of which shall be provided to CORE within thirty (30) days after the completion of the audit, shall be at POWERbahn's expense, unless any such inspection reveals an underpayment by CORE of more than five percent (5%); in which case CORE shall pay all of POWERbahn's costs of the inspection.

In the event of any underpayment of Royalties, CORE shall pay the amount of underpayment within fifteen (15) days of its confirmation of the contents of POWERbahn's reasonably detailed statement of underpayment plus interest thereon at prime rate per annum accrued from the date that such amount underpaid should have been paid to POWERbahn until the date of actual payment. In no event shall the interest paid thereon exceed twelve percent (12%) per annum.

In the event of any non-performance by CORE under Section 4 above, CORE shall correct such non-performance within fifteen (15) days of its confirmation of the contents of POWERbahn's reasonably detailed statement of non-performance.

CORE shall have thirty (30) days to confirm the contents of POWERbahn's statement; if it fails to confirm the statement of underpayment or non-performance within that time, the statement shall be considered to be accepted and payment or corrective action shall be due as stated above. In the event of a disagreement concerning the statement, CORE shall pay or take corrective action regarding the agreed upon portion of the statement as stated above and the parties agree to engage in a good faith effort to resolve the disputed portion of the statement.

In the event of any overpayment of Royalties, POWERbahn shall pay the amount of overpayment to CORE on the later of: (i) the date of its next receipt of a Royalty payment; or (ii) forty-five (45) days of the completion of its audit, plus interest thereon at prime rate per annum accrued from the date of CORE's overpayment. In no event shall: (1) interest be due relative to an overpayment unrelated to acts or omissions of POWERbahn, or (2) the interest paid thereon exceed twelve percent (12%) per annum.

6.    *Invalidity and Unenforceability of the Licensed Intellectual Property.*

a.    If any court of competent jurisdiction renders a final decision that all claims and/or registered rights relative to the Licensed Intellectual Property that covers a specific Licensed Product(s) are invalid or unenforceable, the parties agree that the Royalty payments under section 4 herein for any Net Sales of such specific Licensed Product ("Affected Product") only in the country, state of region in which the decision regarding validity or unenforceability was made (the "Affected Region") shall be changed so that: CORE shall pay to POWERbahn no Royalty relative to the sales in the Affected Region of such specific Licensed Product subsequent to the date that the order invalidating or finding the Licensed Intellectual Property to be unenforceable becomes final. The Royalty payments due relative to Net Sales of other Licensed Products and of such Affected Product Licensed Product in all locations other than the Affected Region shall remain unchanged.

b.    If the Licensed Intellectual Property is subsequently held valid or enforceable, the Royalty rate will then immediately revert to the then applicable rate pursuant to this Agreement (i.e., the ordinary course Royalty rate and not the zero percent Royalty rate) and

20

71573-00001/3042199.1

the Minimum Annual Royalty payment obligation shall revert to the then applicable amount

pursuant to this Agreement (i.e., the ordinary course Minimum Annual Royalty and not the pro

rated reduced amount set forth in subsection (b) above).

      7.    *Confidentiality*

      a.    Confidential Information. For purposes hereof, the term "Confidential

Information" means any confidential information of POWERbahn or CORE including, without

limitation, all business and financial information relating to such party, all proprietary

information relating to the Intellectual Property Rights, Licensed Intellectual Property, Know-

How and any Licensed Product(s) or processes produced in connection therewith (excluding,

however, that portion of such proprietary information incorporated into an issued patent), and all

designs, inventions, discoveries, methods, plans, techniques, processes, documents, drawings,

data, samples, patent applications, trade secrets, know-how, and other information of the

disclosing party and any other information or material considered proprietary by the disclosing

party; provided, however, that Confidential Information shall not include anything that (i) is or

lawfully becomes in the public domain, other than as a result of a breach of an obligation

hereunder; (ii) is furnished to the recipient by a third party having a lawful right to do so; or

(iii) was known to the recipient at the time of the disclosure.

      b.    Confidentiality Obligations. Each party shall for the term of this

Agreement and for a period of three (3) years thereafter (i) treat as confidential and preserve the

confidence of all Confidential Information of the other party; (ii) make no use of the other

party's Confidential Information except as expressly permitted under this Agreement; and

(iii) limit access to the other party's Confidential Information to the recipient's employees,

21

consultants and third parties bound by separate confidentiality agreements who reasonably require access to such Confidential Information, and otherwise maintain policies and procedures designed to prevent any unauthorized disclosure of the Confidential Information. Each of CORE and POWERbahn shall bear responsibility for the actions of its respective employees, contractors, sublicensees, agents, affiliates and assigns for any improper use or disclosure of the other party's Confidential Information.

c.    Return of Confidential Information. Upon termination of this Agreement, each party shall promptly deliver to the other party all tangible and intangible embodiments, electronic or hard copy, including all copies, of the other party's Confidential Information.

d.    Enforcement. POWERbahn and CORE agree that either party will be irreparably harmed and money damages would be inadequate compensation to a party in the event the other party breaches any provision of this Section 7. Accordingly, notwithstanding the Dispute Resolution obligations set forth below, all of the provisions of this Section 7 shall be specifically enforceable, and each party shall be entitled to injunctive relief, specific performance or other equitable relief against the other party, without bond and without prejudice to any other rights and remedies that such party may have for a breach of this Agreement, in addition to other available monetary and other remedies, for the other party's (or successor or assignee of such party) breach of any provision of this Section 7.

8.    *Enforcement and Defensive Measures*

a.    CORE shall have the first right, but no obligation, at its own discretion, to pursue any cause of action (including declaratory relief) regarding the patents portion of the exclusively licensed Licensed Product. CORE shall be solely responsible for all costs, fees, and

22

expenses incurred in connection with such action(s). In connection with any action(s) involving any of the patents portion of the exclusively licensed Licensed Intellectual Property, any proceeds from such action(s) shall first be used to reimburse CORE for its reasonable third party costs, fees, and expenses. CORE agrees to pay POWERbahn one-third (1/3) of the remaining proceeds.

b.      In the event that (i) CORE elects not to pursue or fails to pursue a cause of action regarding the patents portion of the exclusively licensed Licensed Product (which decision shall be communicated in writing to POWERbahn within thirty (30) days of notification to CORE of its opportunity to pursue such cause of action) or (ii) a cause of action exists regarding the Trademark, Copyright or Software portion of the Licensed Product or Technology Components, POWERbahn shall have the right, but no obligation, to pursue such action(s) to the extent that any of the Licensed Intellectual Property is involved. In that case, any proceeds from such action(s) shall first be used to reimburse POWERbahn for its reasonable third party costs, fees, and expenses. POWERbahn agrees to pay CORE one-third (1/3) of the remaining proceeds.

