

Stephen M. Lobbin (SBN 181195)
Email: sml@smlavvocati.com
**SML Avvocati P.C.**
888 Prospect Street, Suite 200
San Diego, CA 92037
Tel: 949.636.1391

Cortney S. Alexander
(application for admission pro hac vice pending)
Email: cortneyalexander@kentrisley.com
Tel: 404.855.3867
**Kent & Risley LLC**
5755 N Point Pkwy, Ste 57
Alpharetta, GA 30022

Attorneys for Defendant
POWERbahn, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| CORE HEALTH & FITNESS, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>POWERBAHN, LLC, and DOES 1 through 10, inclusive.<br><br>Defendants. | Case No. 8:25-cv-00369-FWS-DFM<br><br>**DEFENDANT POWERBAHN, LLC'S ANSWER, AFFIRMATIVE DEFENSES, & COUNTERCLAIMS**<br><br>**DEMAND FOR JURY TRIAL** |

**POWERBAHN'S ANSWER & AFFIRMATIVE DEFENSES**
**TO FIRST AMENDED COMPLAINT**

Defendant POWERbahn, LLC ("POWERbahn") files this Answer to Plaintiff Core Health & Fitness, LLC's First Amended Complaint. POWERbahn Answers and avers as follows, with the numbered paragraphs corresponding to the like numbered paragraphs of the First Amended Complaint. Except as hereinafter specifically admitted, qualified, or affirmatively alleged, POWERbahn denies each and every allegation, matter, or thing contained in the First Amended Complaint. POWERbahn specifically denies that Core is entitled to any relief whatsoever from POWERbahn.

The opening paragraph of the First Amended Complaint is an introductory paragraph that does not require a response from POWERbahn.

1.      POWERbahn admits that this action concerns disputes arising from a certain Exclusive License Agreement dated June 29, 2018, and entered into between Plaintiff as licensee, and POWERbahn as licensor. POWERbahn admits that Exhibit 1 to the First Amended Complaint purports to be a copy of the ELA. POWERbahn is without information sufficient to admit or deny the remaining allegations of Paragraph 1, and therefore denies them.

2.      POWERbahn admits that its website includes the content described in footnote 1 to the First Amended Complaint. POWERbahn admits that it has described itself in a litigation pleading as follows: "POWERbahn is a Reno-based company that researches and develops products and technology concerning, and owns and licenses patents covering, exercise devices and methods that incorporate POWERbahn's proprietary technology, among other things." To the extent Paragraph 2 contains any additional allegations requiring a response, POWERbahn denies them.

3.      POWERbahn admits that Core licensed certain patents and related intellectual property relating to electronic control systems from POWERbahn. The ELA speaks for itself, and POWERbahn denies any allegations that are inconsistent with the ELA. In particular, POWERbahn denies that the primary purpose of the License Agreement was to provide a framework for the development and sale of a "smart bike" because that term does not appear to

1

be set forth in the ELA. POWERbahn is without information sufficient to admit or deny the remaining allegations of Paragraph 3, and therefore denies them.

4.     POWERbahn denies that the provision of the ELA relating to the Recoupable Litigation Advance was a separate and divisible covenant. The ELA speaks for itself, and POWERbahn denies any allegations that are inconsistent with the ELA. POWERbahn admits that at or about the time the ELA was executed, POWERbahn was involved in ongoing litigation to enforce patents that were included in the license to Core under the ELA. To the extent any of the remaining allegations of Paragraph 4 require a response, POWERbahn denies them.

5.     POWERbahn admits that Core provided a Recoupable Litigation Advance of $300,000 pursuant to the ELA. The ELA speaks for itself, and POWERbahn denies any allegations that are inconsistent with the ELA. To the extent any of the remaining allegations of Paragraph 5 require a response, POWERbahn denies them.

6.     POWERbahn is without information sufficient to admit or deny allegations as to what Core is informed or believes, and therefore denies the allegations of Paragraph 6.

7.     POWERbahn admits that public court records indicate that POWERbahn has entered into one or more settlements with third-party defendants resulting from POWERbahn's enforcement of patents. To the extent any of the remaining allegations of Paragraph 7 require a response, POWERbahn denies them.

8.     POWERbahn is without information sufficient to admit or deny allegations as to what Core is informed or believes, and therefore denies the allegations of Paragraph 8.

9.     POWERbahn admits that Core seeks the relief identified in Paragraph 9. POWERbahn denies that Core is entitled to any such relief. To the extent Paragraph 9 contains any additional allegations requiring a response, POWERbahn denies them.

10.     POWERbahn admits that it is a limited liability company organized under the laws of Florida, that it was assigned EIN No. 20-1119660, with its principal place of business and mailing address at 5615 Foret Circle, Reno, Nevada. POWERbahn admits that its Manager

2

is Scott B. Radow. To the extent Paragraph 10 contains any additional allegations requiring a response, POWERbahn denies them.

11.    POWERbahn admits that Core is a limited liability company organized in the State of Nevada. POWERbahn is without information sufficient to admit or deny the remaining allegations of Paragraph 11 and therefore denies them.

12.    POWERbahn is without information sufficient to admit or deny the allegations of Paragraph 12 and therefore denies them.

13.    California Code of Civ. Proc. §410.10 speaks for itself, and POWERbahn denies any allegations inconsistent with that provision. To the extent Paragraph 13 contains any additional allegations requiring a response, POWERbahn denies them.

14.    POWERbahn admits that Core's First Amended Complaint arises out of the ELA. To the extent Paragraph 14 contains any additional allegations requiring a response, POWERbahn denies them.

15.    POWERbahn admits that it does not reside in California. To the extent Paragraph 15 contains any additional allegations requiring a response, POWERbahn denies them.

16.    POWERbahn admits that the amount of the dispute exceeds $35,000.00. To the extent Paragraph 16 contains any additional allegations requiring a response, POWERbahn denies them.

17.    POWERbahn admits that on June 18, 2015, it filed suit in the U.S. District Court for the District of Nevada against Wahoo Fitness, L.L.C. ("Wahoo"), Giant Bicycle, Inc. ("Giant") and Foundation Fitness LLC ("Foundation Fitness") (such action, the "Patent Infringement Case"), alleging that the Wahoo KICKR trainer infringed on its patents. To the extent Paragraph 17 contains any additional allegations requiring a response, POWERbahn denies them.

18.    POWERbahn admits that Giant was dismissed from the Patent Infringement Case on August 31, 2015, prior to filing an answer.