c.      If a cause of action includes both patent and non-patent portions of the exclusively licensed Licensed Product, the parties shall allocate costs and entitlement to proceeds in a ratable manner, pursuant to subsections (a) and (b) above, by POWERbahn controlling the non-patent causes of action and CORE having the first right to control the patent causes of action.

d.      The parties shall reasonably cooperate with one another in any intellectual property litigation regarding the Licensed Product or Licensed Intellectual Property. Neither party shall settle a cause of action regarding any of the Licensed Product or Licensed Intellectual

23

Property, nor make any admissions affecting the value of the Licensed Product, Licensed Intellectual Property, without first obtaining written consent from the other party, which consent will not unreasonably be withheld or delayed, if such other party shall either (i) hold title to such Intellectual Property Rights, or (ii) shall be responsible hereunder for payment of any portion of such settlement or the costs or expenses related thereto; provided that such consent shall not be unreasonably withheld or delayed.

  e.  CORE shall list POWERbahn as an additional insured party on CORE's product liability insurance for all of the Licensed Product in an amount not less than $2,000,000 per occurrence and $2,000,000 in the aggregate from an insurer rated by A.M. Best as not less than AAA. Upon request, CORE will provide POWERbahn with a certificate of insurance to confirm compliance with the preceding sentence.

  f.  CORE hereby indemnifies, defends and holds harmless POWERbahn, its officers, directors, shareholders, employees, representatives, consultants, customers, affiliates, successors, assigns and agents (each a "POWERbahn Indemnitee") against all damages, claims, liabilities, losses and other expenses, including without limitation actual attorneys' fees and costs, whether or not a lawsuit or other proceeding is filed, that arise out of or relate to: (i) CORE's use of the Licensed Intellectual Property, (ii) the Licensed Product (including, but not limited to, the use or sale/lease/loan of the Licensed Product); (iii) CORE's transactions with third parties and/or the operation of its business; and/or (v) CORE's gross negligence or willful acts or omissions. In the event CORE fails to promptly indemnify and defend such claims and/or pay a POWERbahn Indemnitee's expenses, as provided above, such POWERbahn Indemnitee shall have the right to defend itself, and in that case, CORE shall reimburse such POWERbahn

24

Indemnitee for all of its reasonable attorneys' fees, costs and damages incurred in settling or defending such claims within thirty (30) days of such POWERbahn Indemnitee's written requests. Except for where POWERbahn is entirely inactive as an organization but for receipt of royalty payments under this Agreement, POWERbahn hereby indemnifies, defends and holds harmless CORE, its officers, directors, shareholders, employees, representatives, consultants, customers, affiliates, successors, assigns and agents (each a "CORE Indemnitee") against all damages, claims, liabilities, losses and other expenses, including without limitation actual attorneys' fees and costs, whether or not a lawsuit or other proceeding is filed, that arise out of or relate to: (i) POWERbahn's use of the Licensed Intellectual Property unrelated to CORE, (ii) POWERbahn's transactions with third parties and/or the operation of its business; and/or (iii) POWERbahn's gross negligence or willful acts or omissions. In the event POWERbahn fails to promptly indemnify and defend such claims and/or pay a CORE Indemnitee's expenses, as provided above, such CORE Indemnitee shall have the right to defend itself, and in that case, POWERbahn shall reimburse such CORE Indemnitee for all of its reasonable attorneys' fees, costs and damages incurred in settling or defending such claims within thirty (30) days of such CORE Indemnitee's written requests.

9.    ***Modifications, Enhancements and Derivative Works.***

a.    Title to the Licensed Intellectual Property and Intellectual Property contained in or used by Technology Components shall always remain with POWERbahn, and CORE shall not acquire any interest therein except the rights expressly licensed pursuant to this Agreement. The parties agree that POWERbahn shall solely own and have exclusive worldwide right, title and interest in and to the Licensed Intellectual Property, Intellectual Property

25

contained in or used by Technology Components, and to all Know-How, modifications, enhancements, derivative works and Intellectual Property Rights related thereto made in whole or in part by POWERbahn, CORE or associated or affiliated third parties and their respective officers, directors, employees, contractors, authorized sublicensees, agents, successors or assigns ("Modifications, Enhancements and Derivative Works"), all of which is made on a work made for hire basis for POWERbahn and shall constitute additions to the Licensed Intellectual Property. To the extent that any of the aforesaid Modifications, Enhancements and Derivative Works are not a work made for hire, then CORE hereby irrevocably assigns all right, title and interest in such Modifications, Enhancements and Derivative works to POWERbahn . By way of example only, modifications, derivative works or improvements in Software or circuitry used for operation of the Licensed Intellectual Property or the physical housing or connection of same to a piece of Indoor Cycling Product or other Licensed Product would constitute a Modification, Enhancement or Derivative work of the Licensed Intellectual Property. CORE shall not challenge, contest or otherwise impair POWERbahn's ownership of the Licensed Intellectual Property, Know-How, additions thereto or the validity or enforceability of POWERbahn's Intellectual Property Rights related thereto. Except as otherwise permitted herein, POWERbahn shall not use any trade name, corporate name, business name, trademark or service mark of CORE, or any confusingly similar mark or name in connection with the marketing, advertising, sale or distribution of POWERbahn's products and services.

b.      Except with respect to the Licensed Intellectual Property and POWERbahn's Know-How which may be included in a Licensed Product, such as Software, title to the Licensed Product shall always remain with CORE, and POWERbahn shall not acquire any

26

interest therein. The parties agree that, except with respect to the Licensed Intellectual Property and POWERbahn's Know-How, CORE shall solely own and have exclusive worldwide right, title and interest in and to the Licensed Product, and to all modifications, enhancements and derivative works thereof made by CORE, and to all Intellectual Property Rights related thereto made in whole or in part by either/or POWERbahn/CORE, or a third party, and their respective officers, directors, employees, contractors, authorized sublicensees, agents, successors or assigns, all of which is made on a work for hire basis for CORE, POWERbahn shall not challenge, contest or otherwise impair CORE's ownership of the Licensed Product or the validity or enforceability of CORE's Intellectual Property Rights related thereto. By way of example only, improvements to handlebars or bicycle pedals would constitute a modification, enhancement or derivative work of the Licensed Product. Except as otherwise permitted herein, CORE shall not use any trade name, corporate name, business name, trademark or service mark of POWERbahn, or any confusingly similar mark or name in connection with the marketing, advertising, sale or distribution of the Licensed Product.