3

19.     POWERbahn admits that its First Amended Complaint in the Patent Infringement Case included claims for (i) direct infringement of the '865 Patent, (ii) induced infringement of the '865 Patent, (iii) direct infringement of the '476 Patent, and (iv) induced infringement of the '476 Patent. To the extent Paragraph 19 contains any additional allegations requiring a response, POWERbahn denies them.

20.     POWERbahn's First Amended Complaint in the Patent Infringement Case speaks for itself. To the extent the allegations of Paragraph 20 are inconsistent with the First Amended Complaint, POWERbahn denies them. POWERbahn admits that Scott Radow licensed the '865 patent to POWERbahn, that Mr. Radow manages POWERbahn, that POWERbahn entered into a license agreement with Nautilus in 2005, and that Nautilus terminated the agreement in 2008. The First Amended Complaint does not appear to include the specific language set forth in Paragraph 20, and therefore POWERbahn denies the allegations of Paragraph 20. To the extent Paragraph 20 contains any additional allegations requiring a response, POWERbahn denies them.

21.     POWERbahn's First Amended Complaint in the Patent Infringement Case speaks for itself. To the extent the allegations of Paragraph 21 are inconsistent with the First Amended Complaint, POWERbahn denies them. To the extent Paragraph 21 contains any additional allegations requiring a response, POWERbahn denies them.

22.     POWERbahn's First Amended Complaint in the Patent Infringement Case speaks for itself. To the extent the allegations of Paragraph 22 are inconsistent with the First Amended Complaint, POWERbahn denies them. To the extent Paragraph 22 contains any additional allegations requiring a response, POWERbahn denies them.

23.     POWERbahn admits that its original complaint in the Patent Infringement Case included the following statement: "Warner, a former Nautilus executive, took this knowledge of the rights claimed in the '865 patent—and knowledge of the '865 patent itself—with him to Foundation. Foundation then proceeded to copy the '865 patent and sold or licensed the copy to Wahoo." To the extent Paragraph 23 contains any additional allegations requiring a response, POWERbahn denies them.

4

24.    POWERbahn admits that its original complaint in the Patent Infringement Case included the following statement: "POWERbahn seeks at least a 5% royalty on sales of the Kickr to be trebled based on Foundation's willful conduct." To the extent Paragraph 24 contains any additional allegations requiring a response, POWERbahn denies them.

25.    POWERbahn admits that the Patent Infringement Case was moved from the District of Nevada to the U.S. District Court for the Northern District of Georgia on August 8, 2017, proceeding as Case No. 1:17-cv-02965-AT.

26.    POWERbahn admits that, on or about June 29, 2018, Plaintiff, as licensee, and POWERbahn, as licensor, entered into the ELA.

27.    The ELA speaks for itself, and POWERbahn denies any allegations that are inconsistent with the ELA. To the extent any of the remaining allegations of Paragraph 27 require a response, POWERbahn denies them.

28.    POWERbahn admits that Section 12(h)(3) of the ELA states the following: "If any provision of this Agreement as applied to any party or any circumstance shall be adjudged by a court to be unlawful, void, or for any reason unenforceable, such provision shall be deemed separable from the remainder of this Agreement and the same shall in no way affect the validity or enforceability of any other provision of this Agreement, the application of such provision to other parties or circumstances, or the validity or enforceability of this Agreement as whole." To the extent Paragraph 28 contains any additional allegations requiring a response, POWERbahn denies them.

29.    Denied.

30.    POWERbahn admits that Section 5(b)(VII) of the ELA states the following: "Within two (2) years from the date first listed above in this Agreement and only upon written request from POWERbahn, CORE shall pay up to $300,000 within thirty (30) days from such notification ('Recoupable Litigation Advance'). POWERbahn agrees to pay CORE thirty-three percent (33%) of its net proceeds from any settlement or awards from third parties resulting from enforcement of the Patents, including damages, settlement proceeds, or royalties ('Net Litigation Proceeds'). In the event CORE does not receive back the entire Recoupable

Litigation Advance from Net Litigation Proceeds, any remaining unpaid portion of the Litigation Advance shall be deemed a pre-payment of future Royalties and Minimum Annual Royalties." To the extent Paragraph 30 contains any additional allegations requiring a response, POWERbahn denies them.

31. Denied.

32. Denied.

33. POWERbahn admits that it made a written request that Core pay the Recoupable Litigation Advance (as defined in the ELA) within two (2) years of the effective date of the ELA. To the extent Paragraph 33 contains any additional allegations requiring a response, POWERbahn denies them.

34. POWERbahn denies that Core paid the Recoupable Litigation Advance of $300,000.00 to POWERbahn within fifteen (15) days of POWERbahn's written request. POWERbahn denies that Core paid POWERbahn an additional amount of no less than $20,000.00 as a Recoupable Litigation Advance, for a total of no less than $320,000.00. To the extent Paragraph 34 contains any additional allegations requiring a response, POWERbahn denies them.

35. Denied.

36. Denied.

37. POWERbahn is without information sufficient to admit or deny allegations as to what Core is informed or believes, and therefore denies the allegations of Paragraph 37.

38. Denied.

39. POWERbahn is without information sufficient to admit or deny the allegations of Paragraph 39, and therefore denies them.

40. Denied.

41. Denied.

42. POWERbahn admits that it has not made any payments to Core in connection with Net Litigation Proceeds. POWERbahn denies that Core is entitled to any such payment.

POWERBAHN'S ANSWER, AFFIRMATIVE DEFENSES, & COUNTERCLAIMS

To the extent Paragraph 42 contains any additional allegations requiring a response, POWERbahn denies them.

43.      POWERbahn is without information sufficient to admit or deny allegations as to what Core is informed or believes, and therefore denies the allegations of Paragraph 43.

44.      POWERbahn admits that Core has served discovery requests in this litigation seeking information regarding POWERbahn's receipt of Net Litigation Proceeds. To the extent Paragraph 44 contains any additional allegations requiring a response, POWERbahn denies them.

45.      POWERbahn denies that it has failed to comply with any discovery obligations in this litigation or any provision of the ELA, or that it has otherwise acted improperly. To the extent Paragraph 45 contains any additional allegations requiring a response, POWERbahn denies them.

46.      Denied.

47.      Denied.

48.      POWERbahn admits that it and Core previously participated in mediation before a neutral in Reno, Nevada, pursuant to the provisions of Paragraph 12.k of the ELA, which mediation was not successful.