c.      Except as provided in Section 8 above, POWERbahn shall be solely responsible for the filing, maintenance, continuation and prosecution/protection of all Intellectual Property Rights relating to or arising out of the Licensed Intellectual Property provided, however, that CORE shall have the option to reimburse POWERbahn relative to its costs and expenses relative thereto if CORE wants such patents to be included in the exclusive license provision of this Agreement. If CORE elects to exercise such option, it will have the right to review, in a reasonable time period (not to exceed ten (10) days), and timely provide in writing substantial and meaningful consultation on all related patent applications made or to be made by

27

POWERbahn, including, but not limited to, what elements are to be the subject of the application and the jurisdictions in which such application is to be filed. Failure to timely respond in writing shall be deemed agreement to POWERbahn's proposed actions. CORE shall reimburse POWERbahn on or before thirty (30) days after CORE's receipt of a written statement from POWERbahn detailing all reasonable fees and reasonable costs (a fair measure of such reasonable fees and costs being the hourly rate of Dorsey & Whitney LLP and costs incurred by Dorsey & Whitney LLP for similar projects) fifty percent (50%) of that which it incurs in connection with: (i) those portions or elements of each such application in which the application is to be filed and/or (ii) filing and other fees for jurisdictions for which CORE gave its approval. With respect to those portions or elements of an application for which CORE reimburses POWERbahn, such portions or elements shall be added to or included within the Licensed Intellectual Property that is licensed to CORE hereunder within those jurisdictions for which CORE reimburses POWERbahn for the associated application filing and other fees. POWERbahn shall have the right to include in a given application elements or portions that CORE does not approve at POWERbahn's sole expense and such elements or portions shall not be added to or included within the Licensed Intellectual Property that is licensed to CORE hereunder. POWERbahn shall have the right to file an application in jurisdictions that CORE does not approve at POWERbahn's sole expense and CORE shall have no right, title or interest in or to the subject matter of such application within those jurisdictions. In the event that CORE choose not to exercise the option referenced herein, POWERbahn retains its exclusive right to file, maintain, continue, and prosecute/protect all Intellectual Property Rights relating to or arising out of the Licensed Intellectual Property.

28

d.      In the event that POWERbahn or any of its employees or principals are, after the execution of this Agreement, named as applicant or inventor in a patent application or issued patent for any technology relating to the Licensed Intellectual Property, and CORE timely (i) gives notice with comments/consultations or fails to respond and (ii) reimburses POWERbahn as set forth in subsection (c) above, said patent application or issued patent shall be added to or included within the Licensed Intellectual Property licensed to CORE. If CORE declines in writing to accept such an addition or inclusion, POWERbahn may license or exploit said patent application or issued patent any way that does not infringe CORE's rights under existing licenses.

e.      Except as provided in Section 8 above, CORE shall be solely responsible for the filing, maintenance, continuation and prosecution/protection of all Intellectual Property Rights relating to or arising out of the Licensed Product, provided, however, that to the extent that a given patent application incorporates any of the Licensed Intellectual Property, POWERbahn shall have the right to review, in a reasonable time period, and timely provide in writing substantial and meaningful consultation on such application. The above notwithstanding, and regardless of the content of a given application, nothing provided in this subsection (e) shall grant any right, title or ownership interest in and to the Licensed Intellectual Property to CORE.

f.      Nothing in this Section shall be interpreted as a carve-out of the exclusive license granted in this Agreement, nor a license back, whether implicit or explicit, of any rights exclusively licensed to CORE under this Agreement.

10.    **Termination**

29

71573-00001/3042199.1

a.    This Agreement shall be operative as of the date first set forth above and, unless otherwise terminated in accordance with this Agreement, this Agreement shall expire on the 20th anniversary of the date first set forth above, upon the expiration or abandonment of all of the Licensed Intellectual Property, or upon written notice from CORE to POWERbahn after a final decision by a court of competent jurisdiction that all claims of the Licensed Intellectual Property that cover a specific Licensed Product are invalid or unenforceable, whichever occurs first; provided that CORE may elect to terminate this Agreement at any time after four (4) years from the date first written above upon ninety (90) days' advance written notice to POWERbahn, providing that CORE shall pay no less than the Royalties due pursuant to the term of this Agreement through the end of the quarterly period in which the ninety (90) day termination date falls.

b.    If CORE breaches its obligation to timely make any payments or reports in accordance with the terms of this Agreement, POWERbahn may terminate the License Agreement after it provides thirty (30) days' written notice to CORE regarding said breach unless, before the end of the 30-day period, CORE has cured the breach and so notifies POWERbahn in writing, stating the manner of the cure.

c.    If either party materially breaches this Agreement, the other party may terminate this Agreement only after the breaching party has been notified of the breach in writing and has failed to cure the breach within thirty (30) days of receiving written notice of same.

d.    The above notwithstanding, this Agreement may be terminated: (i) by either party in the event that, the other party breaches any of its obligations hereunder and fails to timely cure such breach as provided for herein; (ii) upon the mutual written agreement of the

30

parties; or (iii) immediately upon (1) the actual breach by the other party of its confidentiality or trade secret protection obligations hereunder, (2) the insolvency or bankruptcy of the other party, (3) the other party's commission of an act of fraud, whether prior to or subsequent to the date hereof, upon the non-breaching party, or (5) the other party's gross negligence or willful misconduct relative to the non-breaching party and/or the Licensed Intellectual Property. This Agreement shall be effectively terminated upon the date of the non-breaching party's written notice of termination to the other party.

e.    If either party terminates this Agreement for any reason, CORE shall have a sell-off period from the date of termination, which shall not exceed twelve (12) months in length. During this sell-off period, CORE shall not manufacture additional inventory of Licensed Products (except as stated below), but shall have the right to sell its current and existing inventory of Licensed Products, provided that the sales price of each item of such current and existing inventory shall not be less than seventy-five percent (75%) of the sales price for such item (priced and distributed in a manner consistent with CORE's business practices immediately prior to the termination of this Agreement). Subject to the terms of the immediately preceding sentence, CORE may utilize any raw materials that it has on hand on the termination date to build additional wholegoods inventory that it may sell during the sell-off period. CORE shall continue to be subject to its Royalty reporting and payment obligations concerning any such post-termination sales. Subject to the foregoing 12-month sell-off period, in the event of the termination of this Agreement, CORE shall not sell, license, lease, exchange, loan any goods that use or include Licensed Intellectual Property or otherwise generate any revenue for itself from or related to the Licensed Intellectual Property (with any such revenue to be held in trust for the

31

benefit of POWERbahn and promptly paid over to POWERbahn). Subject to the above, after termination or expiration CORE shall have the continuing right and license to provide service and support for any Licensed Product sold or otherwise distributed by CORE during the term of this Agreement or any related sell-off period.

 f. Upon expiration (as opposed to termination) of this Agreement for reasons other than the expiration or abandonment of all of the Patents, CORE shall remain obligated to pay POWERbahn Royalties on subsequent sales of any Licensed Product manufactured prior to expiration of this Agreement and to reimburse POWERbahn for all actual expenses incurred and reimbursable hereunder.

 g. In no event shall either party be liable to the other for any amounts representing indirect, special, exemplary consequential or punitive damages, arising from the performance or non-performance of this Agreement.