49.      POWERbahn admits that the ELA has terminated.

50.      POWERbahn admits that Section 12(n) of the ELA states the following: "Survival of Terms and Conditions. Except as otherwise specifically provided for in this Agreement, the terms and conditions of this Agreement shall survive the expiration or termination of this Agreement to the full extent necessary for their enforcement and for the protection of the party in whose favor they operate." To the extent Paragraph 50 contains any additional allegations requiring a response, POWERbahn denies them.

51.      POWERbahn denies the allegations of Paragraph 51, including denying that the payment obligations survived termination of the ELA based on Core's breaches of the ELA.

52.      POWERbahn admits that Section 12(l) of the ELA states the following: "Attorneys' Fees. If a party shall commence any arbitration or court action or proceeding

7

against another party in order to enforce the provisions of this Agreement or to recover damages as a result of the alleged breach of any of the provisions of this Agreement, the prevailing party shall be entitled to recover all reasonable costs in connection therewith, including reasonable attorneys' fees." To the extent Paragraph 52 contains any additional allegations requiring a response, POWERbahn denies them.

53.    POWERbahn admits that this action relates to a dispute arising under the ELA. To the extent Paragraph 53 contains any additional allegations requiring a response, POWERbahn denies them.

54.    POWERbahn admits that the United States district court presiding in the Patent Infringement Case administratively closed the action on June 28, 2022 based on a notification from the parties that a settlement in principle had been reached, provided that in the event a settlement was not consummated, any party could move to reopen the action. To the extent Paragraph 54 contains any additional allegations requiring a response, POWERbahn denies them.

55.    POWERbahn admits that, on or about April 2023, Wahoo Fitness reached a written settlement agreement with POWERbahn regarding POWERbahn's allegations against Wahoo in the Patent Infringement Case, with each side paying its own legal costs. POWERbahn admits that, on April 5, 2023, Powerbahn and Wahoo Fitness filed a joint status report stating that they were "pleased to report that they have executed final agreements to resolve all issues between them and expect to file a stipulation of dismissal of claims and counterclaims" between them within 15 days. POWERbahn admits that Exhibit 2 to the First Amended Complaint purports to be a copy of POWERbahn's and Wahoo's Joint Status Report. POWERbahn admits that Wahoo Fitness and Powerbahn thereafter stipulated to the dismissal of claims between them on April 8, 2023. POWERbahn admits that Exhibit 3 to the First Amended Complaints purports to be a copy of the stipulation for dismissal. To the extent Paragraph 55 contains any additional allegations requiring a response, POWERbahn denies them.

56. POWERbahn is without information sufficient to admit or deny allegations as to what Core knows, and therefore denies the allegations of Paragraph 56.

57. Denied.

58. POWERbahn admits that, on May 8, 2024, it filed a motion in the Patent Infringement Case seeking to reopen the action and to file an amended complaint in order to pursue its infringement claims under the '476 Patent against Foundation Fitness and Warner relating to Foundation Fitness' SB20 product. To the extent Paragraph 58 contains any additional allegations requiring a response, POWERbahn denies them.

59. Denied.

60. POWERbahn admits that its reply in support of its motion to file an amended complaint in the Patent Infringement Case stated that "Warner remains connected to the case even with his apparent new employer. Public information indicates that Warner now works for Giant Bicycle, which was initially a party in this case due to its manufacture of the Wahoo KICKR products." To the extent Paragraph 60 contains any additional allegations requiring a response, POWERbahn denies them.

61. POWERbahn admits that, on July 30, 2024, POWERbahn, Foundation Fitness and Warner requested dismissal of the Patent Infringement Case, stating that "[a]s the Court noted in the July 18 Order, the dismissal of POWERbahn's claims against Foundation and Warner relating to Wahoo's KICKR products does not preclude POWERbahn from filing suit against Foundation and/or Warner for infringement in connection with the SB20 product." POWERbahn admits that, on August 6, 2024, the Court entered an order terminating the case. To the extent Paragraph 61 contains any additional allegations requiring a response, POWERbahn denies them.

62. POWERbahn is without information sufficient to admit or deny allegations as to what Core is informed or believes, and therefore denies the allegations of Paragraph 62.

63. POWERbahn incorporates by reference the preceding paragraphs of its Answer.

64.     POWERbahn admits that it and Core entered into the ELA. The ELA has been terminated. To the extent Paragraph 64 contains any additional allegations requiring a response, POWERbahn denies them.

65.     Denied.

66.     Denied.

67.     Denied.

68.     Denied.

69.     Denied.

70.     Denied.

71.     Denied.

72.     Denied.

73.     POWERbahn is without information sufficient to admit or deny the allegations of Paragraph 73, and therefore denies them.

74.     Denied.

75.     POWERbahn denies that it has received any Net Litigation Proceeds that are subject to the ELA, including Section 5(b)(VII). To the extent Paragraph 75 contains any additional allegations requiring a response, POWERbahn denies them.

76.     Denied.

77.     Denied.

78.     Denied.

79.     Denied.

80.     Denied.

### CORE'S PRAYER FOR RELIEF

POWERbahn denies that Core is entitled to any relief or recovery and therefore denies each allegation in its Prayer for Relief, and POWERbahn denies that Core is entitled to any request contained in its Prayer for Relief.

10

## AFFIRMATIVE DEFENSES

Subject to the responses above, POWERbahn alleges and asserts the following defenses in response to the allegations, undertaking the burden of proof only as to those defenses deemed affirmative defenses by law, regardless of how such defenses are denominated herein. In addition to the defenses described below, subject to the responses above, POWERbahn specifically reserves all rights to allege additional defenses that become known through the course of discovery:

### DEFENSE 1: FAILURE TO STATE A CLAIM

1.      Core has failed to state a claim against POWERbahn upon which relief may be granted.

### DEFENSE 2: BREACH OF CONTRACT BY PLAINTIFF

2.      Core failed to comply with the terms of the contract, including failing to (1) make commercially reasonable efforts to promote, market, and sell Licensed Products; (2) exclusively purchase from POWERbahn an annual minimum of certain Technology Components; (3) pay Royalties to POWERbahn, including Annual Minimum Royalties; (4) negotiate in good faith and enter into a definitive agreement to sell POWERbahn indoor cycle frames and related hardware at its most competitive OEM cost to allow POWERbahn to sell a non-commercial product; and (5) negotiate in good faith and execute a Commercial Dealer-Distributor Agreement as set forth in the ELA, which denied POWERbahn the benefits it had under the contract. POWERbahn alleges that the purported claim for relief asserted in the First Amended Complaint is barred by reason of the prior material breaches of the ELA by Core.