11. *Marking*

CORE shall mark LICENSED PRODUCTS manufactured in, sold in or imported into the United States with the patent number of the PATENTS in compliance with 35 U.S.C. §287(a). Such marking may be affixed to the LICENSED PRODUCTS or may be in the form of "Virtual Marking" at CORE's sole discretion. In the event CORE chooses to affix patent marking to Licensed Products, CORE shall provide POWERbahn with electronic digital photos of such marking for approval, and in the event CORE chooses Visual Marks, CORE shall provide POWERbahn with the name and brand of the Licensed Product, Model Number, and UPC (Universal Product Code), if available, and POWERbahn shall list the patents applying to each

32

71573-00001/3042199.1

on its website (http://www.powerbahn.com/patents.html) for such Virtual Marking, and CORE shall affix this same website address on Licensed Products.

### 12. *Other Provisions*

    a.    <u>Notices</u>. All notices, reports, records, or other communications which are required or permitted to be given to the parties under this Agreement shall be sufficient in all respects if given in writing and delivered in person, by telecopy (with evidence of transmission), or by overnight courier, to the receiving party at the address listed on the first page of this Agreement or to such other person and/or address as such party may have given to the other by written notice pursuant to this Section. Notice shall be deemed given on the date of delivery, in the case of personal delivery, telecopy or overnight courier.

    b.    <u>Entire Agreement</u>. This Agreement and the NDA contains the final, entire and complete understanding between the parties as to the subject matter of this Agreement and the NDA and merges and supersedes all prior discussions between them and/or their respective counsel, and neither of the parties shall be bound by any conditions, definitions, warranties, or representations with respect to the subject matter of this Agreement and the NDA, other than as expressly provided in this Agreement or the NDA or as duly set forth on or subsequent to the date hereof in writing signed by the parties.

    c.    <u>Amendments</u>. This Agreement may not be modified or terminated orally, and no claimed amendment, rescission or waiver shall be binding on a party unless in writing signed by a duly authorized representative of the party.

    d.    <u>No Assignment</u>. Neither this Agreement nor any portion of it may be sublicensed, assigned, transferred or delegated without the written consent of both parties, unless

33

the assigning, transferring or delegating party is assigning, transferring or delegating this Agreement in connection with the transfer: (i) of its rights and obligations hereunder to a wholly-owned subsidiary, (ii) to a third party purchaser of substantially all of its assets, or (iii) to an Affiliate, provided, that, any permitted assignee, transferee or delegee must expressly agree in writing to be bound by the terms of this Agreement and assume all obligations of the assignor hereunder (a copy of which shall conveniently be provided to POWERbahn) and no such assignment, transfer or delegation shall relieve a party of its obligations hereunder.

e.    No Joint Venture. Nothing herein contained shall be construed to place the parties in the relationship of partners or joint ventures or agents.

f.    Binding Effect. The provisions of this Agreement shall be binding upon and inure to the benefit of each of the parties and their respective successors and assigns permitted under this Agreement and each party shall affirmatively bind any such successors and assigns to the terms and conditions of this Agreement.

g.    No Waiver. The failure of one of the parties to insist upon the strict performance of any provision of this Agreement or to exercise any right, power, or remedy upon a breach thereof shall not constitute a waiver of that or any other provision of this Agreement or limit that party's right thereafter to enforce any provision or exercise any right.

h.    Rules of Construction. The following rules shall govern the interpretation and construction of this Agreement:

(1)    All headings for articles and sections are for convenience only and shall not limit, alter, or otherwise affect the construction or interpretation of this Agreement.

34

71573-00001/3042199.1

Case 8:25-cv-00369-FWS-DFM    Document 1-2    Filed 02/24/25    Page 95 of 121   Page ID #:858

(2)     Whenever the context so requires, the neutral gender shall include the feminine or masculine, the feminine shall include the masculine and vice versa, and the singular number shall include the plural and vice versa.

(3)     If any provision of this Agreement as applied to any party or any circumstance shall be adjudged by a court to be unlawful, void, or for any reason unenforceable, such provision shall be deemed separable from the remainder of this Agreement and the same shall in no way affect the validity or enforceability of any other provision of this Agreement, the application of such provision to other parties or circumstances, or the validity or enforceability of this Agreement as whole.

(4)     Any rule of construction disfavoring the drafting party shall not apply in the construction of any provision of this Agreement.

i.     Counterparts/Facsimile. This Agreement may be executed in two or more counterparts and by facsimile, all of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

j.     Authority Warranty. Each of the persons signing below warrants that he is duly authorized to sign this Agreement on behalf of the party for which he is signing.

k.     Dispute Resolution. Except for the enforcement of the provisions of Section 6 which is specifically excluded from the scope of this paragraph, the parties shall attempt to have all disputes, controversies or claims between the parties arising under or related to this Agreement, including its breach, termination or validity, resolved by at least one (1) day of mediation in Reno, Nevada before any other legal proceedings are initiated by either party.

35

Anything that is not resolved through mediation shall be resolved pursuant to subsection (o) below.

l.   Attorneys' Fees. If a party shall commence any arbitration or court action or proceeding against another party in order to enforce the provisions of this Agreement or to recover damages as a result of the alleged breach of any of the provisions of this Agreement, the prevailing party shall be entitled to recover all reasonable costs in connection therewith, including reasonable attorneys' fees.

m.   Further Assurances. The parties shall cooperate fully with each other and execute such further instruments, documents, and agreements, and shall give such further written assurances, as may be reasonably requested by the other party to better evidence and reflect the transactions described herein and contemplated hereby, and to carry into effect the intent and purposes of this Agreement.

n.   Survival of Terms and Conditions. Except as otherwise specifically provided for in this Agreement, the terms and conditions of this Agreement shall survive the expiration or termination of this Agreement to the full extent necessary for their enforcement and for the protection of the party in whose favor they operate.

o.   Applicable Law. This Agreement, and all matters relating hereto, including any matter or dispute arising out of the Agreement, shall be interpreted, governed, and enforced according to the laws of the State of California, excluding any conflicts of law rules that may require application of the laws of any other state or country, and the parties hereto consent to the exclusive jurisdiction of any appropriate court in the State of California to resolve such disputes.