### DEFENSE 3: NO BREACH OF CONTRACT

3.      Core is not entitled to the damages demanded in the FAC because POWERbahn did what it was required to do under the ELA except anything it was prevented or excused from doing. Any failure by POWERbahn to perform the obligation described in the First Amended Complaint resulted from or was excused by Core's failure to perform its obligations as required by the ELA, including without limitation failing to (1) make commercially reasonable efforts to promote, market, and sell Licensed Products; (2) exclusively purchase

11

from POWERbahn an annual minimum of certain Technology Components; (3) pay royalties to POWERbahn, including annual minimums; (4) negotiate in good faith and enter into a definitive agreement to sell POWERbahn indoor cycle frames and related hardware at its most competitive OEM cost to allow POWERbahn to sell a non-commercial product; and (5) negotiate in good faith and execute a Commercial Dealer-Distributor Agreement as set forth in the ELA, which denied POWERbahn the benefits it had under the contract. The performance by POWERbahn of the obligations referenced in the First Amended Complaint was contingent upon Core's performance of these obligations under the ELA that it failed to perform.

### DEFENSE 4: ALL OBLIGATIONS PERFORMED

4. POWERbahn fully and/or substantially fully performed any and all obligations it may have had to Core.

### DEFENSE 5: OFFSET

5. POWERbahn alleges that by virtue of the acts of Core and/or the persons and/or the entities acting on Core's behalf, POWERbahn been damaged in an amount equal to or greater than the amount of damages, if any, to which Core might be entitled, including the damages described in POWERbahn's Counterclaims based on Core's breaches described above, the allegations of which are incorporated herein by reference. As a result, POWERbahn is entitled to an offset against any sums found owing to Core from POWERbahn.

### DEFENSE 6: FRAUD, DECEIT, OR MISREPRESENTATION

6. Core's claims are in whole or in part barred by its fraud, deceit, or misrepresentation(s).

### DEFENSE 7: WAIVER

7. Core gave up its right(s) under the contract(s) and, therefore, Core cannot collect the damages demanded.

### DEFENSE 8: FAILURE TO MITIGATE DAMAGES

8. Core is not entitled to damages, interest and/or attorney's fees because it failed to mitigate its alleged damages, which POWERbahn denies even exist.

12

## DEFENSE 9: NO DAMAGES TO PLAINTIFF

9.     Core did not incur any damages, and insofar as it did, it did not incur damages in the amount or type alleged by Core and any such claimed damages would be too speculative to prove or recover.

## DEFENSE 10: OTHER EQUITABLE DEFENSES

10.     Upon information and belief, Core is barred, in whole or in part, from asserting its allegation(s) based on the equitable doctrines of estoppel, unjust enrichment, acquiescence, unclean hands, and/or any other equitable remedy.

## DEFENSE 11: STATUTE OF LIMITATIONS

11.     Core's claims are barred, in whole or in part, by the applicable statute of limitations.

## DEFENSE 12: RESERVATION

12.     POWERbahn reserves all other defenses unknown at the time of filing this Answer.

## COUNTERCLAIMS

FOR ITS CLAIMS against Counterdefendant Core Health & Fitness, LLC ("Core"), Counterclaimant POWERbahn, LLC ("POWERbahn") alleges as follows:

## PARTIES, JURISDICTION, & VENUE

1.     POWERbahn is a limited liability company. POWERbahn's sole member is Scott Radow, who is a citizen of Nevada. POWERbahn is therefore a citizen of Nevada.

2.     Core is a limited liability company. Discovery provided by Core and declarations provided by knowledgeable persons regarding the citizenship of Core's members demonstrate that Core is not a citizen of Nevada.

3.     This action arises from an Exclusive License Agreement ("ELA") dated June 29, 2018, between POWERbahn and Core. Attached hereto as Exhibit A as is a true and correct copy of the ELA.

13

4.     Jurisdiction is proper in this Court because the ELA states in Paragraph 12(o) that "the parties hereto consent to the exclusive jurisdiction of any appropriate court in the State of California to resolve" any matter or dispute arising out of the ELA.

5.     Venue is proper in this Court because Core has asserted that it has a place of business in Orange County, California. Venue is also proper in this Court at least because Core consented to venue when it filed the underlying Complaint and First Amended Complaint in California Superior Court for the County of Orange, which case was properly removed to this Court.

### THE EXCLUSIVE LICENSE AGREEMENT

6.     Prior to the parties' execution of the ELA on June 29, 2018, Core led POWERbahn to believe that Core was eager to bring products incorporating POWERbahn's technology to market. For example, on April 10, 2017, Core's then President & COO wrote to POWERbahn's manager, Scott Radow, the following: "Check out this product that was at FIBO. . . I know we can make a better product with your technology and we have distribution so we can own the market." PBN001205.

7.     Similarly, a year later, as the parties' discussions were advancing towards the execution of the ELA, Mr. Grosz wrote on April 16, 2018, "I rode the new Wattbike and the bike I road last year. The technology is really coming along and it is time to get Powerbahn to market." PBN001488.

8.     Core and POWERbahn entered into the ELA on June 29, 2018. Ex. A, 1. Under that agreement, POWERbahn granted Core an exclusive license to certain intellectual property, including patents, for exploitation in connection with certain commercial exercise equipment (e.g., equipment for use in gyms, hotels and the like). *Id.* at 1-3, 8.

9.     The ELA placed several material obligations on Core. Those obligations included, for example, that Core (1) make commercially reasonable efforts to promote, market, and sell licensed products (*id.* at § 4(e)); (2) exclusively purchase from POWERbahn certain Technology Components, including minimum annual purchase requirements of 2,000 per year (*id.* at § 3(a), (e)); (3) pay royalties to POWERbahn, including certain minimum annual royalty

14

POWERBAHN'S ANSWER, AFFIRMATIVE DEFENSES, & COUNTERCLAIMS

payments (*id.* at § 5(a), (b)); (4) sell POWERbahn indoor cycle frames and related hardware components at its most competitive OEM cost to allow POWERbahn to sell a non-commercial product (*id.* at § 3(g)); and (5) execute a Commercial Dealer-Distributor Agreement allowing POWERbahn to operate as a dealer, distributor, and/or franchisor for Core's products (*id.* at § 3(g)).