36

p.    Force Majeure. Neither party shall have any liability for delays or failures in performance of any obligation under this Agreement that are cause by any act or occurrence that is beyond the reasonable control or anticipation of such party, including but not limited to fire, flood, earthquake or other natural disaster, shortages of materials, labor disputes, war or civil disturbance, terrorist act or objective threat of a terrorist act, or interruption of transportation facilities. Such party's performance shall be excused for the time that any such event continues to occur.

q.    Cumulative Remedies. Nothing in this Agreement shall be construed to suggest that termination of this Agreement shall be the exclusive remedy of a non-breaching party to this Agreement. Each party shall have all remedies available at law or in equity for breach of this Agreement, all of which remedies shall be cumulative.

r.    Executory Contract. The license granted to CORE hereunder is and will be deemed to be, for purposes of Section 365(n) of the United States Bankruptcy Code, as it may be amended, a license of rights to "intellectual property" as defined under Section 101 of the Bankruptcy Code. The parties further agree that a reasonable amount of time for this license to be accepted or rejected is one hundred twenty (120) days after the filing of a voluntary petition commencing a bankruptcy case.

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the date first written above.

**CORE, Inc.**

37

71573-00001/3042199.1

By:

Name: Justin Grosz

Title: President

June 29, 2018

**POWERbahn, LLC**

By:

Name: Scott Radow

Title: Manager

38

71573-00001/3042199.1

EXHIBIT A

EXCLUSIVE LICENSE AGREEMENT
POWERbahn – CORE

| | |
|---|---|
| Patent Title: | Exercise Device |
| Patent Number: | 7,862,476 |
| Filing Date: | December 22, 2006 |

| | |
|---|---|
| Patent Title: | Bipedal locomotion training and performance evaluation device and method |
| Patent Number: | 7,066,865 |
| Filing Date: | December 1, 2003 |

| | |
|---|---|
| Patent Title: | Exercise device and method for simulating physical activity |
| Patent Number: | 7.841,964 |
| Filing Date: | October 26, 2009 |

| | |
|---|---|
| Patent Title: | Exercise device and method for simulating physical activity |
| Patent Number: | 7,608,015 |
| Filing Date: | May 22, 2006 |

| | |
|---|---|
| Patent Title: | Stationary exercise equipment |
| Patent Number: | 7,833,135 |
| Filing Date: | June 27, 2008 |

| | |
|---|---|
| U.S. Copyright Serial No.: | Txu-1-255-384 |
| Software Filing Date: | August 22, 2005 |
| POWERbahn Trademark: | POWERbahn™ |
| Music Synchro Trademark: | Music Synchro™ |

Exhibit A

GG DRAFT 4/26/18

71573-00001/3042199.1

EXHIBIT B

NON-DISCLOSURE AGREEMENT
August 24, 2010

Exhibit B

GG DRAFT 4/26/18

71573-00001/3042199.1

NONDISCLOSURE AGREEMENT

Agreement dated _Aug 23_, 2010 (the "Effective Date"), between POWERbahn, LLC a Florida limited liability company ("POWERbahn") at 1521 Alton Road, Unit #272, Miami Beach, Florida 33139 and

_Core Fitness, LLC dba StairMaster_, a _Nevada limited liability Company_ at _8000 NE Parkway Dr Vancouver, WA 98662_ ("Company").

1.      Background. POWERbahn and Company (the "parties") intend to engage in discussions and negotiations concerning the possible establishment of a business relationship between them. In the course of such discussions and negotiations and in the course of any such business relationship, it is anticipated that each party will disclose or deliver to the other party and to the other party's directors, officers, employees, agents or advisors (including, without limitation, attorneys, accountants, consultants, bankers, financial advisors and members of advisory boards) (collectively, "Representatives") certain of its trade secrets or confidential or proprietary information for the purposes of enabling the other party to evaluate the feasibility of such business relationship and to perform its obligations and exercise its rights under any such business relationship that is agreed to between the parties (the "Purposes"). The parties have entered into this Agreement in order to assure the confidentiality of such trade secrets and confidential or proprietary information in accordance with the terms of this Agreement. As used in this Agreement, the party disclosing Proprietary Information (as defined below) is referred to as the "Disclosing Party"; the party receiving such Proprietary Information is referred to as the "Recipient".

2.      Proprietary Information. As used in this Agreement, the term "Proprietary Information" shall mean all information designated as such by the Disclosing Party or information which by its nature is of a type which is considered to be confidential and/or proprietary. In addition, the term "Proprietary Information" shall be deemed to include: (a) any notes, analyses, compilations including software or firmware, studies, interpretations, prototypes or printed circuit boards, memoranda or other documents, prepared by the Recipient or its Representatives which contain, reflect or are based upon, in whole or in part, any Proprietary Information furnished to the Recipient or its Representatives pursuant hereto; and (b) the existence or status of, and any information concerning, the discussions between the parties concerning the possible establishment of a business relationship.

3.    Scope of Agreement. This Agreement shall apply to all Proprietary Information disclosed between the parties hereto without regard to whether such disclosure was made before the Effective Date.

4.    Use and Disclosure of Proprietary Information. The Recipient and its Representatives shall use the Proprietary Information of the Disclosing Party only for the Purposes and such Proprietary Information shall not be used for any other purpose without the prior written consent of the Disclosing Party. The Recipient and its Representatives shall hold in confidence, and shall not disclose any Proprietary Information of the Disclosing Party; provided, however, that (i) the Recipient may make any disclosure of such information to which the Disclosing Party gives its prior written consent; and (ii) any of the Proprietary Information may be disclosed by the Recipient to its Representatives who need to know such information in connection with the Purposes and who are informed of the confidential nature of such information and of the terms of this Agreement. In any event, the Recipient shall be responsible for any breach of this Agreement by any of its Representatives, and agrees, at its sole expense, to take reasonable measures to restrain its Representatives from prohibited or unauthorized disclosure or use of the Proprietary Information. Notwithstanding anything contained in this Agreement to the contrary, this Agreement shall not prohibit the Recipient from disclosing Proprietary Information of the Disclosing Party to the extent required in order for the Recipient to comply with applicable laws and regulations, provided that the Recipient provides prior written notice of such required disclosure to the Disclosing Party and takes reasonable and lawful actions to avoid and/or minimize the extent of such disclosure.

5.    Limitation on Obligations. The obligations of the Recipient specified in Section 4 shall not apply, and the Recipient shall have no further obligations, with respect to any Proprietary Information to the extent that such Proprietary Information:

    (a)    is generally known to the public at the time of disclosure or becomes generally known without the Recipient or its Representatives violating this Agreement;

    (b)    is in the Recipient's possession at the time of disclosure; or

    (c)    becomes known to the Recipient through disclosure by sources other than the Disclosing Party without such sources violating any confidentiality obligations to the Disclosing Party.