10.    At the time Core and POWERbahn executed the ELA, POWERbahn was deep in litigation against Core's competitor, Foundation Fitness LLC, and another Wahoo Fitness, LLC. The ELA required Core, "[w]ithin two (2) years from the date first listed above in this Agreement and only upon written request from POWERbahn" to "pay up to $300,000 within thirty (30) days from such notification," which the ELA referred to as a "Recoupable Litigation Advance." *Id.* at § 5(b)(VII). Under certain conditions, the ELA provided that "any remaining unpaid portion of the Litigation Advance shall be deemed a pre-payment of future Royalties and Minimum Annual Royalties." *Id.*

11.    POWERbahn understands from its discussions with Core that a key reason Core was interested in providing the Recoupable Litigation Advance is because Foundation was a key competitor to Core.

12.    While Core provided the Recoupable Litigation Advance of $300,000 (not $320,000, as Core alleges), that amount alone was insufficient to fund a patent litigation in federal court, which is apparent from published surveys regarding the cost of patent litigation.

13.    POWERbahn would not have entered into a standalone agreement with Core for litigation funding on the terms set forth in § 5(b)(VII). Such terms would have been unreasonable when compared with typical funding arrangements for patent litigation, which was and is well-known in the litigation funding industry.

14.    POWERbahn was counting on the revenue it expected and had bargained for under the ELA to continue its lawsuit against Foundation Fitness LLC (a competitor of Core) and Wahoo Fitness, LLC on the patents exclusively licensed to Core.

15.    Core, however, did not live up to its obligations under the ELA. This included, for example, failing to (1) make commercially reasonable efforts to promote, market, and sell

15

Licensed Products; (2) exclusively purchase from POWERbahn an annual minimum of certain Technology Components; (3) pay royalties to POWERbahn, including annual minimums; (4) negotiate in good faith and enter into a definitive agreement to sell POWERbahn indoor cycle frames and related hardware at its most competitive OEM cost to allow POWERbahn to sell a non-commercial product; and (5) negotiate in good faith and execute a Commercial Dealer-Distributor Agreement as set forth in the ELA. These failures caused a great deal of harm to POWERbahn, which was deep in litigation against Foundation and Wahoo, asserting infringement of patents exclusively licensed to Core for the commercial market.

16. For example, even though the ELA was executed on June 29, 2018, after extensive discussion between the parties that should have permitted Core to hit the ground running and swiftly bring a Licensed Product to market, by March 27, 2020, Core had made almost no discernible progress towards bringing a Licensed Product to market. On that date, Core employee Kevin Corbalis sent POWERbahn's manager, Scott Radow, an email attaching "an outline of the Smart Bike development," referring to Core's plan for developing a Licensed Product. That outline described a 64-week development process to begin mass production of a Licensed Product. However, the outline did not even identify a specific start date for the project.

17. Thus, Core's own documentation indicated that it had not officially kicked off its development process, and that it expected development to take a minimum of 64 weeks from whenever that start date might be. That indicated that even if Core had immediately initiated the development plan on March 27, 2020, by the time a product was actually introduced to market (which would occur sometime after mass production began), three years would have passed since the ELA was signed.

18. POWERbahn gave Core multiple opportunities to cure its breach, but it failed to do so.

19. Core's failure to develop a Licensed Product (or cure such failure) violated its obligation under the ELA to make commercially reasonable efforts to promote, market, and sell Licensed Products. Core's violation of this aspect of the ELA caused a great deal of damage to

16

POWERbahn because POWERbahn was to receive a 5% royalty on Net Sales of Licensed Products. The magnitude of the damage to POWERbahn is demonstrated, for example, by the ELA's exemplary calculation of royalties under the ELA: "By way of example only, if the first calendar quarter after the earlier of the Launch Date or January 1, 2020, the Average Sale price is $2,000, the Royalty is five percent (5%), and the number of units applicable to the first quarter after launch is 1,250, the Minimum Annual Royalty Payment shall be $2,000 x 5% x 1,250, which equals $125,000." Moreover, even the calculation of ***Minimum Royalties*** was based on the following number of annual units: (1) 1,250 units in the first year after commencement; (2) 3,000 units in the second year; (3) 5,000 in the third year; (4) 7,500 in the fourth year; and (5) 10,000 in the fifth year. At 10,000 units per year and an Average Sale Price of $2,000, POWERbahn's Minimum Annual Royalty would have been $1,000,000.

20.      Moreover, had Core complied with its obligations under the ELA, even if Core had terminated the contract as of the end of June 2022, POWERbahn's royalties (including the selloff period permitted in § 10(e)) would have been at least approximately $2,000,000 (and potentially more) based on sales that would have occurred during that period but for Core's breach with an Average Sales Price in the first year of at least $2,000.00 per Licensed Product, with annual increases (e.g., to adjust for inflation) thereafter.

21.      In April 2020, Core asserted that Covid-19 impacted its launch of a Licensed Product. However, by that point, twenty-two (22) months, or nearly two years, had already passed since the Effective Date of the ELA, June 29, 2018. Moreover, Core received at least $4,532,000 in loans through the Paycheck Protection Program, of which $3,554,067 was forgiven. Therefore, the U.S. taxpayers provided funding to Core to assist it with any disruption caused by Covid-19.

22.      Core also breached its obligation to purchase at least 2,000 Technology Components from POWERbahn annually at a price roughly comparable to that charged to other POWERbahn customers that purchase similar products. In keeping with this provision, POWERbahn sent Core an invoice for $600,000 for 2,000 Technology Components in 2020.

17

POWERBAHN'S ANSWER, AFFIRMATIVE DEFENSES, & COUNTERCLAIMS

Core refused to pay it, notwithstanding the requirements of the ELA mandating that it purchase at least 2,000 Technology Components per year.

23.    Core's failure to purchase the required minimum number of Technology Components from POWERbahn caused a great deal of damage to POWERbahn, including the amount of profit POWERbahn would have obtained from selling Core such Technology Components at a price roughly comparable to that charged to other POWERbahn customers. Had Core complied with its obligations under the ELA to make commercially reasonable efforts to promote, market, and sell Licensed Products, POWERbahn would have earned even more as the exclusive provider of Technology Components to Core under the ELA. For example, even if Core had terminated the contract as of the end of June 2022, POWERbahn expects that its profit on the sale of Technology Components would have been at least approximately $4,500,000 (and potentially more) (including Technology Components purchased for Licensed Products built for sale during the sell-off period).