2

{6221.001-00353643.DOC- ()}

6.     Ownership of Proprietary Information.  The Recipient agrees that it shall not receive any right, title or interest in, or any license or right to use, the Disclosing Party's Proprietary Information or any patent, copyright, trade secret, trademark or other intellectual property rights therein, by implication or otherwise. Each of the parties hereto represents, warrants and covenants that the trade secrets which it discloses to the other party pursuant to this Agreement have not been stolen, appropriated, obtained or converted without authorization.

7.     Return of Proprietary Information.  The Recipient shall, upon the written request of the Disclosing Party, return to the Disclosing Party all Proprietary Information received by the Recipient or its Representatives from the Disclosing Party (and all copies and reproductions thereof).  In addition, the Recipient shall destroy:  (i) any notes, reports or other documents prepared by the Recipient which contain Proprietary Information of the Disclosing Party; and (ii) any Proprietary Information of the Disclosing Party (and all copies and reproductions thereof) which is in electronic form or cannot otherwise be returned to the Disclosing Party. Alternatively, upon written request of the Disclosing Party, the Recipient shall destroy all Proprietary Information received by the Recipient or its Representatives from the Disclosing Party (and all copies and reproduction thereof) and any notes, reports or other documents prepared by the Recipient which contain Proprietary Information of the Disclosing Party. Notwithstanding the return or destruction of the Proprietary Information, the Recipient and its Representatives will continue to be bound by their obligations of confidentiality and other obligations hereunder.

8.     Miscellaneous.

       (a)     This Agreement supersedes all prior agreements, written or oral, between the parties relating to the subject matter of this Agreement. This Agreement may not be modified, changed or discharged, in whole or in part, except by an agreement in writing signed by the parties.

       (b)     This Agreement will be binding upon and inure to the benefit of the parties and their respective heirs, successors and assigns.

       (c)     This Agreement shall be construed and interpreted in accordance with the internal laws of the State of Florida, without giving effect to the principles of conflicts of law thereof.  The parties further agree that any litigation or other proceedings regarding the interpretation, breach or enforcement of this Agreement will be filed in and heard only by the state or federal courts sitting in the State of Florida

3

{6221.001-00353643.DOC- ()}

with jurisdiction to hear such disputes, and the parties hereby expressly submit to the jurisdiction of such courts.

(d)     The provisions of this Agreement are necessary for the protection of the business and goodwill of the parties and are considered by the parties to be reasonable for such purpose.  The Recipient agrees that any breach of this Agreement will cause the Disclosing Party substantial and irreparable injury and, therefore, in the event of any such breach, in addition to other remedies which may be available, the Disclosing Party shall have the right to specific performance and other injunctive and equitable relief.

(e)     The confidentiality obligations imposed by this Agreement shall continue with respect to a particular item of Proprietary Information until the third anniversary of the disclosure of such Proprietary Information to Recipient pursuant to this Agreement.

(f)     For the convenience of the parties, this Agreement may be executed by facsimile and in counterparts, each of which shall be deemed to be an original, and both of which taken together, shall constitute one agreement binding on both parties.

*[Signatures appear on following page.]*

4

{6221.001-00353643.DOC- 0}

EXECUTED as of the day and year first set forth above.

POWERBAHN, LLC

By: _____

Name: Scott Radow

Title: MGR

Core Fitness, LLC dba stairmaster

By: _____

Name: Dustin Grosz

Title: President

## EXHIBIT C

### NON-DISCLOSURE AGREEMENT
February 16, 2016

Exhibit C

GG DRAFT 4/26/18

71573-00001/3042199.1

## NONDISCLOSURE AGREEMENT

Agreement dated February 19, 2016 (the "Effective Date"), between POWERbahn, LLC a limited liability company ("POWERbahn") with offices at 5615 Foret Circle, Reno, NV 89511 and

Core Health + Fitness LLC , a Nevada limited liability company at 4400 NE 77th Ave, Suite 300 Vancouver WA 98662 ("Company").

1.    Background. POWERbahn and Company (the "parties") intend to engage in discussions and negotiations concerning the possible establishment of a business relationship between them. In the course of such discussions and negotiations and in the course of any such business relationship, it is anticipated that each party will disclose or deliver to the other party and to the other party's directors, officers, employees, agents or advisors (including, without limitation, attorneys, accountants, consultants, bankers, financial advisors and members of advisory boards) (collectively, "Representatives") certain of its trade secrets or confidential or proprietary information for the purposes of enabling the other party to evaluate the feasibility of such business relationship and to perform its obligations and exercise its rights under any such business relationship that is agreed to between the parties (the "Purposes"). The parties have entered into this Agreement in order to assure the confidentiality of such trade secrets and confidential or proprietary information in accordance with the terms of this Agreement. As used in this Agreement, the party disclosing Proprietary Information (as defined below) is referred to as the "Disclosing Party"; the party receiving such Proprietary Information is referred to as the "Recipient".

2.    Proprietary Information. As used in this Agreement, the term "Proprietary Information" shall mean all information designated as such by the Disclosing Party or information which by its nature is of a type which is considered to be confidential and/or proprietary. In addition, the term "Proprietary Information" shall be deemed to include: (a) any notes, analyses, compilations including software or firmware, studies, interpretations, prototypes or printed circuit boards, memoranda or other documents, prepared by the Recipient or its Representatives which contain, reflect or are based upon, in whole or in part, any Proprietary Information furnished to the Recipient or its Representatives pursuant hereto; and (b) the existence or status of, and any information concerning, the discussions between the parties concerning the possible establishment of a business relationship.

3.    <u>Scope of Agreement</u>. This Agreement shall apply to all Proprietary Information disclosed between the parties hereto without regard to whether such disclosure was made before the Effective Date.

4.    <u>Use and Disclosure of Proprietary Information</u>.  The Recipient and its Representatives shall use the Proprietary Information of the Disclosing Party only for the Purposes and such Proprietary Information shall not be used for any other purpose without the prior written consent of the Disclosing Party.  The Recipient and its Representatives shall hold in confidence, and shall not disclose any Proprietary Information of the Disclosing Party; provided, however, that (i) the Recipient may make any disclosure of such information to which the Disclosing Party gives its prior written consent; and (ii) any of the Proprietary Information may be disclosed by the Recipient to its Representatives who need to know such information in connection with the Purposes and who are informed of the confidential nature of such information and of the terms of this Agreement.  In any event, the Recipient shall be responsible for any breach of this Agreement by any of its Representatives, and agrees, at its sole expense, to take reasonable measures to restrain its Representatives from prohibited or unauthorized disclosure or use of the Proprietary Information.  Notwithstanding anything contained in this Agreement to the contrary, this Agreement shall not prohibit the Recipient from disclosing Proprietary Information of the Disclosing Party to the extent required in order for the Recipient to comply with applicable laws and regulations, <u>provided that</u> the Recipient provides prior written notice of such required disclosure to the Disclosing Party and takes reasonable and lawful actions to avoid and/or minimize the extent of such disclosure.