24.    As discussed above, Core's failure to introduce a Licensed Product to market in keeping with its obligations under the ELA damaged POWERbahn due to the loss of Royalties that would have been due to POWERbahn based on the sale of Licensed Product. Additionally, Core failed to live up to its obligation to pay POWERbahn Minimum Annual Royalties Payments. The ELA indicated that "beginning January 1, 2019 through the earlier of the Launch Date or January 1, 2020 and provided that the Launch Date does not occur prior to March 31, 2019, Core shall pay POWERbahn $50,000 of Minimum Annual Royalties in four equal quarterly installments of. $12,500 thirty (30) days after the end of each quarter." ELA, § 5(b).

25.    The ELA separately indicated that, thereafter, the Minimum Annual Royalty Payments shall be calculated and paid 30 days after the end of the calendar quarter or partial calendar quarter that follows the earlier of (i) the Launch Date or (ii) January 1, 2020. *Id.* The ELA indicated that in the "First year after commencement of calculation, the Minimum Number of Units for purposes of the calculation was to be 1,250 units (§ 5(b)(II) of ELA)." *Id.*

In the second year, it was to be 3,000 units. In the third year, it was to be 5,000 units. In the fourth year, it was to be 7,500 units. In the fifth year, it was to be 10,000 units. *Id.*

26.    Core did not comply with its obligation to pay Minimum Annual Royalty Payments in 2020. For the first quarter of 2020, it paid POWERbahn $12,500. However, this was the quarterly amount for 2019, not 2020. The Minimum Annual Royalty Payment for 2020 was to be calculated based on a Minimum Number of Units of 1,250. Based on the exemplary Average Sale Price of $2,000 set forth in § 5(b), this would have resulted in a Minimum Annual Royalty Payment of $125,000 (or $31,250 per quarter). Moreover, Core did not make any Minimum Annual Royalty Payments after the second quarter of 2020.

27.    While Core attempted to justify its underpayment of the Minimum Annual Royalty Payment for 2020 based on the fact that a Launch date had not occurred, that there were no Licensed Product sold, and that since the Launch Date had not occurred, the Minimum Number of Units listed in the ELA were not applicable and therefore there was no actual Average Sale Price, this position of Core only demonstrates that the ELA itself recognizes that, had Core made commercially reasonable efforts to promote, market, and sell Licensed Products, it would have launched a Licensed Product by that point, and that Core was effectively renegotiating its obligations under the ELA.

28.    POWERbahn was damaged by Core's failure to pay the Minimum Annual Royalty Payments, including without limitation the difference between the amount Core actually paid versus the amount due under the ELA.

29.    Core also breached the ELA by failing to act in good faith to do all things necessary to negotiate and execute a Commercial Dealer-Distributor Agreement allowing POWERbahn to operate as a dealer, distributor, and/or franchisor for Core's products. This was despite POWERbahn repeatedly attempting to engage Core in discussions toward execution of a Commercial Dealer-Distributor Agreement.

30.    POWERbahn was damaged by Core's failure to negotiate and execute a Commercial Dealer-Distributor Agreement. Had Core done so, POWERbahn would have profited from selling Core products as a dealer/distributor in an amount to be proven at trial.

31. Core also breached the ELA by failing to negotiate in good faith an agreement to permit POWERbahn to purchase Indoor Cycle frames and related hardware components, e.g., pedals, saddles, chains, etc., developed by Core for commercial and non-commercial products at Core's most competitive OEM cost quote. Again, this was despite POWERbahn's efforts to engage Core on this aspect of the ELA.

32. POWERbahn was directly and proximately damaged by Core's breach of its express obligation under Section 3(g) of the ELA to negotiate and execute an agreement to permit POWERbahn to purchase Indoor Cycle frames and related hardware components. Core acted in violation of good faith and fair dealing to ensure that POWERbahn could not build and ship its own products in the non-commercial market. As a direct result of Core's breach, POWERbahn was unable to secure the reliable and cost-effective supply of frames, which POWERbahn had designed toward in Solidworks, and POWERbahn was prevented from having the opportunity to grow its business. Had Core negotiated and executed an agreement as required by Section 3(g) of the ELA, POWERbahn would have been able to purchase the frame and components without incurring expensive tooling costs typically associated with other suppliers. This significant difference in upfront investment after POWERbahn had designed its noncommercial Indoor Cycle to Core's existing frame that had been produced by Core for several years, coupled with Core's breach, prevented POWERbahn from bringing to market Indoor Cycles for the non-commercial market, which were to incorporate these related hardware components (especially when coupled with the damage to POWERbahn caused by Core's other breaches). But for Core's breach of Section 3(g) of the ELA, POWERbahn could have introduced products into the non-commercial market as contemplated by the ELA during a period that yielded the highest grossing sales of non-commercial exercise equipment and indoor cycles in all of recorded history, as noted by the success of several companies that sold indoor cycles during that time period, including Peloton, Wahoo, and Foundation Fitness.

33. As noted in Core's First Amended Complaint, Foundation Fitness was in litigation with POWERbahn over patent infringement, and Foundation is currently in the process of bankruptcy in the State of Colorado, during which process Foundation's financial

20

statements were disclosed. Those statements showed gross revenue of their product that infringed POWERbahn's patents of $24,437,295 from the years 2020 to 2023 in the noncommercial market. POWERbahn was damaged by Core's breach of its obligation to negotiate and execute an agreement to permit POWERbahn to purchase Indoor Cycle frames and related hardware components to allow POWERbahn to sell Indoor Cycles in the noncommercial market in an amount to be proven at trial (in addition to the damages POWERbahn suffered due to Core's failure to make commercially reasonable efforts to promote, market, and sell Licensed Products and Core's failure to purchase Technology Components as required under the ELA). The success that Foundation had in selling an infringing product similar to what POWERbahn designed on Core's existing frame and would have sold but for Core's breach demonstrates the magnitude of harm to POWERbahn, which will be proven at trial (in addition to the POWERbahn's damages relating to Royalties and lost profits on Technology Components).

34.    With no Licensed Product having been launched, prior to termination of the ELA, POWERbahn sought additional litigation funding from Core. In 2020, Core proposed an agreement under which Core would have provided POWERbahn additional funding in exchange for an additional "multiple entitlement" above and beyond the percentage set forth in the ELA. Core's proposal also involved Core having the right to receive back its $300,000 Recoupable Litigation Advance on top of any share in recovery before POWERbahn would receive funds (which was not part of the ELA). This would have created a perverse result that placed POWERbahn behind Core, in second place, for priority to capital in POWERbahn's lawsuit based on its own inventions and its own intellectual property. Core's proposal effectively tried to transform the ELA into an onerous litigation funding contract, with Core receiving a significant multiple in a waterfall ahead of POWERbahn.