5.    <u>Limitation on Obligations</u>.  The obligations of the Recipient specified in Section 4 shall not apply, and the Recipient shall have no further obligations, with respect to any Proprietary Information to the extent that such Proprietary Information:

    (a)    is generally known to the public at the time of disclosure or becomes generally known without the Recipient or its Representatives violating this Agreement;

    (b)    is in the Recipient's possession at the time of disclosure; or

    (c)    becomes known to the Recipient through disclosure by sources other than the Disclosing Party without such sources violating any confidentiality obligations to the Disclosing Party.

{6221.001-00353643.DOC- 0}

6.   Ownership of Proprietary Information.  The Recipient agrees that it shall not receive any right, title or interest in, or any license or right to use, the Disclosing Party's Proprietary Information or any patent, copyright, trade secret, trademark or other intellectual property rights therein, by implication or otherwise. Each of the parties hereto represents, warrants and covenants that the trade secrets which it discloses to the other party pursuant to this Agreement have not been stolen, appropriated, obtained or converted without authorization.

7.   Return of Proprietary Information.  The Recipient shall, upon the written request of the Disclosing Party, return to the Disclosing Party all Proprietary Information received by the Recipient or its Representatives from the Disclosing Party (and all copies and reproductions thereof).  In addition, the Recipient shall destroy:  (i) any notes, reports or other documents prepared by the Recipient which contain Proprietary Information of the Disclosing Party; and (ii) any Proprietary Information of the Disclosing Party (and all copies and reproductions thereof) which is in electronic form or cannot otherwise be returned to the Disclosing Party. Alternatively, upon written request of the Disclosing Party, the Recipient shall destroy all Proprietary Information received by the Recipient or its Representatives from the Disclosing Party (and all copies and reproduction thereof) and any notes, reports or other documents prepared by the Recipient which contain Proprietary Information of the Disclosing Party. Notwithstanding the return or destruction of the Proprietary Information, the Recipient and its Representatives will continue to be bound by their obligations of confidentiality and other obligations hereunder.

8.   Miscellaneous.

   (a)   This Agreement supersedes all prior agreements, written or oral, between the parties relating to the subject matter of this Agreement. This Agreement may not be modified, changed or discharged, in whole or in part, except by an agreement in writing signed by the parties.

   (b)   This Agreement will be binding upon and inure to the benefit of the parties and their respective heirs, successors and assigns.

   (c)   This Agreement shall be construed and interpreted in accordance with the internal laws of the State of Nevada, without giving effect to the principles of conflicts of law thereof.  The parties further agree that any litigation or other proceedings regarding the interpretation, breach or enforcement of this Agreement will be filed in and heard only by the state or federal courts sitting in the State of

3

{6221.001-00353643.DOC- ()}

Nevada with jurisdiction to hear such disputes, and the parties hereby expressly submit to the jurisdiction of such courts.

(d)     The provisions of this Agreement are necessary for the protection of the business and goodwill of the parties and are considered by the parties to be reasonable for such purpose.  The Recipient agrees that any breach of this Agreement will cause the Disclosing Party substantial and irreparable injury and, therefore, in the event of any such breach, in addition to other remedies which may be available, the Disclosing Party shall have the right to specific performance and other injunctive and equitable relief.

(e)     The confidentiality obligations imposed by this Agreement shall continue with respect to a particular item of Proprietary Information until the third anniversary of the disclosure of such Proprietary Information to Recipient pursuant to this Agreement.

(f)     For the convenience of the parties, this Agreement may be executed by facsimile and in counterparts, each of which shall be deemed to be an original, and both of which taken together, shall constitute one agreement binding on both parties.

*[Signatures appear on following page.]*

4

{6221.001-00353643.DOC- 0}

EXECUTED as of the day and year first set forth above.

POWERBAHN, LLC

By: _____

Name: _____
Title: _____


Core Health + Fitness

By: _____

Name: Dustin Grosz
Title: President

Signature Page to Nondisclosure Agreement, p-5

## EXHIBIT D

### SUPPLIER QUALITY REVIEW STANDARDS

- Suppliers of goods to CORE Health & Fitness, LLC ("CORE") are subject to a formal initial assessment and recurring audit of 1st and 3rd party manufacturing/assembly facilities. Assessments and audits may be conducted by CORE staff or contracted staff appointed by CORE.

- A first article inspection report (FAIR) must be submitted by supplier and approved by CORE prior to first production shipments leaving supplier's facility.

- Subsequent production shipments are subject to CORE requiring batch inspection documentation to confirm product's conformance to specification. Batch size and frequency to be determined by CORE's selected AQL index.

- CORE may periodically inspect all inbound production materials and hold or reject shipments if any non-conformities are discovered. CORE will notify supplier of non-conformities via a corrective and preventative action request form (CPAR) and supplier shall provide an initial response within 24 hours. CORE may also require the supplier to provide resources to facilitate increased inspection volume as part of the containment effort within the CPAR protocol.

- In the event that (a) two consecutive production shipments of inbound production materials or (b) three production shipments of inbound production materials in the same calendar quarter are non-conforming, CORE may, at its option, terminate supplier's right to supply goods to CORE and any associated contracts.

AQL reference chart; selected AQL index of 1.5 bolded and underlined:

**C=0 Sampling Plans**
**Index Values**
(Associated AQL)

| Lot Size | 1.0 | **1.5** | 2.5 | 4.0 | 6.5 | 10.0 |
|---|---|---|---|---|---|---|
| 2 to 8 | * | * | 5 | 3 | 2 | 2 |
| 9 to 15 | 13 | **8** | 5 | 3 | 2 | 2 |
| 16 to 25 | 13 | **8** | 5 | 3 | 3 | 2 |
| 26 to 50 | 13 | **8** | 5 | 5 | 5 | 3 |
| 51 to 90 | 13 | **8** | 7 | 6 | 5 | 4 |
| 91 to 150 | 13 | **12** | 11 | 7 | 6 | 5 |
| 151 to 280 | 20 | **19** | 13 | 10 | 7 | 6 |
| 281 to 500 | 29 | **21** | 16 | 11 | 9 | 7 |
| 501 to 1200 | 34 | **27** | 19 | 15 | 11 | 8 |

Exhibit D

GG DRAFT 4/26/18

71573-00001/3042199.1

**C=0 Sampling Plans**
**Index Values**
(Associated AQL)

| Lot Size | 1.0 | **1.5** | 2.5 | 4.0 | 6.5 | 10.0 |
|---|---|---|---|---|---|---|
| 1201 to 3200 | 42 | **35** | 23 | 18 | 13 | 9 |
| 3201 to 10,000 | 50 | **38** | 29 | 22 | 15 | 9 |
| 10,001 to 35,000 | 60 | **46** | 35 | 29 | 15 | 9 |
| 35,001 to 150,000 | 74 | **56** | 40 | 29 | 15 | 9 |
| 150,001 to 500,000 | 90 | **64** | 40 | 29 | 15 | 9 |
| 500,001 and over | 102 | **64** | 40 | 29 | 15 | 9 |

Exhibit D

GG DRAFT 4/26/18

71573-00001/3042199.1

# **Exhibit 2**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

POWERBAHN, LLC, §
§
    Plaintiff, §
§
                       §   C.A. NO. 1:17-CV-02965-AT
v. §
§
FOUNDATION FITNESS LLC, § **JURY TRIAL DEMANDED**
WAHOO FITNESS, LLC, AND §
PATRICK WARNER, §
§
    Defendants.