35.    Barnes & Thornburg, counsel for Core in this case, had been retained by Core to evaluate the additional litigation funding, which, on information and belief,  included drafting the agreement that Core proposed to POWERbahn that would have provided POWERbahn additional funding in exchange for the additional "multiple entitlement."

21

36.    POWERbahn informed Core in 2020 that it was in material breach of the ELA and asked it to cure such breach, but Core refused. Instead of curing such breach, Core attempted to renegotiate the ELA by refusing to buy Technology Components from POWERbahn and offering POWERbahn instead a one-time fee of $150,000 that was, according to Core, to be recoupable from POWERbahn's own future royalties, which was a complete departure from the ELA. Pursuant to §10(b) of the ELA, POWERbahn provided Core with written notice of its breaches and gave Core multiple opportunities to cure these breaches within the 30-day cure period specified in the ELA.

37.    POWERbahn therefore terminated the agreement in 2020 (after the cure period specified in the ELA) due to Core's failure to material breach of the agreement, which had caused a great deal of damage and hardship to POWERbahn.

38.    The parties subsequently conducted a mediation in 2020 in an effort to resolve their disputes, but that effort was unsuccessful.

39.    Core then retained Barnes and Thornburg in this case. Core's original complaint in this case wrongly implied that it made written requests to POWERbahn for full disclosure regarding its receipt of Net Litigation Proceeds after POWERbahn settled its litigation with Wahoo. That is false. When asked about this in a meet and confer meeting between the parties, shortly after the lawsuit had been filed, Core's lead counsel, Ali Mojdehi, who represented Core in mediation, said that Core had meant the written requests were made during the mediation. However, mediation occurred in 2020 when expert discovery and dispositive motions were in play in the litigation with Wahoo, which Core knew well, so it was not credible that Core would have made written requests to POWERbahn regarding Net Litigation Proceeds. In Core's First Amended Complaint, it tacitly concedes the falsity of its original assertion by revising its allegation to assert that it has made such requests during the course of this litigation (that is, after the filing of its original complaint in this action).

40.    POWERbahn disagrees with Core's assertion that the litigation-funding provisions were divisible from the remainder of the ELA, including Core's obligations discussed above. This is evidenced, for one example, by the fact that, under certain

22

circumstances in the ELA, Core would be able to deem the Recoupable Litigation Advance a pre-payment of future Royalties and Minimum Annual Royalties. Thus, especially in view of Core's material breaches of multiple obligations under the ELA, POWERbahn denies that Core is entitled to any share in the Net Litigation Proceeds.

41.    POWERbahn complied with all its material obligations under the ELA. In particular, POWERbahn complied with the exclusive nature of the ELA including its warranty that it would not enter into any other agreement, which would conflict with the terms of the ELA. POWERbahn also complied with its warranty that, throughout the term of the ELA, it would have ownership and/or control of the Licensed Intellectual Property and Software, free and clear of all liens and encumbrances, and the right to license the Licensed Intellectual Property to Core in accordance with the terms and provisions of the ELA subject to (a) future transfers or licenses granted by POWERbahn of the Licensed Intellectual Property for use in fields other than Exercise Equipment; (b) POWERbahn's rights to manufacture and distribute itself or license to third parties rights to manufacture and distribute Non-commercial Exercise Equipment the Licensed Intellectual Property.

42.    Core's First Amended Complaint references Section 8(d)'s provision that "The parties shall reasonably cooperate with one another in any intellectual property litigation regarding the Licensed Product or Licensed Intellectual Property." This provision is in the context of Section 8, which deals with Enforcement and Defensive Measures involving exclusively Licensed Product or Licensed Intellectual Property. Section 8(d) goes on to indicate that neither party shall take certain actions regarding any of the Licensed Product or Licensed Intellectual Property only "if such other party shall either (i) hold title to such Intellectual Property Rights, or (ii) shall be responsible hereunder for payment of any portion of such settlement or the costs or expenses related thereto; provided that such consent shall not be unreasonably withheld or delayed." POWERbahn never engaged in any litigation that met those criteria, and therefore no instance requiring cooperation in applicable litigation arose.

43.    Moreover, even if POWERbahn's litigation against Wahoo and Foundation was subject to the first sentence of Section 8(d), POWERbahn complied with that provision. When

Core employee Ashley Thorne asked for a litigation update in January 2019, POWERbahn promptly replied. *See, e.g.,* PBN002357. Moreover, as Core acknowledged in its opposition to POWERbahn's motion to disqualify Barnes & Thornburg, POWERbahn provided access to POWERbahn's expert reports on infringement, validity, and damages. Moreover, POWERbahn's counsel discussed their views on the litigation with Core's counsel. POWERbahn also continued to provide updates on the litigation even in the lead up to the termination of the ELA. *See, e.g.,* PBN001697; PBN002015.

44.    Core has also attempted to blame its lack of progress in developing and introducing a Licensed Product on POWERbahn. Such attempt is false. POWERbahn provided Core with a great deal of documented assistance to try to bolster Core's development of a Licensed Product, going far beyond any actual contractual obligation to do so.

## FIRST CLAIM FOR RELIEF (BREACH OF CONTRACT)

45.    POWERbahn realleges and incorporates by reference in this claim for relief the preceding allegations of this Counterclaim as though fully set forth herein.

46.    POWERbahn and Core entered into the ELA.

47.    POWERbahn, by granting Core an exclusive license for the commercial market, was prevented from monetizing the exclusively licensed intellectual property, either by selling products in the commercial market itself or licensing others to do so. Core nonetheless benefited from having the exclusive license, even without launching a Licensed Product, because the exclusive nature of the license meant that its competitors were not able to utilize POWERbahn's intellectual property (meaning Core did not have to compete with such products).

48.    Core breached its obligations under the ELA by failing to (1) make commercially reasonable efforts to promote, market, and sell Licensed Products; (2) exclusively purchase from POWERbahn an annual minimum of certain Technology Components; (3) pay royalties to POWERbahn, including annual minimums; (4) negotiate in good faith and enter into a definitive agreement to sell POWERbahn indoor cycle frames and related hardware at its most competitive OEM cost to allow POWERbahn to sell a non-

24

commercial product; and (5) negotiate in good faith and execute a Commercial Dealer-Distributor Agreement as set forth in the ELA.

49.    All conditions that needed to occur before Core was required to perform the obligations described in the preceding paragraph were fulfilled. POWERbahn complied with all of its obligations under the ELA or was excused from having to do so, including all obligations POWERbahn needed to perform before Core was required to perform the obligations described in the preceding paragraph.