## JOINT STATUS REPORT REGARDING CLAIMS BETWEEN
## POWERBAHN, LLC AND WAHOO FITNESS, LLC

Pursuant to the parties' March 6, 2023, Joint Status Report, POWERbahn, LLC ("POWERbahn") and Wahoo Fitness, LLC ("Wahoo") submit this updated Joint Status Report.

POWERbahn and Wahoo are pleased to report that they have executed final agreements to resolve all issues between them and expect to file a stipulation of dismissal of claims and counterclaims between POWERbahn and Wahoo within the next fifteen (15) days.

This 5th day of April, 2023.

                              */s/ Cortney S. Alexander*

Daniel A. Kent
  dankent@kentrisley.com
  Tel:  (404) 585-4214
  Fax:  (404) 829-2412
Stephen R. Risley
  steverisley@kentrisley.com
  Tel:  (404) 585-2101
  Fax:  (404) 389-9402
Cortney S. Alexander
  cortneyalexander@kentrisley.com
  Tel:  (404) 855-3867
  Fax:  (770) 462-3299
KENT & RISLEY LLC
5755 N Point Pkwy Ste 57
Alpharetta, GA 30022

Attorneys for Plaintiff

*/s/ Holmes J. Hawkins III*
Holmes J. Hawkins III
  Georgia Bar No. 338681
  hhawkins@kslaw.com
Russell E. Blythe
  Georgia Bar No. 141379
  rblythe@kslaw.com
**KING & SPALDING, LLP**
1180 Peachtree St., NE
Atlanta, GA 30309
Phone: (404) 572-4600
Facsimile: (404) 572-5136

*Attorneys for Defendant*
*Wahoo Fitness, LLC*

# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| POWERBAHN, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action File |
| | ) | |
| vs. | ) | No. 1:17-cv-02965-AT |
| | ) | |
| FOUNDATION FITNESS LLC, | ) | |
| WAHOO FITNESS, LLC, | ) | |
| And PATRICK WARNER, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## STIPULATION OF DISMISSAL OF CLAIMS
## BETWEEN POWERBAHN AND WAHOO

IT IS HEREBY STIPULATED by Plaintiff POWERbahn LLC ("POWERbahn"), on the one hand, and Defendant Wahoo Fitness, LLC ("Wahoo"), on the other hand (POWERbahn and Wahoo collectively, the "Parties"), that pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii):

1.      All claims asserted by POWERbahn against Wahoo in the above-captioned action are dismissed with prejudice;

2.      All claims (whether styled as "counterclaims" or otherwise) asserted by Wahoo against POWERbahn in the above-captioned action are dismissed with prejudice; and

3.      Each of the Parties shall bear its own costs and attorneys' fees.

Respectfully submitted this 8th day of April, 2023.

**KENT & RISLEY LLC**

/s/ *Cortney S. Alexander*
Daniel A. Kent
dankent@kentrisley.com
Tel: (404) 585-4214
Fax: (404) 829-2412
Stephen R. Risley
steverisley@kentrisley.com
Tel: (404) 585-2101
Fax: (404) 389-9402
Cortney S. Alexander
cortneyalexander@kentrisley.com
Tel: (404) 855-3867
Fax: (770) 462-3299
5755 N Point Pkwy Ste 57
Alpharetta, GA 30022

**ATTORNEYS FOR PLAINTIFF POWERBAHN, LLC**

**KING & SPALDING LLP**

/s/ *Holmes J. Hawkins III*
Holmes J. Hawkins III
  Georgia Bar No. 338681
Russell E. Blythe
  Georgia Bar No. 141379
King & Spalding LLP
1180 Peachtree St. NE
Atlanta, GA 30309
Tel: 404-572-4600
Fax: 404-572-5136
hhawkins@kslaw.com
rblythe@kslaw.com

**ATTORNEYS FOR DEFENDANT WAHOO FITNESS, LLC**

# PROOF OF SERVICE

**CASE NAME:**       *Core Health & Fitness, LLC v. POWERbahn, LLC, et al.*
**CASE NUMBER:**  30-2024-01412019-CU-BC-CXC

I, the undersigned, am over 18 years of age, employed in the County of San Diego, California, in which the within-mentioned service occurred; and that I am not a party to the subject cause of action. My business address is 2550 Fifth Ave, Suite 910, San Diego, California 92103.

On February 7, 2025, I served the following documents:

## FIRST AMENDED COMPLAINT

## SEE ATTACHED SERVICE LIST

☒       **BY ELECTRONIC SERVICE.** I caused a true and correct copy of the document(s) described above to be electronically served on counsel of record at the electronic service addresses listed on the attached service list via email.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on February 7, 2025

_____
Andrew Galvin
andrew.galvin@mojdehigalvin.com

1

PROOF OF SERVICE

**<u>SERVICE LIST</u>**

*Core Health & Fitness, LLC v. POWERbahn, LLC, et al.*
Orange County Superior Court Case No. 30-2024-01412019-CU-BC-CXC

Allison M. Rego
Barnes & Thornburg LLP
arego@btlaw.com
655 West Broadway, Suite 1300
San Diego, California  92101
Telephone:     (619) 321-5000
Facsimile:     (310) 284-3894
*Attorneys for Plaintiff Core Health & Fitness, LLC*

Stephen M. Lobbin, Esq.
SML Avvocati P.C.
888 Prospect Street, Suite 200
San Diego, CA 92037
Email: sml@smlavvocati.com | cmf@smlavvocati.com
*Attorneys for Defendant POWERbahn, LLC*

Cortney Alexander, Esq.
Kent & Risley LLC
5755 N Point Pkwy Ste 57
Alpharetta, GA 30022
Email: cortneyalexander@kentrisley.com
*Attorneys for Defendant POWERbahn, LLC*

2

PROOF OF SERVICE