50.    Core's breach of the ELA is a substantial factor in causing POWERbahn's harm, including by failing to (1) make commercially reasonable efforts to promote, market, and sell Licensed Products; (2) exclusively purchase from POWERbahn an annual minimum of certain Technology Components; (3) pay royalties to POWERbahn, including annual minimums; (4) negotiate in good faith and enter into a definitive agreement to sell POWERbahn indoor cycle frames and related hardware at its most competitive OEM cost to allow POWERbahn to sell a non-commercial product; and (5) negotiate in good faith and execute a Commercial Dealer-Distributor Agreement as set forth in the ELA.

51.    As a direct and proximate result of Core's breaches, POWERbahn has been damaged in an amount according to proof at trial, including POWERbahn's reasonable costs and attorneys' fees.

**SECOND CLAIM FOR RELIEF**

**(BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING)**

52.    POWERbahn realleges and incorporates by reference in this claim for relief the preceding allegations of these Counterclaims as though fully set forth herein.

53.    Core has asserted that it complied with all of its contractual obligations and, thus, did not breach its obligations under the ELA by failing to (1) make commercially reasonable efforts to promote, market, and sell Licensed Products; (2) exclusively purchase from POWERbahn an annual minimum of certain Technology Components; (3) pay Royalties to POWERbahn, including Annual Minimum Royalties; (4) negotiate in good faith and enter into a definitive agreement to sell POWERbahn indoor cycle frames and related hardware at its

25

most competitive OEM cost to allow POWERbahn to sell a non-commercial product; and (5) negotiate in good faith and execute a Commercial Dealer-Distributor Agreement as set forth in the ELA.

54.    POWERbahn disagrees with Core's position that Core complied with all of its obligations under the ELA, including those described above. However, to the extent it were determined that Core did not actually breach the ELA with respect to the foregoing provisions, then POWERbahn asserts that Core breached the implied covenant of good faith and fair dealing with respect to such obligations, including by failing to introduce a Licensed Product to market, failing to purchase Technology Components from POWERbahn, failing to cooperate with POWERbahn on an agreement to sell POWERbahn indoor cycle frames and related hardware, and failing to enter into a Commercial Dealer-Distributor Agreement. POWERbahn's damages for such breaches would be in an amount to be proved at trial, including the damages relating to Core's failure to launch a Licensed Product and buy Technology Components in at least the amounts discussed herein (including POWERbahn's reasonable costs and attorneys' fees).

55.    Moreover, on information and belief, Core's failure to launch a Licensed Product was not due to honest mistake, bad judgment or negligence, but was rather the result of a conscious and deliberate pattern of conduct—it consciously and deliberately chose to take an exclusive license for the commercial space and consciously and deliberately chose to sit on that license without launching a Licensed Product. This unfairly frustrated the agreed common purposes and disappointed the reasonable expectations of POWERbahn, thereby depriving it of the benefits of the agreement, including the receipt of Royalties and profits from the sale of Technology Components. Moreover, POWERbahn, by granting Core an exclusive license for the commercial market, was prevented from monetizing the exclusively licensed intellectual property, either by selling products in the commercial market itself or licensing others to do so. Core nonetheless benefited from having the exclusive license, even without launching a Licensed Product, because the exclusive nature of the license meant that its competitors were

26

not able to utilize POWERbahn's intellectual property (meaning Core did not have to compete with such products).

56.    Additionally, on information and belief, Core's failure to enter into an agreement to sell POWERbahn indoor cycle frames and related hardware, and failing to enter into a Commercial Dealer-Distributor Agreement, was not due to honest mistake, bad judgment or negligence, but was rather the result of a conscious and deliberate act—it consciously and deliberately chose not to engage with POWERbahn's efforts to execute these agreements. This unfairly frustrated the agreed common purposes and disappointed the reasonable expectations of POWERbahn, thereby depriving it of the benefits of the agreement.

57.    As discussed herein, all conditions that needed to occur before Core was required to perform the obligations described in the preceding paragraph were fulfilled. POWERbahn complied with all of its obligations under the ELA or was excused from having to do so, including all obligations POWERbahn needed to perform before Core was required to perform the obligations described in the preceding paragraph.

### PRAYER FOR RELIEF

WHEREFORE, POWERbahn prays for judgment as follows:

   a.  That the Court dismiss Core's First Amended Complaint with prejudice;

   b.  That the Court grant judgment in favor of POWERbahn on all its Defenses;

   c.  That the Court grant judgment denying Core any relief whatsoever;

   d.  That the Court grant judgment in POWERbahn's favor and against Core on POWERbahn's Counterclaims;

   e.  That the Court grant POWERbahn damages as described in the Counterclaims above, in favor of POWERbahn and against Core in an amount to be determined at trial;

   f.  That POWERbahn be awarded its costs and reasonable attorneys' fees, including amounts incurred for defending against Core's claims and in seeking relief on POWERbahn's Counterclaims; and

27

g. For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b) and L.R. (C.D. Cal.) 38-1, Defenant and Counterclaimant POWERbahn hereby demands a jury trial on all the issues so triable in this action.

DATED: March 3, 2025

Respectfully submitted,

/s/ *Stephen M. Lobbin*
Stephen M. Lobbin
Email: sml@smlavvocati.com
**SML Avvocati P.C.**
888 Prospect Street, Suite 200
San Diego, CAL 92037
Tel: 949.636.1391

Cortney S. Alexander
(application for admission pro hac vice pending)
Email: cortneyalexander@kentrisley.com
Tel: 404.855.3867
**Kent & Risley LLC**
5755 N Point Pkwy, Ste 57
Alpharetta, GA 30022

28

## PROOF OF SERVICE

I am a citizen of the United States and a resident of the State of Louisiana, having a place of business at Kent & Risley LLC, 5755 N Point Pkwy, Ste 57, Alpharetta, GA. I am over the age of eighteen years, and not a party to this action. My email address is cortneyalexander@kentrisley.com.

On the date set forth below, counsel for POWERbahn served the documents set forth below on counsel for Plaintiff by electronically transmitting them via e-mail.

**DOCUMENTS SERVED:**

• POWERbahn's Answer, Affirmative Defenses, and Counterclaims, including Exhibit A thereto.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on March 3, 2025, at Maurice, LA.

By:    */s/ Cortney S. Alexander*

Attorneys for Defendant
POWERbahn, LLC

POWERBAHN'S ANSWER, AFFIRMATIVE DEFENSES, & COUNTERCLAIMS